# United States Court of Appeals for the Sixth Circuit

**Case No. 24-5783**

BOONE COUNTY REPUBLICAN : 
PARTY EXECUTIVE 
COMMITTEE, *et. al.* :

     *Plaintiffs/Appellants* :

v.

  :

**DAVID WALLACE**, *et. al.*

  :

     *Defendants/Appellees*

  :

## PLAINTIFFS/APPELLANTS' EMERGENCY MOTION FOR INJUNCTION PENDING APPEAL WITH MATERIALS IN SUPPORT

Plaintiffs, Boone County Republican Party Executive Committee ("BCRP"), the Hardin County Republican Party Executive Committee ("HCRP"), and the Jessamine County Republican Party Executive Committee ("JCRP"), through Counsel, move this Court for an Injunction Pending Appeal pursuant to FRAP 8(a)(1)(C), to prevent the Defendants from enforcing Advisory Opinion 2024-02, or KRS Chapter 121, against them for expending funds they have raised to engage in express advocacy in favor of constitutional amendments on the ballot in Kentucky this November. Plaintiffs moved for this relief below [Doc. 24, PageID#227-231], but it was denied [Doc. 26, PageID#285-294], thus satisfying Plaintiffs' obligations under FRAP 8(a)(2)(A)(ii).

1

This relief is <u>emergency relief</u>, in that presently Defendants are chilling this election-related speech by denying Plaintiffs the ability to engage in constitutionally protected advocacy in the lead up to the November election. Canvassing activities for the beginning of September had been planned in support of these amendments, but presently are being chilled due to Defendants' unconstitutional actions.

## I.    <u>Factual Background</u>

### <u>Introduction</u>

School choice has become a central issue in American society and politics, and that is true in Kentucky.  (Pl.'s Ver. Compl., Doc. 1, at PageID#1-15 at ¶1). Certain public schools have faced increasing criticism and challenges over issues that include basic transportation problems in getting children to school,[1] testing results from larger school districts that reveal significant deficiencies in the areas of basic reading and math,[2] and deficiencies in career readiness.  *Id.*  In recent

---

[1] https://www.wdrb.com/news/education/a-year-in-review-of-jcps-transportation-system-busing-issues-in-louisville/article_cf5ab9ee-ea39-11ee-809d-cb20aaa08530.html (last accessed 7/17/2024).

[2] https://nces.ed.gov/nationsreportcard/subject/publications/dst2022/pdf/2023010xj8.pdf (last accessed 7/17/2024); https://www.wdrb.com/in-depth/most-jcps-students-struggle-with-reading-and-math-at-grade-level-diagnostic-testing-shows/article_8eb03f74-d87d-11ec-8b89-430271ed9494.html (last accessed 7/17/2024); https://www.usnews.com/education/k12/kentucky/districts/fayette-county-107072#:~:text=In%20Fayette%20County%20Public%20Schools%2C%2041%25%20of%20elementary%20students%20tested,above%20that%20level%20for%20math (last accessed 7/17/2024).

years, the Kentucky General Assembly has addressed these deficiencies by providing record funding to local schools.[3]  *Id.*  Yet that has not alleviated the problems the increased funds were used to remedy.  *Id.*  Frustrated with the lack of progress, the Kentucky General Assembly took measures in 2021 to enact an educational opportunity account law providing tax credits to permit parents, rather than the state, to make the choice on where and how students are educated.[4]  *Id.*  In December, 2022, the Kentucky Supreme Court ruled the provision unconstitutional.  *Commonwealth ex rel. Cameron v. Johnson*, 658 S.W.3d 25 (Ky. 2022).  *Id.*

In 2024, the Kentucky General Assembly, with a vote that fell largely upon party lines, placed a constitutional amendment on the November, 2024 ballot, to permit what *Johnson* forbade, to permit the General Assembly to enact school choice legislation.[5]  *Id.* at ¶2.  If passed, it will amend the Kentucky Constitution to provide for the following:

---

[3] https://www.prichardcommittee.org/posts/historic-increase-in-education-funding-helps-drive-a-big-bold-future-for-kentucky#:~:text=%E2%80%8D-,Historic%20increase%20in%20education%20funding%20helps%20drive,Big%20Bold%20Future%27%20for%20Kentucky&text=LEXINGTON%2C%20Ky%20%E2%80%94%20As%20the%202024,million%20annually%20in%20education%20funding (last accessed 7/17/2024); https://www.kentuckyteacher.org/leadership/guest-columns/2022/05/2022-kentucky-general-assembly-includes-key-increases-for-education-funding-in-biennial-budget/ (last accessed 7/17/2024).

[4] 21 RS HB 563, https://apps.legislature.ky.gov/record/21rs/hb563.html (last accessed 7/17/2024);

[5] 24 RS HB 2, available at https://apps.legislature.ky.gov/record/24rs/HB2.html (last accessed 7/17/2024).

*The General Assembly may provide financial support for the education of students outside the system of common schools. The General Assembly may exercise this authority by law, Sections 59, 60, 171, 183, 184, 186, and 189 of this Constitution notwithstanding.* *Id.*

This is the second amendment passed for consideration on the ballot in the fall of 2024, and is referred to by us as the "School Choice Amendment." *Id.* These legislative efforts are in line with the Republican Party Platform, including the 2024 Platform, which contains an entire chapter on cultivating great K-12 schools, and that specifically provides for universal school choice in every state.[6] *Id.* at ¶3.

## The Parties

Plaintiffs, the Boone County Republican Party Executive Committee ("BCRP"), the Hardin County Republican Party Executive Committee ("HCRP"), and the Jessamine County Republican Party Executive Committee ("JCRP"), are the county party executive committees for the Republican Party; they are also "executive committees" pursuant to Kentucky campaign finance law, including KRS 121.015. *Id.* at ¶4.

Defendants, all sued in their official capacities, are mostly members of the Kentucky Registry of Election Finance ("KREF"), with Defendant John Steffen

---

[6] 2024 Republican Party Platform, at Chapter 7, pages 17-18, at ¶2. Available at: https://prod-static.gop.com/media/RNC2024-Platform.pdf?_gl=1*184yiv3*_gcl_au*MTU5NTA3NzQzLjE3MjExNDQ2NzA.&_ga=2.64768809.702348249.1721235523-854709142.1721144670 (last accessed 7/17/2024).

serving as the Executive Director of KREF. *Id.* at ¶¶ 5-6. KREF is charged with enforcement of, and actively enforces,[7] Kentucky's campaign finance laws arising under KRS Chapter 121. *Id.* at ¶7. KREF's enforcement authority includes the ability to issue advisory opinions that not only provide a defense in a later enforcement action, but also articulate KREF's position on Chapter 121 as applied to particular conduct. *Id.* KREF makes its advisory opinions public so that others can determine the scope and requirements of the law. *Id.* at ¶8.

<div align="center">

**<u>Facts Common to the Claims</u>**

</div>

On June 10, 2024, the HCRP and JCRP sought an advisory opinion from KREF on whether they could use funds they raised to advocate in favor of the School Choice Amendment, advising that they intended to spend funds for that purpose.[8] *Id.* at ¶¶ 14-15.

Plaintiffs have raised significant funds and continue to solicit funds for the express purpose of purchasing signs and campaign materials (to include mailers and door-to-door door hangers) that advocate in favor of the Republican party candidates and nominees (both local and national), and in favor of the School Choice Amendment (the "Joint Expenditures"). *Id.* at ¶¶ 16, 20-23. Plaintiffs determined that school choice is a central issue for their voters, and such

---

[7] https://kref.ky.gov/legal/Pages/Cases.aspx (last accessed 7/17/2024).
[8] https://kref.ky.gov/KREF%20Advisory%20Opinions/2024-002%20Requests.pdf (last accessed 7/17/2024).

expenditures would help their candidates including by driving turnout.  *Id.* at ¶17. The BCRP equally intends to spend in favor of Amendment 1, which prohibits non-citizens from voting in Kentucky's elections, because BCRP has made a similar determination about such expenditures assisting its nominees' election prospects.  *Id.* at ¶18.

BCRP, HCRP, and JCRP each intend to spend, and continue to raise, money for election-related communications both in support of their nominated candidates, and in support of the School Choice Amendment, usually in the same mailer or in door-to-door hangers.  *Id.* at ¶24.  BCRP even designed a mail piece that it intends to have printed, reproduced, and mailed to Republican and Independent voters in Boone County in October, 2024.  *Id.* at ¶25.  An exemplar of that mailer was attached as **Exhibit A** to the Verified Complaint.  *Id.*  In accordance with BCRP's election related plans, the mail piece must be finalized and submitted to the printer not later than the first week of October, 2024, in order to be delivered approximately a week prior to the November 5, 2024 general election date.  *Id.*

On July 8, 2024, KREF issued Advisory Opinion 2024-02 ("Advisory Opinion"), attached as **Exhibit B** to the verified Complaint,[9] in which KREF opined that executive committees, to include the BCRP, HCRP, and JCRP, could

---

[9] Also available at https://kref.ky.gov/KREF%20Advisory%20Opinions/2024-002%20Opinion.pdf (last accessed 7/17/2024).

not expend any funds that advocated in favor of the School Choice Amendment (and, by implication, any other constitutional amendment). *Id.* at ¶26. Specifically, the Advisory Opinion makes clear that it is a restriction on the content of speech in that "a county executive committee **may not use the funds that it raises** … **to support a constitutional amendment**." *Id.*

KREF's stated justification was that spending money to advocate in favor of the School Choice Amendment (which advances the party's platform) was not promoting the party's nominees, and thus was not part of other day-to-day operations of the party. *Id.* at ¶27.

On July 16, 2024 and July 17, 2024, Counsel for Plaintiffs wrote KREF. *Id.* at ¶28; Exhibit C. Counsel for Plaintiffs asked KREF if it would disavow any intention to enforce its Advisory Opinion, but KREF declined to disavow an intention to enforce. *Id.* at ¶29; **Exhibit C**. And, given the tenor and rancor of the public debate on the School Choice Amendment, if Plaintiffs spend funds in favor of the School Choice Amendment, they will draw a verified complaint, starting KREF's enforcement process. *Id.* at ¶30.

Plaintiffs' intended First Amendment protected, election-related speech is thus presently chilled, as Plaintiffs are required to either forgo making expenditures in favor of the School Choice Amendment, or face enforcement by

7

KREF (and potentially criminal prosecutors on a referral from KREF) under KRS 121.140. *Id.* at ¶32.

To be clear, and for the avoidance of all doubt, Plaintiffs intend to begin door-to-door efforts in favor of their candidates by August 31, 2024; and that requires orders to be placed for door hangers, thus making it necessary to spend Joint Expenditures, not later than August 24, 2024 (with the design for such door-to-door pieces needing to be done a few days prior to that), though they would have done so earlier if they could have. *Id.* at ¶35. Plaintiffs equally intend to place orders for mail in early October, 2024. *Id.* None of these activities can occur (or have occurred) because of Defendants' actions as described above. *Id.* *Thus, without immediate injunctive relief, Plaintiffs speech has certainly been chilled and their election-related speech and plans are currently being impaired and interrupted.* *Id.*

**The District Court holds a hearing and denies injunctive relief**

The District Court held a hearing on Plaintiffs' motion on August 16, 2024. (Doc. 19, PageID#205). The District Court denied Plaintiffs' motion in an opinion and order issued on August 22, 2024. (Doc. 22). The transcript was filed of record. (Doc. 25).

The District Court concluded that Plaintiffs had standing. But, without explicitly stating the level of scrutiny it employed, the District Court also

8

concluded that KREF's prohibition of Plaintiffs' speech in favor of the constitutional amendments was, allegedly, merely a *de minimis* disclosure requirement and did not violate the First Amendment, because Plaintiffs' individual members could register a separate political issues committee which could advocate in support of the constitutional amendments (even though such committee still could not produce the Joint Expenditure mailer or transfer funds from Plaintiffs to the committee for that purpose). Thus, according to the District Court, Defendants did not violate the First Amendment. [Doc. 22, PageID#208-224]. Plaintiffs timely appealed. [Doc. 23, PageID#225-226].

## II. Law and Argument

### A. Standard of Review

When deciding whether to issue a preliminary injunction, or an injunction pending appeal, the court must consider the following four factors: (1) likelihood of success on the merits; (2) irreparable harm; (3) harm to others; and (4) the public interest. *Suster v. Marshall*, 149 F.3d 523, 528 (6th Cir. 1998); *Northeast Ohio Coalition for the Homeless v. Blackwell*, 467 F.3d 999, 1009 (6th Cir. 2006). The remaining factors are met where constitutional rights are infringed upon, and so, in these cases, the likelihood of success factor is dispositive. *H.D.V. - Greektown, LLC v. City of Detroit*, 568 F.3d 609 (6th Cir. 2009) (abuse of discretion not to grant preliminary injunction where constitutional violation found);

9

*Roberts v. Neace*, 958 F.3d 409 (6th Cir. 2020); *Maryville Baptist Church, Inc. v. Beshear*, 957 F.3d 610 (6th Cir. 2020); *Elrod v. Burns*, 427 U.S. 347, 373 (1976).

**B. The District Court correctly held that Plaintiffs established standing**

To establish a likelihood of success in a lawsuit, a plaintiff must have standing. *See Vitolo v. Guzman*, 999 F.3d 353, 359 (6th Cir. 2021). Plaintiffs can show that they have standing to raise this pre-enforcement First Amendment challenge by establishing that: (1) they intend to engage in expression that the Free Speech Clause (or Association Clause) arguably protects, (2) their expression is arguably proscribed by the challenged actions of Defendants, and (3) they face a credible threat of enforcement from those Rules. *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159-162 (2014) (*quoting Babbitt v. Farm Workers*, 442 U.S. 289, 298 (1979)). *See, also, Fischer v. Thomas*, 52 F.4th 303, 307 (6th Cir. 2022).

The Verified Complaint makes clear that Plaintiffs intend to (and took steps to) engage in expression that the Free Speech Clause (or Association Clause) arguably protects. (Ver. Compl., Doc. 1 at ¶¶ 14-18, 20-25, 30-31, 33, 35, Exhibit A, PageID#5-7, 9-10, 19). And, Defendants have proscribed Plaintiffs' intended activities. (Ver. Compl., Doc. 1, at ¶¶ 26-29, 31-32, Exhibit B, PageID#7-9, 20-22). That leaves a credible threat of enforcement.

"To identify a credible threat of enforcement, the first and most important factor is whether the challenged action chills speech." *Fischer*, 52 F.4th 303, 307, *citing McKay v. Federspiel*, 823 F.3d 862, 869 (6th Cir. 2016). And, KREF's "actions do just that." *Id.* The JCRP is self-censoring because Defendants prohibit the speech at issue. (Ver. Compl., Doc. 1, at ¶36, PageID#10).

"Beyond chill, a variety of facts can demonstrate a credible threat of enforcement." *Fischer*, 52 F.4th 303, 307. Those are whether: (1) there is prior history of enforcement against the plaintiffs or others; (2) warning letters were sent to the plaintiffs; (3) the challenged regulatory regime makes enforcement easier or more likely; and (4) the prosecuting entity refused to disavow enforcement. *Id.,* "This isn't a laundry list; the [Plaintiffs] don't have to satisfy all the factors." *Id.* at 307-308.

The first factor is met because "KREF is charged with enforcement of (KRS 121.140), and actively enforces[10] Kentucky's campaign finance laws, arising under KRS Chapter 121." (Ver. Compl., Doc. 1 at ¶7, PageID#4). Past enforcement actions against others suffice to establish this factor. *Fischer*, 52 F.4th 303 at 308.

The second factor is met because KREF sent a threatening letter, in the form of an advisory opinion, to two of these Plaintiffs, and KREF posted its letter online to serve as a warning to others. (Ver. Compl., Doc. 1 at ¶¶ 8-9, 26-27, Exhibit B,

---

[10] https://kref.ky.gov/legal/Pages/Cases.aspx (last accessed 7/17/2024).

PageID#4, 7-8, 20-22). Defendants' General Counsel not only threatened that sending "mail and door-to-door pieces" is at least "dancing so close to a violation of the law," she also informed Plaintiffs that Defendants would not disclaim enforcement if Plaintiffs proceeded with their intended speech. (Doc. 1-4, PageID#24-25). Such communications are sufficient to meet the second factor. *Kiser v. Reitz*, 765 F.3d 601, 605, 609 (6th Cir. 2014). Indeed, what matters for this second factor is whether plaintiffs have pointed to "enforcement warning letters" addressing "their specific conduct." *Fischer*, 52 F.4th 303 at 308, *quoting McKay*, 823 F.3d at 869.

The third factor is met because the law "contains a feature making enforcement 'easier or more likely'—namely, a provision authorizing any member of the public to file complaints." *Fischer*, 52 F.4th 303 at 308, *quoting McKay*, 823 F.3d at 869. Here, "KREF is also charged, under KRS 121.140, with processing and handling complaints." (Ver. Compl., Doc. 1, at ¶10, PageID#4-5). KREF receives complaints from the public, and, if there is probable cause, significant financial penalties can be imposed as well as referrals for criminal enforcement. *Id., citing* KRS 121.140(2), (4), and (5). "[T]hat includes 'political opponents' with incentives to file "frivolous complaints" on the eve of an election." *Fischer*, 52 F.4th 303 at 308, *quoting Driehaus*, 573 U.S. at 164. Moreover, it is likely such complaints will be filed here "given the tenor and rancor

12

of the public debate on the School Choice Amendment." (Ver. Compl., Doc. 1, at ¶30, PageID#9).

The fourth factor is also met because prior to filing suit, Defendants were asked whether they would disclaim enforcement. The response was "I am not able to say that the Registry would ignore a properly filed complaint…" (Ver. Compl., Doc. 1, at ¶29, Exhibit C, PageID#8-9, 23). Thus, "our caselaw makes it clear that such refusals, in combination with the other factors, weigh in favor of finding a credible threat of prosecution." *Fischer*, 52 F.4th 303 at 308, *citing McKay*, 823 F.3d at 869.

Again, these factors are not "a laundry list; the [Plaintiffs] don't have to satisfy all the factors." *Fischer*, 52 F.4th 303 at 307-308. Yet here, Plaintiffs have done so.

**C. Plaintiffs have established a likelihood of success on the merits: to the extent that the Advisory Opinion or KRS Chapter 121 prohibits political parties from expending funds to engage in express advocacy in favor of constitutional amendments, such prohibitions violate the First Amendment**

1. The restriction is a content-based speech restriction triggering strict scrutiny, and the restriction does not pass muster

Defendants' actions here, as reflected in KREF's Advisory Opinion, violate both the Speech and Association protections of the First Amendment. As the Supreme Court has found, "[t]he First Amendment 'has its fullest and most urgent application to speech uttered during a campaign for political office.'" *Citizens*

13

*United v. Fed. Election Comm'n*, 558 U.S. 310, 339-340 (2010) (*quoting Eu v. S.F. Cnty. Democratic Cent. Comm.*, 489 U.S. 214, 223 (1989)); *see also Buckley v. Valeo*, 424 U.S. 1, 48 (1976) ("Advocacy of the election or defeat of candidates for federal office is no less entitled to protection under the First Amendment than the discussion of political policy generally or advocacy of the passage or defeat of legislation."). Thus, political speech—including independent expenditures in support of public issues or constitutional amendments—is at the core of speech protected by the First Amendment. *Buckley,* supra, 424 U.S. at 39. (citation omitted).

Precedent is clear that the government may not impose restrictions on disfavored speakers or condition restrictions on speech based on the type of speaker. *Citizens United*, 558 U.S. 310 (2010). "In the realm of protected speech, the legislature is constitutionally disqualified from dictating the subjects about which persons may speak and the speakers who may address a public issue." *Id.* at 347, *quoting First Nat'l Bank v. Bellotti*, 435 U.S. 765, 784-785 (1978). "Discussion of public issues and debate on the qualifications of candidates are integral to the operation of the system of government established by our Constitution." *Buckley*, supra, 424 U.S. at 14.

Defendants do not prohibit individuals from making expenditures in favor of constitutional amendments (or opposing constitutional amendments), but do

14

prohibit executive committees/political parties from doing so. That is a content-based restriction on political speech unquestionably prohibited by clearly established case law on the Freedom of Association. *See Eu*, 489 U.S. 214, 224-225, *quoting Citizens Against Rent Control/Coalition for Fair Housing v. Berkeley*, 454 U.S. 290, 296 (1981). ("Even though individual members of the state central committees and county central committees are free to issue endorsements, imposing limitations 'on individuals wishing to band together to advance their views on a ballot measure, while placing none on individuals acting alone, is clearly a restraint on the right of association.'").

Without question KREF's Advisory Opinion is a spending prohibition based on the content of speech (as opposed to a contribution restriction), which triggers strict scrutiny. *Kruse v. City of Cincinnati*, 142 F.3d 907, 912-13 (6th Cir. 1998). That truly is the case here because KREF will need to look at the content of the Plaintiffs' proposed communication to determine if it ran afoul of KREF's Advisory Opinion. *Reed v. Town of Gilbert*, 576 U.S. 155 (2015).

Therefore, in order to be upheld, the public issue expenditure prohibition must be both narrowly tailored, *Fed. Election Comm'n v. Nat'l Conserv. Political Action Comm.*, 470 U.S. 480, 496 (1985) ("NC-PAC"), and necessary to serve a compelling state interest, *Fed. Election Comm'n v. Mass. Citizens for Life*, 479

U.S. 238, 251-252 (1986). *See also Austin v. Mich. Chamber of Commerce*, 494 U.S. 652, 657 (1990).

Courts around the country have been steadfast in striking down prohibitions similar to those issued by Defendants here. *Sanders County Republican Cent. Comm. v. Bullock*, 698 F.3d 741 (9th Cir. 2012) (unconstitutional to prohibit political party from spending money to endorse non-partisan judicial candidates); *Berkeley*, 454 U.S. 290, 296.

2. <u>There is no "register another committee" exception to the First Amendment, and the "solution" does not work in any event</u>

Nor does Defendants' proposed "solution" to the problem, namely requiring Plaintiffs to register an issues-related Political Action Committee separate from the executive committee, solve the problem. First, because such issues PACs are "burdensome alternatives," that "are expensive to administer and subject to extensive regulations," and thus do "not alleviate the First Amendment problems" with Defendants' prohibition on executive committee expenditures in favor of (or opposed to) constitutional amendments. *Citizens United*, 558 U.S. 310 at 337. And beyond burden, issues PACS can't even run Joint Expenditures – while they can advocate in favor of the constitutional amendment(s), they cannot advocate for the parties' nominees, so they cannot run political communications associating the two. See, e.g., KRS 121.180(10).

Consequently, the District Court's determination that the Advisory Opinion is merely a "disclosure requirement" is contradicted by the facts and the law. First, the Advisory Opinion nowhere requires Plaintiffs to disclose expenditures or contributors, or to put a disclaimer on any mailers. Rather, the Advisory Opinion flatly prohibits Plaintiffs from spending *any amount* in favor of a constitutional amendment issue. Again, one need merely go back to the plain language of the Advisory Opinion: "Thus the answer to the second question is that a county executive committee ***may not use the funds*** it raises for party nominees to support a constitutional amendment." (Doc. 1-3, PageID#23 (emphasis added)).

And, even conceding a generalized governmental interest in disclosure, narrow tailoring requires that the government only employ the least restrictive means to achieve its interest, *United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803, 813 (2000), but Defendants cannot meet that burden here.

Here, Defendants could compel timely disclosure of expenditures and contributors, rather than prohibit any and all spending by political parties in favor of constitutional issues, and that is fatal to Defendants position. Courts disfavor wholesale bans on types of expression protected by the First Amendment, and such bans are usually invalidated on the ground that they clearly fail a "least restrictive means" analysis. *See, e.g., Schneider v. Town of Irvington*, 308 U.S. 147, 160-65 (1939) (invalidating a ban on hand-bill distribution because less intrusive means

17

existed); *Martin v. City of Struthers*, 319 U.S. 141, 145-46 (1943) (same); *City of Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 430 (1993) (invalidating an ordinance prohibiting news racks dispensing commercial handbills that amounted to a "sweeping ban that bars from its sidewalks a whole class of constitutionally protected speech"); *Citizens United v. FEC*, 558 U.S. 310, 337 (2010) (invaliding an "outright ban" on specific types of corporate political speech).

In fact, if disclosure actually was the state interest at issue here (versus merely being Defendants' *post-hoc* excuse), an outright ban on issue related advocacy is not the narrowly tailored means to meet a disclosure interest when more timely disclosure easily could be compelled. Instead, Defendants' bogus disclosure argument rests upon the false premise (accepted by the District Court) that, somehow, some members of the Plaintiffs can band together to register a separate committee, with separate requirements, to engage in the core political speech in question. However, this ignores the fact that funds already raised cannot be used in that fashion (donations from an executive committee to a political issues committee is prohibited under KRS 121.150(12)).

Regardless, Plaintiffs, as associations, have <u>full rights to engage in speech as associated interests</u> and it is no answer that others may engage in comparable speech. *Citizens United v. FEC*, 558 U.S. 310, 343 (2010) (holding that free speech rights have to be viewed from the perspective of an organization which

18

rights even if it is not a natural person, and holding "[t]he Court has thus rejected the argument that political speech of corporations or other associations should be treated differently under the First Amendment simply because such associations are not 'natural persons.'"); *FEC v. Nat'l Conservative Political Action Comm.*, 470 U.S. 480, 494 (1985)).

Indeed, *Citizens United* makes clear that "[i]n the realm of protected speech, the legislature **is constitutionally disqualified** from dictating the subjects about which persons may speak and the speakers who may address a public issue." 558 U.S. 310 at 347. (emphasis added). "If the First Amendment has any force, it prohibits Congress [or states] from fining or jailing citizens, or associations of citizens, for simply engaging in political speech." *Id.* at 349. And on this record, *Citizens United* directly contradicts the District Court's decision, rather than support it as the District Court mistakenly believed. Moreover, "[o]ur Nation's speech dynamic is changing, and informative voices should not have to circumvent onerous restrictions to exercise their First Amendment rights." *Id.* at 364. Again: strict scrutiny applies, and it was not met.

The District Court also improperly determined that, somehow, the burden was negligible for certain members of the Plaintiffs to separately register a political issues committee, thus reaching the mistaken conclusion that this matter was distinguishable from *FEC v. Massachusetts Citizens for Life*, 479 U.S. 238 (1986).

19

There, the Court discussed and rejected the argument by the FEC (and the District Court's mistaken conclusion here) that because the plaintiff could register a separate committee to engage in the speech activities that it desired, the plaintiff's claim failed. The Supreme Court was clear in its holding that (like Plaintiffs here) the entity desiring to engage in speech was "not free to use its general funds for campaign advocacy purposes," and while that may not have been an "an absolute restriction on speech," it nevertheless was "a substantial one." *Id.* at 252. In other words, it was not the burden of establishing a committee and the steps taken that made the burden "substantial," but instead it was the very fact that the entity could not "use its general funds for campaign advocacy purposes," that made it so. *Id.*

And the comparators of burdens in *Massachusetts Citizens for Life* are practically indistinguishable from those here. The Court explained the burdens to include (i) identifying all contributors donating over $200; (ii) disclosing the name and address of all recipients of funds exceeding $200; and (iii) identifying all persons who make contributions over $200 earmarked for independent expenditures. *Id.* Additionally, the political issues committee had to (iv) appoint a campaign treasurer; (v) ensure contributions are forwarded to the treasurer within 10 or 30 days of receipt, depending on the amount; (vi) ensure its treasurer keeps an account of every contribution regardless of amount, to include the name and address of any person who makes a contribution in excess of $ 50, all contributions

20

received from political committees, and the name and address of any person to whom a disbursement is made regardless of amount; (vii) preserve receipts for all disbursements over $200 and all records for three years; (viii) file a statement of organization containing its name, address, the name of its custodian of records, and its banks, safety deposit boxes, or other depositories; (ix) report any change in the above information within 10 days; and (x) only dissolve upon filing a written statement that it will no longer receive any contributions or make disbursements, and that it has no outstanding debts or obligations. *Id.* at 253-254. Its filing included quarterly reporting during election years, and reports 12 days before and 30 days after an election. *Id.* at 254.

The Supreme Court observed that "[d]etailed record-keeping and disclosure obligations, along with the duty to appoint a treasurer and custodian of the records, impose administrative costs that many small entities may be unable to bear." *Id.* "Furthermore, such duties require a far more complex and formalized organization than many small groups could manage." *Id.* And in a footnote the Court observed that "the administrative costs of complying with such increased responsibilities may create a disincentive for the organization itself to speak." *Id.* at fn.7.

Under Kentucky law, a separate political issues committee (even if it could engage in the joint advocacy/expenditures, which it cannot) must (i) file official notice of intention at the time of organization, giving names, addresses, and

positions of the officers of the organization, identifying an official contact person

of the committee, and providing the issue or issues that it is advocating for (KRS

121.170(1)); (ii) have separate chairpersons and treasurers (KRS 121.170(3)); (iii)

designate a treasurer to act as agent (KRS 121.170(2) makes the provisions of KRS

121.160 applicable to the committee, including KRS 121.160(1)); (iv) obtain a

separate bank account (which usually requires obtaining a separate EIN from the

IRS) (KRS 121.170(2) and KRS 121.160(2)(a)); (v) keep detailed records of

contributors (KRS 121.170(2) and KRS 121.160(2)(b)); (vi) obtain separate checks

for the purpose of making expenditures over $25, which any expenditure like a

mailer would be (KRS 121.170(2) and KRS 121.160(2)(c)); (vii) maintain for six

years from the date of the last report filing all receipts and account records (KRS

121.170(2) and KRS 121.160(2)(d)); (viii) report "all money, loans, or other things

of value, received from any source, and expenditures authorized, incurred, and

made, since the date of the last report," including a "complete statement of all

expenditures authorized, incurred, or made" that "shall include the name, address,

and occupation of each person to whom an expenditure is made in excess of

twenty-five dollars ($25), and the amount, date, and purpose of each expenditure"

(KRS 121.180(3)(a)), with reports filed 60 days, 30 days, and 15 days prior to an

election (KRS 121.180(3)(b)(2), (3), and (4)), as well as 30 days after (KRS

121.180(4)); (ix) not use funds to further candidates for office, including the

22

Republican slate (KRS 121.180(10)); and (x) not receive funds from an executive committee (in fact, the representation by Defendants' General Counsel that the issues committee could receive raised funds from the Plaintiffs herein is contrary to the directives on Defendants' websites) (KRS 121.150(12)).

These are not *de minimis* requirements. In fact, Defendants have a multi-page brochure that outlines these onerous requirements, complete with a threat of felony or misdemeanor charges for non-compliance.[11]

Finally, the District Court is alone in its conclusion that a separate committee could somehow alleviate the constitutional problems with a content-based restriction on speech. *Carey v. FEC*, 791 F. Supp. 2d 121, 132-133 (DCD 2011); *Catholic Leadership Coalition of Tex. v. Reisman*, 764 F.3d 409, 430, fn.27 (5th Cir. 2014) (explaining that separate committees are separate legal entities, and cannot be viewed from the perspective that its members can form separate committees, and noting that doing so runs contrary to the holdings in *Citizens United* and *Nat'l Conservative Political Action Comm.*, 470 U.S. 480, 494 (1985)); *Richey v. Tyson*, 120 F. Supp. 2d 1298, 1317 (ALND 2000).

Plaintiffs clearly established likelihood of success on the merits.

---

[11] https://kref.ky.gov/KREF%20Forms%20and%20Pubs/Political%20Issue%20Cmte%20Brochure%202022.pdf (last accessed 8/23/2024).

**D. The remaining injunction factors favor entry of preliminary injunctive relief**

Having demonstrated a likelihood of success on the merits, the remaining factors collapse, including irreparable harm. *City of Detroit*, 568 F.3d 609 (abuse of discretion not to grant preliminary injunction where constitutional violation found); *Beshear*, 957 F.3d 610; *Elrod*, 427 U.S. 347, 373; *Winter*, 56 F. Supp. 3d 884, 901; *Martin-Marietta Corp. v. Bendix Corp.*, 690 F.2d 558, 568 (6th Cir. 1982); *G & V Lounge*, 23 F.3d 1071, 1079. Moreover, "there is no public interest in enforcing a law that curtails debate and discussion regarding issues of political import." *Suster v. Marshall*, 149 F.3d 523, 533 (6th Cir. 1998) (*quoting Citizens Against Rent Control/Coalition for Fair Housing v. City of Berkeley*, 454 U.S. 290, 299 (1981)). The runup to the November election is well underway. Allowing Defendants to prohibit First Amendment protected speech in this context is irreparable – to the Plaintiffs – and to voters who will receive their message.

**IV. Conclusion**

Appellants respectfully request that an injunction pending appeal be granted enjoining Defendants from enforcing Advisory Opinion 2024-02 and KRS Chapter 121 against them for making expenditures that advocate in favor of passage of the constitutional amendments on Kentucky's ballot this fall.

Respectfully submitted,

/s/ Christopher Wiest_____
Christopher Wiest (KBA 90725)
Theodore Roberts (KBA 100610)
Chris Wiest, Atty at Law, PLLC
50 E. Rivercenter Blvd., Ste. 1280
Covington, KY 41011
513/257-1895 (c)
chris@cwiestlaw.com

/s/Thomas B. Bruns_____
Thomas B. Bruns (KBA 84985)
Bruns, Connell, Vollmar & Armstong
4750 Ashwood Drive, STE 200
Cincinnati, OH 45241
tbruns@bcvalaw.com
513/312-9890
***Attorneys for Plaintiffs/Appellants***

## CERTIFICATE OF SERVICE

I certify that I have served a copy of the foregoing upon Counsel for the Defendants/Appellees, this 27th day of August, by filing same with the Court via its CM/ECF system, and by electronic mail upon Counsel for the Defendants/Appellees, which will provide notice to all parties Counsel.

/s/ Christopher Wiest_____

## CERTIFICATE OF COMPLIANCE

As required by Fed. R. App. P. 32(g) and 6th Cir. R. 32(a), I certify that this Reply contains 5,183 words. This response complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in 14-point Times New Roman font using Microsoft Word.

/s/ Christopher Wiest_____

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
FRANKFORT

|  |  |  |
|---|---|---|
| BOONE COUNTY REPUBLICAN PARTY EXECUTIVE COMMITTEE, *et al.*, | ) ) ) ) ) | Case No. 3:24-cv-00049-GFVT |
| Plaintiffs, | ) ) ) | |
| V. | ) ) | **OPINION** **&** **ORDER** |
| H. DAVID WALLACE, *et al.*, | ) ) | |
| Defendants. | ) ) | |

*** *** *** ***

The Constitution does not require that political speech be absolutely free from governmental requirements related to the message.  With that said, governmental requirements can become so burdensome that there is a risk that they actually limit the message.  When that line is crossed, it contravenes the protections of the First Amendment.

This case presents the question of whether a Kentucky statute and Kentucky Registry of Election Finance regulations cross the line described.  The Plaintiffs seek an Order preventing the Defendants from taking enforcement action against them if, as Executive Committees, they use funding to advocate in favor of a constitutional amendment on the November ballot.  Simply put, the Plaintiffs contend that the line has been crossed.  But on the facts presently before the Court, that is not likely to be the case.  For the reasons set out below, the Motion for Preliminary Injunction [R. 6] is **DENIED**.

**I**

In March 2021, the Kentucky General Assembly enacted House Bill (HB) 563.  Under HB 563, Kentucky taxpayers who donate to account-granting organizations (AGO) receive

essentially a dollar-for-dollar tax credit against their income taxes.  These AGOs allocate

taxpayer contributions to education opportunity accounts (EOA), which can be used for

education-related expenses.  The primary goal behind this tax structure was to assist in reducing

the cost of nonpublic school tuition.  The law became effective on June 29, 2021, but was short-

lived.  On December 15, 2022, the Kentucky Supreme Court found the law was unconstitutional

under Section 184 of the Kentucky Constitution.  *Commonwealth ex rel. Cameron v. Johnson*,

658 S.W.3d 25 (Ky. 2022).   Section 184 provides that "no sum shall be raised or collected for

education other than in common schools until the question of taxation is submitted to the legal

votes."  Ky. Const. § 184.

In response to the Supreme Court's opinion, the Kentucky General Assembly placed a

constitutional amendment on the ballot for November 2024.  The Kentucky Registry of Election

Finance (KREF) is tasked with, *inter alia*, "administering Kentucky's campaign finance law."

About, *Kentucky Registry of Election Finance*, https://kref.ky.gov/about/Pages/default.aspx (last

accessed July 24, 2024).  As part of the enforcement scheme, KREF can issue advisory opinions

pursuant to KRS § 121.135.

In June 2024, the Jessamine County Republican Party Executive Committee (JCRP) and

the Hardin County Republican Party Executive Committee (HCRP) wrote to KREF seeking an

advisory opinion on whether they could use funds to campaign in favor of the School Choice

Amendment on the November 2024 election ballot.  The Boone County Republican Party

Executive Committee (BCRP) did not request an advisory opinion, although they are a party to

this suit.[1]

---

[1] The Defendants argue that BCRP cannot bring a preliminary injunction motion due to their failure to request an advisory opinion.  [R. 14 at 7.]  The Court disagrees.  The Supreme Court found that when a Plaintiff alleges "an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by statute, and there exists a credible threat of prosecution thereunder," the burden for a preliminary injunction has been met.

BCRP, as well as JCRP and HCRP, have all raised money with the explicit purpose of campaigning in favor of the School Choice Amendment.  Specifically, the Plaintiffs seek to invest in "election-related communications for both their nominated candidates, and the School Choice Amendment, usually in the same mailer or door-to-door hangers." *Id.* at 7.  The mail piece must be finalized by October 2024 in order to be delivered before the November 5th election date.

On July 8, 2024, KREF issued Advisory Opinion 2024-02, in which they found that the Plaintiffs could not expend funds that advocate in favor of the School Choice Amendment.  As support KREF found that within the definition of "executive committee" in 32 KAR 1:050, the Plaintiffs are only entitled to "raise[] and spend[] funds to promote political party nominees," not advocate for a constitutional amendment.  Further, KREF found that advocating for a constitutional amendment was not part of "other activities commensurate with the day-to-day operations of a political party." *Advisory Opinion 2024-02*, Kentucky Registry of Election Finance (July 8, 2024), https://kref.ky.gov/KREF%20Advisory%20Opinions/2024-002%20Opinion.pdf.

After the issuance of the Advisory Opinion, Mr. Weist, counsel for the Plaintiffs, emailed KREF to say that the Plaintiffs "intention is to run electioneering communications that jointly advocate for both the Republican ticket (up and down the ballot) as well as the constitutional amendment, including voter education that a straight ticket vote does not vote for the amendment." [R. 14 at 11.]  In their Response, the Defendants appear to contend that this particular framing of the issue presents "a different question entirely" than what was covered in

---

*Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979).  The Court finds that because BCRP has alleged their intent to engage in the same conduct as JRCP and HCRP, the same threat of prosecution exists to BCRP as well.

3

the AO 2024-02. *Id.* In their initial request, JCRP and HCRP both stated "they want to promote and support the passing of Amendment 2 on School Choice," but said nothing about voter education or joint expenditures. [*See* R. 14-3 at 1-2.]

Nonetheless, the Defendants reiterated at the Preliminary Injunction hearing that the Plaintiffs cannot advocate in favor of the School Choice Amendment *as an Executive Committee*. The Plaintiffs, however, could advocate for the School Choice Amendment if they formed a Political Issues Committee—but they could not advocate for a political candidate as a Political Issues Committee. Stated another way, there is no way for the Plaintiffs to advocate for both political candidates and political issues, such as the Constitutional Amendment in question, without having to operate as both an Executive Committee and a Political Issues Committee.

The Plaintiffs feel certain that if they were to expend money in favor of the School Choice Amendment, they would face an enforcement action, effectively chilling their election-related speech. As such, the Plaintiffs filed the present action arguing the Defendants' AO 2024-02 violated the First Amendment. As relief, the Plaintiffs seek "a preliminary injunction or temporary restraining order" prohibiting the Defendants from continuing to chill the Plaintiffs' speech. On July 24, 2024, the Court denied the Plaintiffs' request for a Temporary Restraining Order, finding that the TRO is not the proper vehicle for the relief that the Plaintiffs seek. Rather, the Court set an expedited briefing scheduled for the Motion for Preliminary Injunction, which concluded on August 14, 2024. [R. 13.] A Preliminary Injunction hearing was held on August 16, 2024. [R. 19.]

## II

"A preliminary injunction is an extraordinary remedy which should be granted only if the movant carries his or her burden of proving that the circumstances clearly demand it."

4

*Overstreet v. Lexington–Fayette Urban County Government*, 305 F.3d 566, 573 (6th Cir. 2002) (citing *Leary v. Daeschner*, 228 F.3d 729, 739 (6th Cir. 2000)) (cleaned up) ("[A] preliminary injunction involv[es] the exercise of a very far-reaching power . . .")).  Because of the unique procedural posture brought on by a Motion for Preliminary Injunction, the Court notes that the nature and purpose of a preliminary injunction informs the analysis. As the Supreme Court has stated:

> The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held. Given this limited purpose, and given the haste that is often necessary if those positions are to be preserved, a preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits. A party thus is not required to prove his case in full at a preliminary injunction hearing.

*University of Texas v. Camenisch*, U.S. 390, 395 (1981). Therefore, the findings of fact and conclusions of law made by a district court in granting a preliminary injunction are not binding at a trial on the merits. *Id.*  It is through this lens the Court makes the following findings of fact and conclusions of law.

To issue a preliminary injunction, the Court must consider whether: (1) the movant shows a strong likelihood of success on the merits; (2) the movant will suffer irreparable harm if the injunction is not issued; (3) the issuance of the injunction would cause substantial harm to others; and (4) the public interest would be served by issuing the injunction.  *Overstreet*, 305 F.3d at 573.

The Sixth Circuit noted that "[w]hen a party seeks a preliminary injunction on the basis of a potential constitutional violation, the likelihood of success on the merits often will be the determinative factor."  *City of Pontiac Retired Employees Ass'n v. Schimmel*, 751 F.3d 427, 430 (6th Cir. 2014) (quoting *Obama for Am. v. Husted*, 697 F.3d 423, 436 (6th Cir. 2012)).  The

5

Defendants argue that the Plaintiffs are unlikely to succeed on the merits because they do not have standing to pursue this action.[2]  [R. 14 at 12-13.]  Accordingly, the Court's analysis begins with standing.  Standing requires (1) an injury-in-fact that is (2) traceable and (3) redressable. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016).

## A

The Defendants primarily focus on the Plaintiffs' claimed injuries, arguing that they are hypothetical, not actual and imminent. [R. 14 at 12-13.]  Because the Plaintiffs seek injunctive relief before the Defendants have begun enforcing the Rule, this implicates decades of precedent considering when an expected injury affords standing.  Pre-enforcement review is permissible if threatened enforcement is "sufficiently imminent." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014).  A movant must establish "an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and [that] there exists a credible threat of prosecution thereunder." *Id.* at 159 (quoting *Babbitt v. Farm Workers*, 442 U.S. 289, 298 (1979)).  If such circumstances are shown, the Plaintiffs have "adequately alleged a concrete and imminent harm sufficient to fulfill the 'injury in fact' requirements." *See Kiser v. Reitz*, 765 F.3d 601, 608 (6th Cir. 2014).

The injury requirement cabins the federal courts' power. *Vander Jagt v. O'Neill*, 699 F.2d 1166, 1177 (D.C. Cir. 1982) (Bork, J., concurring) ("[I]njury in fact, far from being a simple, descriptive term, is a concept freighted with policies that limit the kinds of injury courts may consider.").  Both its constitutional and prudential elements are "founded in concern about the proper—and properly limited—role of the court in a democratic society." *Id.* (quoting *Warth*

---

[2] The Defendants appear to conflate "irreparable injury," which is a requirement for a preliminary injunction, with "injury in fact," which is a requirement of standing.  [R. 14 at 11-12.]  Because it is unclear as to which injury standard the Defendant is objecting, the Court will assume that the Defendant is objecting to both types of injury.

*v. Seldin*, 422 U.S. 490, 498 (1975)).  Though courts may be tempted to relax standing requirements to reach the merits of a particular issue, avoiding that temptation is an important exercise of judicial restraint which maintains the separation of powers.

Plaintiffs bear the burden of establishing standing.  *Lujan*, 504 U.S. at 561.  And because the elements of standing are "not mere pleading requirements but rather an indispensable part of the plaintiff's case," the plaintiff must support each element with "the manner and degree of evidence required at the successive stages of the litigation."  *Id.*  Movants must substantiate their claimed injury with evidence establishing that injury.  *Mich. Coal. of Radioactive Materials, Inc. v. Griepentrog*, 945 F.2d 150, 154 (6th Cir. 1991).  Accordingly, the issue is whether the Plaintiffs provide evidence that the statute threatens a certainly impending injury.

The Plaintiffs here want to advocate both in favor of a political candidate and a constitutional amendment.  However, according to the Advisory Opinion, the Plaintiffs are not allowed to advertise for the constitutional amendment as an Executive Committee under the current statutory structure.  Because KREF has not yet enforced its regulations in a disciplinary way against the Plaintiffs, they cannot demonstrate a past injury.  However, the Court finds that the Plaintiffs have alleged a sufficient threat of future prosecution to demonstrate an injury in fact.

**1**

With respect to the intention to engage, the Plaintiffs have indicated a clear intent that they plan to engage in the alleged course of conduct.  [*See* R. 1 at 7.]  In their Complaint, the Plaintiffs assert that "BCRP, HCRP, and JCRP each intend to raise, and spend money, in support of election-related communications for both their nominated candidates, and the School Choice Amendment."  *Id.*  The Court finds that this declaration indicates a clear intent to engage in the

precise conduct at issue in this case.

## 2

With respect to whether the alleged conduct is "arguably proscribed" by this statute, this requirement is met. KREF made clear in both their Advisory Opinion and Preliminary Injunction hearing that they interpret KRS 121.175 and 32 KAR 1:050 as prohibiting an Executive Committee from advocating for constitutional amendments, which is the precise conduct the Plaintiffs wish to engage. Based on the foregoing, the Plaintiffs ability to participate in the conduct they wish is arguably proscribed by KRS Chapter 121.175 and 32 KAR 1:050.

## 3

The last requirement is whether there is a threat of prosecution. A credible threat is defined as a "credible fear" that the state or its agents will in fact enforce the law against the Plaintiffs. *Kiser*, 765 F.3d at 609. Oftentimes, prior enforcement of the law in question provides sufficient evidence of a credible threat. *Id.* Due to the unique nature of an Advisory Opinion, neither party has alleged specific instances of KREF enforcing KRS 121.175 as it relates to the set of facts provided. Nonetheless, KREF is charged with enforcing KRS Chapter 121, and they have done so in the past. KRS 121.120(1)(e). As part of their enforcement function, KREF is allowed to issue advisory opinions to provide guidance on their interpretation of the statute. *See* KRS 121.120(1)(f). It logically follows that because KREF has the authority to enforce and has issued an unfavorable Advisory Opinion in this matter, there exists a credible threat of enforcement. Further, the Sixth Circuit has found that "when the administrative agency 'ha[s] not disavowed enforcement if [the plaintiffs] make similar statements in the future,'" this provides additional support that there is a credible threat. *Kiser*, 765 F.3d at 609 (internal quotes

8

omitted).[3] Here, KREF has not disavowed any threat of enforcement.

Further, the Plaintiffs face potential fines and referral to the Attorney General's office for criminal prosecution. *See* KRS 121.120(4)(n); KRS 121.990. The Court finds that these serious potential consequences contribute to a finding of injury in fact. Neither party disputes the causal connection between the Plaintiffs injury and the allegedly unconstitutional statute. Further, the Plaintiff has properly alleged that their injury will be redressed by a favorable decision. [R. 1 at 10.] Accordingly, the Plaintiffs' have standing to proceed in this action.

**B**

Having found the Plaintiffs have standing, the Court moves to address the preliminary injunction factors. To issue a preliminary injunction, the Court must balance the following factors: (1) whether the movant has shown a strong likelihood of success on the merits; (2) whether the movant will suffer irreparable harm if the injunction is not issued; (3) whether the issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by the injunction. *Overstreet*, 305 F.3d at 573. "[W]hen a party seeks a preliminary injunction on the basis of a potential violation of the First Amendment, 'the likelihood of success on the merits often will be the determinative factor.'" *Jones v. Caruso*, 569 F.3d 258, 265-66 (6th Cir. 2009). *See also City of Pontiac Retired Emps. Ass'n v. Schimmel*, 751 F.3d 427, 430 (6th Cir. 2014).

**1**

The first part of a preliminary injunction looks at the likelihood of success on the merits. The Plaintiffs rely heavily on *FEC v. Massachusetts Citizens for Life* for the proposition that the

---

[3] The Court notes that *Kiser* is distinguishable is some sense because the Plaintiff in that case has multiple warnings from the Board. *Kiser*, 765 F.3d at 609. Due to the delicate nature of the First Amendment violations, while multiple warnings would surely bolster the injury in fact analysis, it is not necessary for a finding of injury in fact.

burdens of registering as a Political Issues Committee are too severe, such that the requirement constitutes a violation of the First Amendment.  479 U.S. 238 (1986).  But the teachings of *Massachusetts Citizens* is not that expansive.  The facts differ significantly from the facts of this case.  The Court finds the burden on the Plaintiffs in the present case is minimal, if it imposes a burden at all.

In *Massachusetts Citizens*, the Supreme Court found that the bureaucratic burden placed on Appellant's speech violated the First Amendment.  Section 316 of the Federal Election Campaign Act (FECA) (codified 2 U.S.C. § 441b) prohibited corporations from using treasury funds to make an expenditure in connection with a federal election and required that any expenditure made for such a purpose be financed by voluntary contributions to a separate segregated fund.  MCFL, a nonprofit corporation, sought to challenge the constitutionality of § 441b.

The Supreme Court found that MCFL clearly violated § 441b, but ultimately found that § 441b violated the Constitution. To determine whether there is a constitutional violation, the Supreme Court noted the Court must first "determine whether the prohibition of § 441b burdens political speech." *Massachusetts Citizens*, 479 U.S. at 251.  It is this part of the *Massachusetts Citizens* analysis that the Plaintiffs analogized to the case at hand.

In *Massachusetts Citizens*, the FEC minimized the impact on the MCFL's First Amendment rights by arguing that MCFL "remains free to establish a separate segregated fund, composed of contributions earmarked for that purpose by the donors, that may be used for unlimited campaign spending." *Id.*  But the FEC noted that MCFL "is not free to use its general funds for campaign advocacy purposes." *Id.*

Similarly, in the case at hand, KREF also attempts to minimize the infringement on First

10

Amendment rights by arguing that the Plaintiffs can still speak, but in order to advocate for both political candidates and political issues, they must operate as both an Executive Committee and a Political Issues Committee.  [R. 14 at 10.]  However, unlike *Massachusetts Citizens*, where the Supreme Court found that although § 441b was "not an absolute restriction on speech," it was still "a substantial one."  Here, the burden placed on the Plaintiffs is not substantial enough to rise to the level of a First Amendment violation.  *Massachusetts Citizens*, 479 U.S. at 251.

In *Massachusetts Citizens*, in order to establish the requisite "separate segregated fund," MCFL was required to "appoint a treasurer," "ensure that contributions are forwarded to the treasurer within 10 or 30 days of receipt," "see that its treasurer keeps an account of every contribution," keep "the name and addresses of any person who makes a contribution in excess of $50," keep record of "all contributions received from political committees," keep "the name and address of any person to whom a disbursement is made," and "preserve receipts for all disbursements over $200 and all records for three years."  *Massachusetts Citizens*, 479 U.S. at 253.  Further, MCFL was subject to a stringent disclosure schedule, requiring MCFL to file either monthly reports with the FEC or "quarterly reports during election years, a pre-election report no later than the 12th day before an election, and reports every six months during nonelection years."  *Id.* at 253.

Not only is the timing of disclosure schedule frequent, but the content of the disclosure requirement was onerous.  These disclosure reports "must contain information regarding the amount of cash on hand; the total amount of receipts, detailed by 10 different categories," among many other requirements.  *Id.* at 254.  Last, "MCFL may solicit contributions for its separate segregated fund only from its 'members' . . . which does not include persons who have merely contributed to" MCFL in the past.  *Id.*

Ultimately, the Supreme Court found that these additional requirements imposed a "significant burden" on MCFL's First Amendment rights. *Id.* at 266 (O'Connor, J., concurring). First, the "[d]etailed recordkeeping and disclosure obligations, along with the duty to appoint a treasurer and custodian of the records, impose administrative costs that many small entities are unable to bear." *Id.* at 254. Second, the "duties require a far more complex and formalized organization than many small groups could manage." *Id.* Last, the "[r]estriction of solicitation of contributions to 'members' vastly reduces the sources of funding for organizations." *Id.*

The same can simply not be said of the case at bar. The Plaintiffs need not appoint additional officers to create a Political Issues Committee, as they already are required to have a treasurer as an Executive Committee. *See* KRS 121.170(3) ("All provisions of KRS 121.160 governing the duties and responsibilities of a candidate . . . shall apply to a registered committee."); s*ee also* KRS 121.160(1) ("Each candidate . . . shall . . .designate a campaign treasurer."). In fact, Political Issues Committees could have the exact same members of BCRP, JCRP, and HCRP respectively—they do not need to change anything about their structure or membership.

Further, the primary difference between an Executive Committee and a Political Issues Committee is that a Political Issues Committee has a different disclosure schedule than an Executive Committee. Where an Executive Committee is required to report biannually—one time in July and one time in January, a Political Issues Committee is required to report 60 days, 30 days, and 15 days preceding an election, as well as 30 days following an election in an election year. KRS 121.180(3); KRS 121.180(3)(b). Otherwise, Political Issue Committees are required to report quarterly. *Id.* However, the substance of the disclosures is substantially the same information. [R. 14 at 16 ("[N]o additional information is required, nor left out across the

12

two-reporting scheme.").]  Despite Plaintiffs arguments to the contrary, the Court ultimately finds this is largely a matter of disclosure.  Because of this, the Supreme Court has acknowledged that "[d]isclaimer and disclosure requirements may burden the ability to speak, but they 'impose no ceiling on campaign-related activities,' and 'do not prevent anyone from speaking.'" *Citizens United v. FEC*, 558 U.S. 310, 366–67 (2010) (internal citations omitted).

Last, at the Preliminary Injunction hearing, although not mentioned in the briefing, the Plaintiffs alluded to the fact that the funds raised by a Political Issues Committee are less fungible, meaning they must be used for their articulated purpose and do not roll-over from year-to-year.  The Defendants did not dispute this point.  The Defendants noted that unexpended funds can be returned pro rata to contributors, donated to charity, or retained to further the same public issue.  The Court finds this requirement is not only not burdensome, but it also makes practical sense.  The money raised to advocate in favor of the School Choice Amendment should *actually* be spent advocating in favor of said amendment.

In sum, the alleged burdens on the Plaintiffs in this case can be chalked up to a disclosure requirement, and the Defendant has an interest in ensuring electoral finance transparency and integrity, as well as providing the electorate with disclosure information prior to an election.  *See Buckley v. Valeo*, 424 U.S. 1, 66–67 (1976). The Court finds that under either the "exacting" scrutiny standard or the rational basis standard, the Defendant has met their burden. Accordingly, the Plaintiff is unlikely to be successful on the merits.

**2**

The second part of a preliminary injunction analysis looks to whether the movant will suffer irreparable harm if the injunction is not issued. *Overstreet*, 305 F.3d at 573.  "[T]o the extent that [the moving party] can establish a likelihood of success on the merits of its First

13

Amendment claim, it also has established the possibility of irreparable harm as a result of the deprivation of the claimed free speech rights." *Connection Dist. Co. v. Reno*, 154 F.3d 281, 288 (6th Cir.1998) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)).  The Plaintiffs argue that the "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." [R. 6 at 18 (quoting *Reno*, 154 F.3d at 288).]  While the Court agrees with the Plaintiffs' assertion, the assertion is not applicable to these facts.  In a case such as this one, where Plaintiffs have failed to demonstrate a strong likelihood of success on the merits of their First Amendment claim, it follows that Plaintiffs have also failed to establish the possibility of irreparable harm. The Court buttresses this conclusion by noting, once again, that although Plaintiffs cannot advocate in favor of the School Choice Amendment as an Executive Committee, they can as a Political Issues Committee—with only a *de minimis* additional burden on their ability to speak.

The Court also notes that the injury-in-fact requirement for standing is distinct from the irreparable harm required for injunctive relief.  *Taylor v. Resolution Trust Corp.*, 56 F.3d 1497, 1508 (D.C. Cir. 1995) (noting that while "[t]his inquiry [regarding irreparable injury] overlaps with the standing issue somewhat" grounds supporting a motion for a preliminary injunction "must show more" than mere standing).  In other words, not every injury-in-fact can be classified as an irreparable injury.  This distinction makes logical sense.  If every plaintiff with Article III standing was permitted to circumvent the showing of irreparable harm for injunctive relief, the irreparable harm requirement would be meaningless. Nonetheless, Plaintiffs fail to show how enforcement of the statute creates a risk of irreparable harm, which, as noted above, is a separate and distinct requirement from the injury-in-fact requirement.

**3**

Because both parties combine their arguments relating to harm to others and the public interest, the Court will address both jointly.  Defendants argue that the public has an interest in "knowing about who is spending on a ballot issue." [R. 14 at 15.]  Further, Defendants argue that the Plaintiffs' timing of their "advertising and subsequent request for preliminary injunction ensures that the voting public, will not have a chance to see who contributed to the ballot issue ads for Amendment 2" prior to the election.  *Id.*  Plaintiffs charge that Defendants will not be harmed by the issuance of a preliminary injunction, arguing that when a constitutional right is at stake, the balance of harm undoubtedly weighs in favor of an injunction. [R. 17-1 at 22-23.]

The public is clearly the "others" the Court considers in this factor and the public has an interest in maintaining electoral finance integrity and transparency.  The Court finds that the alleged harm to the Plaintiffs in being required to register as both an Executive Committee and a Political Issues Committee is outweighed by the public's interest in having timely disclosures.  Thus, the Court finds the harm to others and the public interest both weigh in favor of KREF.

**C**

Plaintiffs ask the Court for a preliminary injunction preventing the enforcement of AO 2024-02 against them. The Court finds Plaintiffs have failed to show a likelihood of success on the merits of their claims, such that their request for a Preliminary Injunction must be denied. The Plaintiffs have also filed a Motion for a Permanent Injunction and Motion for Summary Judgment [R. 6], and the Defendants have filed a Motion to Dismiss.  [R. 15.]  Because the Court's role in deciding a Preliminary Injunction Motion is different from the standard of both a Motion to Dismiss and a Motion for Summary Judgment, the Court does not address these motions at this juncture.  These motions, however, remain pending before the Court.

## III

Many states, including Kentucky, have imposed financial disclosure requirements on political committees.  These requirements are intended to ensure a well-informed electorate and prevent electoral funding corruption.  In light of the above analysis, the Court finds that KRS 121.175 and 32 KAR 1:050, as well as the way in which they have been interpreted through the applicable Advisory Opinion is constitutional.  The Plaintiffs' speech is not limited, and it is not the job of the Court to invoke a anti-majoritarian decision when the laws in question are simply inconvenient, inelegant, or inefficient.  Courts should be modest in the exercise of that power.  It is reserved for those rare instances when there is a need to rectify Constitutional violations—none of which have occurred here.  *See generally Summers v. Earth Island Inst.*, 555 U.S. 488, 492 (2009) (noting a court may engage in judicial review and issue a remedy revising legislative and executive action only "when necessary in the execution of" its duty to decide a case).  Accordingly, and the Court being otherwise sufficiently advised, it is hereby **ORDERED** that the Plaintiffs' Motion for Preliminary Injunction [R. 6] is **DENIED**.

16

This the 22nd day of August, 2024.

Gregory F. Van Tatenhove
United States District Judge

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE EASTERN DISTRICT OF KENTUCKY – at COVINGTON**

| | | |
|---|---|---|
| **Boone County Republican Party Executive** | : | Case No. |
| **Committee; Hardin County Republican** | | |
| **Party Executive Committee; and Jessamine** | : | |
| **County Republican Party Executive** | | |
| **Committee;**[1] | : | |
| | | |
| **PLAINTIFFS** | : | |
| | | |
| v. | : | |
| | | |
| **H. David Wallace, Laura Marie Bennett,** | : | |
| **Jessica Burke, Richard Larkin,** | | |
| **Adrian Mendiondo, Thomas O'Brien,** | : | |
| **J. Bissell Roberts**, *all in their official* | | |
| *capacities as members of the Kentucky* | : | |
| *Registry of Election Finance* | | |
| | : | |
| and | | |
| | : | |
| **John Steffen**, *in his official capacity as* | | |
| *Executive Director of the Kentucky* | : | |
| *Registry of Election Finance* | | |
| | : | |
| **DEFENDANTS** | | |

**<u>PLAINTIFFS' VERIFIED COMPLAINT FOR DECLARATORY AND INJUNCTIVE</u>**
**<u>RELIEF</u>**

Plaintiffs, through Counsel, and for their Verified Complaint for Declaratory and

Injunctive Relief, state as follows:

**<u>INTRODUCTION</u>**

1.  School choice has become a central issue in American society and politics.  In Kentucky in

particular, that is especially the case.  Certain public schools, including in our most populated

areas, have faced increasing criticism and challenges, over issues that include basic

---

[1] To the extent necessary, Plaintiffs also include the respective political parties directed and
controlled by the executive committees.

transportation problems in getting children to school,[2] testing results that reveal significant deficiencies in larger school districts in the areas of basic reading and math,[3] and deficiencies in career readiness.  For its part, the Kentucky General Assembly and its Republican super-majority has addressed these deficiencies in recent years by providing record funding to local schools.[4]  Yet that has not alleviated the problems and issues.  Frustrated with the lack of progress in public schools in ensuring adequate education, despite billions of dollars in public school funding, the Kentucky General Assembly took measures in 2021 to enact an educational opportunity account law, providing tax credits to permit parents, rather than the state, to make choices on where and how students are educated.[5]  The Kentucky Supreme Court ruled the provision unconstitutional in December, 2022.  *Commonwealth ex rel. Cameron v. Johnson*, 658 S.W.3d 25 (Ky. 2022).

---

[2] https://www.wdrb.com/news/education/a-year-in-review-of-jcps-transportation-system-busing-issues-in-louisville/article_cf5ab9ee-ea39-11ee-809d-cb20aaa08530.html (last accessed 7/17/2024).

[3] https://nces.ed.gov/nationsreportcard/subject/publications/dst2022/pdf/2023010xj8.pdf (last accessed 7/17/2024); https://www.wdrb.com/in-depth/most-jcps-students-struggle-with-reading-and-math-at-grade-level-diagnostic-testing-shows/article_8eb03f74-d87d-11ec-8b89-430271ed9494.html (last accessed 7/17/2024); https://www.usnews.com/education/k12/kentucky/districts/fayette-county-107072#:~:text=In%20Fayette%20County%20Public%20Schools%2C%2041%25%20of%20elementary%20students%20tested,above%20that%20level%20for%20math (last accessed 7/17/2024).

[4] https://www.prichardcommittee.org/posts/historic-increase-in-education-funding-helps-drive-a-big-bold-future-for-kentucky#:~:text=%E2%80%8D-,Historic%20increase%20in%20education%20funding%20helps%20drive,Big%20Bold%20Future%27%20for%20Kentucky&text=LEXINGTON%2C%20Ky%20%E2%80%94%20As%20the%202024,million%20annually%20in%20education%20funding (last accessed 7/17/2024); https://www.kentuckyteacher.org/leadership/guest-columns/2022/05/2022-kentucky-general-assembly-includes-key-increases-for-education-funding-in-biennial-budget/ (last accessed 7/17/2024).

[5] 21 RS HB 563, https://apps.legislature.ky.gov/record/21rs/hb563.html (last accessed 7/17/2024);

2. The Kentucky General Assembly, with a vote that fell largely upon political lines, in 2024, placed a constitutional amendment on the ballot for the November, 2024 election, to permit what *Johnson* forbade, namely to permit the General Assembly to enact school choice legislation.[6]  If passed, it will amend the Kentucky Constitution to provide for the following: ***The General Assembly may provide financial support for the education of students outside the system of common schools. The General Assembly may exercise this authority by law, Sections 59, 60, 171, 183, 184, 186, and 189 of this Constitution notwithstanding.***  This will be the second amendment passed by the legislature for consideration by Kentucky's voters on the ballot in the fall of 2024, and is colloquially known as "amendment 2," but we refer in this suit to the foregoing legislation and amendment as the "School Choice Amendment."

3. All of the foregoing efforts by Kentucky's General Assembly are consistent with the Republican Party Platform, including the 2024 Platform, that contained an entire chapter of the platform on cultivating great K-12 schools, that specifically provides for providing universal school choice in every state.[7]

<div align="center">

**<u>PARTIES</u>**

</div>

4. At all relevant times herein, Plaintiffs, the Boone County Republican Party Executive Committee ("BCRP"), the Hardin County Republican Party Executive Committee ("HCRP"), and the Jessamine County Republican Party Executive Committee ("JCRP"), are the duly chartered county party executive committees for the Republican Party; all are also

---

[6] 24 RS HB 2, available at https://apps.legislature.ky.gov/record/24rs/HB2.html (last accessed 7/17/2024).

[7] 2024 Republican Party Platform, at Chapter 7, pages 17-18, at ¶2.  Available at: https://prod-static.gop.com/media/RNC2024-Platform.pdf?_gl=1*184yiv3*_gcl_au*MTU5NTA3NzQzLjE3MjExNDQ2NzA.&_ga=2.64768809.702348249.1721235523-854709142.1721144670 (last accessed 7/17/2024).

"executive committees" pursuant to Kentucky campaign finance law, including KRS 121.015.

5. At all relevant times herein, Defendants H. David Wallace, Laura Marie Bennett, Jessica Burke, Richard Larkin, Adrian Mendiondo, Thomas O'Brien, and J. Bissell Roberts are the members of the Kentucky Registry of Election Finance ("KREF"), who are all sued in their official capacity.

6. At all relevant times herein, Defendant John Steffen is the Executive Director of KREF, who is also sued in his official capacity.

7. KREF is charged with enforcement of (KRS 121.140), and actively enforces[8] Kentucky's campaign finance laws, arising under KRS Chapter 121.

8. KREF is empowered, pursuant to KRS 121.135, to issue advisory opinions, which are made available to the public and posted online. While, pursuant to the terms of KRS 121.135, the issuance of an advisory opinion provides certain legal protection for the requester who complies with advice given (if the facts provided are also adequately described), it also reflects KREF's view of the law and the scope of Kentucky election finance law, and is made available to the public so others can determine the scope and requirements of law.

9. An advisory opinion serves another purpose as well: to delineate KREF's view of the law so that those who transgress it know that they will be held accountable. Said another way, it serves as threat of enforcement for those who run afoul of any opinion.

10. KREF is also charged, under KRS 121.140, with processing and handling complaints. Upon receipt of a sworn complaint, including by the public or on its own initiative, KREF is required to determine if there is probable cause for a violation. KRS 121.140(2). Once

---

[8] https://kref.ky.gov/legal/Pages/Cases.aspx (last accessed 7/17/2024).

probable cause is established, KREF can then resolve the violation by way of agreement, or hearing. Penalties include up to $5,000 per violation, or, if the violation is made knowingly, the law permits referral to prosecuting attorneys for criminal prosecution. KRS 121.140(2), (4), and (5).

## JURISDICTION AND VENUE

11. Subject matter jurisdiction over the claims and causes of action asserted by Plaintiffs in this case is conferred on this Court pursuant to 42 U.S.C. §1983, 42 U.S.C. § 1988, 28 U.S.C. §1331, 28 U.S.C. §1343, 28 U.S.C. §§ 2201 and 2202, and other applicable law.

12. Venue in this district is proper pursuant to 28 U.S.C. §1391 and other applicable law.

13. Venue in this division is appropriate since all of the deprivations of the Boone County Plaintiff's Constitutional Rights occurred and were directed to Boone County (28 U.S.C. 1392(b)(2)), a Defendant resides in this District and Division (28 U.S.C. 1392(b)(1)), and future deprivations of Plaintiff's Constitutional Rights are threatened and likely to occur in this division.

## FACTS COMMON TO ALL CLAIMS

14. On or about June 10, 2024, the HCRP and JCRP wrote to KREF, seeking an advisory opinion on whether they could use funds they raised to advocate in favor of the School Choice Amendment for the November, 2024 general election?[9]

15. In both letters, HCRP and JCPR advised KREF that they wished to and intended to use funds they raised to advocate in favor of the School Choice Amendment for the November, 2024 general election.

---

[9] https://kref.ky.gov/KREF%20Advisory%20Opinions/2024-002%20Requests.pdf (last accessed 7/17/2024).

5

16. In fact, HCRP, JCRP, and BCRP all have expressly raised funds and solicited donors for donations, for the express purpose of purchasing signs, campaign materials (to include mailers and door-to-door door hangers) that advocate in favor of the Republican party candidates and nominees (both local and national), as well as the School Choice Amendment (the "Joint Expenditures").

17. BCRP, HCRP, and JCRP have each determined that school choice and the School Choice Amendment is a central issue for voters, particularly voters that align with their values, especially in light of the 2024 Republican National Platform and its entire plank on education, including school choice.  They have also determined that advocacy in favor of the School Choice Amendment is likely to also substantially assist in electing their nominated candidates, including because driving voter turnout in support for the School Choice Amendment will result in additional voter turnout for nominated Republican candidates.

18. The BCRP equally intends to spend in favor of amendment 1, a provision that prohibits non-citizens from voting in Kentucky's elections.  It has equally determined that this amendment is consistent with the party's platform, and will advance Republican nominees for political office and turnout for those candidates in the November, 2024 election.

19. Indeed, well established circuit precedent teaches that a party platform, and the candidates that it endorses, are part and parcel with each other.  *Carey v. Wolnitzek*, 614 F.3d 189, 201-202 (6th Cir. 2010) ("A party platform after all is nothing more than an aggregation of political and legal positions, a shorthand way of announcing one's views on many topics of the day").

20. BCRP has raised approximately $20,000 for the purpose of running Joint Expenditures.

21. HCRP has raised approximately $10,000 for the purpose of running Joint Expenditures.

6

22. JCRP has raised approximately $10,000 for the purpose of running Joint Expenditures.

23. BCRP, HCRP, and JCRP are in the process of raising additional funds for the purpose of running Joint Expenditures.

24. For the avoidance of all doubt, BCRP, HCRP, and JCRP each intend to raise, and spend money, in support of election-related communications for both their nominated candidates, and the School Choice Amendment, usually in the same mailer or door-to-door hangers.

25. To that end, BCRP previously had been working with graphic designers on its mail piece that it intends to have printed and reproduced, and mailed, to Republican and Independent voters in Boone County, in October, 2024.  A draft of that mail piece, as of July 19, 2024, is attached as **Exhibit A**.  While the details of that mailer may change, the general content and intent concerning that mailer, including the mailer's purpose as a Joint Expenditure that advocates for both the ticket and the constitutional amendment, will not.  The mail piece must be finalized and submitted to the printer, not later than the first week of October, 2024, to be in a position to be delivered approximately a week prior to the November 5, 2024 general election date, in accordance with BCRP's election-related plans.

26. On July 8, 2024, KREF issued Advisory Opinion 2024-02, attached as **Exhibit B**,[10] in which it opined that executive committees, to include the BCRP, HCRP, and JCRP, could not expend any funds that advocated in favor of the School Choice Amendment (and, by implication, any other constitutional amendment).  The opinion was made publicly available on KREF's website for public consumption.  Specifically, KREF Advisory Opinion 2024-02

---

[10] Also available at https://kref.ky.gov/KREF%20Advisory%20Opinions/2024-002%20Opinion.pdf (last accessed 7/17/2024).

makes clear that "a county executive committee may not use the funds that it raises … to support a constitutional amendment." *Id.*

27. KREF justified its position in KREF Advisory Opinion 2024-02 because KREF promulgated an administrative regulation, 32 K.A.R. 1:050 that defines "executive committee" as (1) "Executive committee" means an organizational unit or affiliate recognized within the document governing a political party, that raises and spends funds to promote political party nominees, and performs other activities commensurate with the day-to-day operation of a political party, including voter registration drives, assisting candidate fundraising efforts, holding state conventions or local meetings, and nominating candidates for local, state, and federal office," and, according to KREF, spending money to advocate in favor of the School Choice Amendment was not promoting their nominees, and was not part of other day-to-day operations of the party.

28. On July 16, 2024 and July 17, 2024, undersigned Counsel for Plaintiffs wrote KREF, asking them to withdraw KREF Advisory Opinion 2024-02, observing that KRS 121.175 permits all committees to expend funds in favor of (or in opposition to) constitutional amendments, pointing out that advancing causes that are critical platform issues is a function of a political party, and providing case law on why KREF Advisory Opinion 2024-02 is unconstitutional. For the avoidance of doubt, the communication makes clear it is made on behalf of Plaintiffs. A true and accurate copy of those exchanges are attached as **Exhibit C**.

29. Of note, counsel for Plaintiffs asked KREF if they were disavowing any intentions to enforce KREF Advisory Opinion 2024-02, but they declined to disavow such intentions to enforce KREF Advisory Opinion 2024-02.  *See* **Exhibit C**.  To the contrary, and in response to an inquiry about whether KREF would take enforcement action if Plaintiffs sent election related

8

mail or door-to-door pieces that advocated in favor of the constitutional amendments, Defendants' General Counsel specifically noted that "I am not able to say that the Registry would ignore a properly filed complaint…" *Id.*

30. Among other things, given the tenor and rancor of the public debate on the School Choice Amendment, it is certain that if BCRP, HCRP, or JCRP expend funds in favor of the School Choice Amendment, Plaintiffs will have a verified complaint filed against them, triggering a review for probable cause by KREF under KRS 121.140(1) and (2).

31. Thus at present, (i) Plaintiffs BCRP, HCRP, and JCRP each have a present intention to expend funds they have raised and intend to continue to raise funds and spend such funds to advocate in favor of the School Choice Amendment including by way of mailers and door-to-door campaign printings; (ii) BCRP has undertaken graphic design efforts to complete these tasks; (iii) KREF has issued correspondence and an advisory opinion, specifically directed to HCRP and JCRP that engaging in these expenditures is not permitted by Kentucky campaign finance law as KREF interprets and enforces it; (iii) KREF accepts complaints from the public; (iv) there will be a complaint filed if BCRP, HCRP, and JCRP spend funds in favor of the School Choice Amendment; and (v) Defendants have not disavowed enforcement and in fact have explicitly indicated that they are "not able to say that the Registry would ignore a properly filed complaint."

32. Plaintiffs' intended protected election-related speech is thus presently chilled, as they are required to either forgo making expenditures in favor of the School Choice Amendment, or face imminent enforcement by KREF for doing so (and potentially criminal prosecutors on a referral from KREF) under KRS 121.140.

9

33. Plaintiffs have thus alleged an intention to engage in a course of conduct arguably affected with a constitutional interest (to spend money on election-related communications in favor of one or both of the pending constitutional amendments); that Defendants content the challenged statutes and actions proscribe, and, if Plaintiffs do so, there will be a certainly impending threat of prosecution/enforcement.

34. The actions set forth herein have and continue to deprive Plaintiffs of their First Amendment rights and is presently irreparably chilling their speech.

35. To be clear, and for the avoidance of all doubt, Plaintiffs intend to begin door-to-door efforts in favor of their candidates by August 31, 2024; that requires orders to be placed for door hangers making Joint Expenditures not later than August 24, 2024 (with the design for such door-to-door pieces needing to be done a few days prior to that), though they will do so earlier if they can. Plaintiffs equally intend to place orders for mail in early October, 2024. None of these activities can occur because of Defendants' actions. *Thus, without injunctive relief issued not later than August 21, 2024, Plaintiffs speech will certainly be chilled and their election-related speech and plans will be interrupted*.

36. Regardless of relief awarded by this Court, the BCRP and HCRP intends to make the expenditures in question in favor of the constitutional amendments; the JCRP, fearing enforcement action, will not do so without injunctive relief. The BCRP and HCRP seeks injunctive relief precluding Defendants from taking any enforcement action against them for such expenditures.

37. Finally, Plaintiffs intend to continue to make expenditures in future election cycles on issues and issues-related campaigns, including on constitutional amendments, tax proposals, and the like, anytime such issues have an intersection with the Republican Party's platform.

## COUNT I – VIOLATION OF FIRST AMENDMENT

### Part I – As Applied Challenge

38. Plaintiffs hereby reincorporate the preceding paragraphs as if fully set forth herein.

39. Plaintiffs are groups comprising citizens of the United States of America.

40. Plaintiffs have a clearly established right under the United States Constitution and its statutes to Freedom of Speech, Association, and Expression and other First Amendment guarantees.

41. Defendants, using their respective offices and acting under color of state law, have violated Plaintiff's First Amendment Rights, which has deprived Plaintiffs, who are citizens of the United States, of their right of Free Speech, and of Association, as guaranteed under the First Amendment of the U.S. Constitution, which rights are clearly established, and therefore subjected themselves under 42 U.S.C. § 1983, to prospective injunctive relief, and declaratory relief under 28 U.S.C. § 2201.

42. The First Amendment of the U.S. Constitution provides, in relevant part, that "Congress shall make no law ... abridging the freedom of speech..."  The First Amendment has been incorporated under the Fourteenth Amendment to apply to the states, including the Commonwealth of Kentucky, under *Gitlow v. New York*, 268 U.S. 652 (1925).

43. Defendants abused the authority of their respective offices and, while acting under color of law and with knowledge of Plaintiffs' established rights, used their offices to violate Plaintiffs' First Amendment rights.

44. KREF Advisory Opinion 2024-02, and to the extent they are implicated by KREF Advisory Opinion 2024-02, KRS 121.175 and 32 K.A.R. 1:050 constitute spending restrictions (as opposed to a contribution restriction), which triggers strict scrutiny.  *Kruse v. City of Cincinnati*, 142 F.3d 907, 912-13 (6th Cir. 1998).  To be upheld, therefore, the campaign-

expenditure restrictions must be both narrowly tailored, *Fed. Election Comm'n v. Nat'l Conserv. Political Action Comm.*, 470 U.S. 480, 496 (1985) ("NC-PAC"), and necessary to serve a compelling state interest, *Fed. Election Comm'n v. Mass. Citizens for Life*, 479 U.S. 238, 251-252 (1986). *See also Austin v. Mich. Chamber of Commerce*, 494 U.S. 652, 657, 108 L. Ed. 2d 652, 110 S. Ct. 1391 (1990). That is all the more the case because the restriction at issue would need to look at the content of the communication to determine if it ran afoul of KREF Advisory Opinion 2024-02. *Reed v. Town of Gilbert*, 576 U.S. 155 (2015).

45. There is no compelling government interest in preventing Plaintiffs from making election-related expenditures that advocate in favor of the School Choice Amendment to include Joint Expenditures, and, that Plaintiffs contend, will also have the effect of advancing Republican nominees to office.

46. For the avoidance of all doubt, Plaintiffs do not challenge the requirements under Kentucky law that requires them to report their contributors or the expenditures for their communications.

47. Even if Defendants can establish a compelling government interest, any interest is not narrowly tailored by a prohibition on making election-related expenditures that advocate in favor of the School Choice Amendment to include Joint Expenditures.

48. To the extent that Kentucky law prohibits Plaintiffs from making election-related expenditures that advocate in favor of the School Choice Amendment to include Joint Expenditures, it is unconstitutional. KREF Advisory Opinion 2024-02 is unconstitutional.

49. Plaintiffs seeks declaratory relief, and prospective injunctive relief under 42 U.S.C. 1983 and 28 U.S.C. §§ 2201 and 2202, declaring KREF Advisory Opinion 2024-02, and to the extent

they are implicated by KREF Advisory Opinion 2024-02, KRS 121.175 and 32 K.A.R. 1:050 unconstitutional, as applied, to the speech and campaign activities set forth herein. Plaintiffs likewise seek a preliminary and permanent injunction enjoining any enforcement by Defendants (including for expenditures made during the pendency of this suit) of KREF Advisory Opinion 2024-02, and to the extent they are implicated by KREF Advisory Opinion 2024-02, KRS 121.175 and 32 K.A.R. 1:050, as applied to any and/or all of the foregoing scenarios. Plaintiffs further seeks their reasonable attorney fees under 42 U.S.C. § 1988.

### Part II – Facial Challenge

50. Plaintiffs hereby reincorporates the preceding paragraphs as if fully set forth herein.

51. In addition to the foregoing, the impermissible applications of the law are substantial when compared against any legitimate sweep of KREF Advisory Opinion 2024-02, and to the extent they are implicated by KREF Advisory Opinion 2024-02, KRS 121.175 and 32 K.A.R. 1:050.

52. KRS 121.175 and 32 K.A.R. 1:050 are also void for vagueness, because as Defendants have applied and interpreted them, they extend to election-related communications that advocate in favor of constitutional amendments, which have the effect of advancing the candidacy of Republican nominees. No reasonable person could discern a violation of these provisions from simply reading them on their face from advocacy in favor of the School Choice Amendment to include Joint Expenditures, and yet they are being extended in a manner beyond the face of such provisions by Defendants.

53. KRS 121.175 and 32 K.A.R. 1:050 fail to establish standards that are sufficient to guard against the arbitrary deprivation of liberty interests.

13

54. A substantial number of instances exist in which KRS 121.175 and 32 K.A.R. 1:050 cannot be applied constitutionally. For instance, it is obvious that the KREF believes a violation exists wherever a party spends funds that KREF does not believe is consistent with "normal" party operations, to include, without limitation, advocacy in favor of the School Choice Amendment to include Joint Expenditures.

55. Plaintiffs further seeks declaratory relief, and prospective injunctive relief under 42 U.S.C. 1983 and 28 U.S.C. §§ 2201 and 2202, declaring KRS 121.175 and 32 K.A.R. 1:050, unconstitutional on their face; Plaintiffs likewise seeks a permanent injunction enjoining any enforcement by Defendants (including for expenditures made during the pendency of this suit). Plaintiffs further seek their reasonable attorney fees under 42 U.S.C. § 1988.

<u>Part III – Emergency Injunctive Relief</u>

56. Plaintiffs hereby reincorporate the preceding paragraphs as if fully set forth herein.

57. Plaintiffs seeks emergency relief, including a preliminary injunction or temporary restraining order, so that Defendants do not continue to cause them irreparable harm, including by chilling their intended forthcoming protected speech.

**WHEREFORE**, Plaintiff demands judgment as prayed for, including:

A. That this Court issue a declaration that KREF Advisory Opinion 2024-02, and to the extent they are implicated by KREF Advisory Opinion 2024-02, KRS 121.175 and 32 K.A.R. 1:050 are unconstitutional, as applied, to the speech and campaign activities set forth herein.

B. That this Court issue a declaration that to the extent they are implicated by KREF Advisory Opinion 2024-02, KRS 121.175 and 32 K.A.R. 1:050 are unconstitutional on their face because of overbreadth or vagueness;

14

C. That this Court award a temporary restraining order and/or preliminary injunction, enjoining enforcement of these rules, on an as-applied or facial basis, including forbidding Defendants from enforcing KREF Advisory Opinion 2024-02 and enjoining any enforcement by Defendants (including for expenditures made during the pendency of this suit) of that provision, and to the extent they are implicated by KREF Advisory Opinion 2024-02, KRS 121.175 and 32 K.A.R. 1:050 against Plaintiffs or generally;

D. That this Court award permanent injunctive relief, prohibiting any enforcement of KREF Advisory Opinion 2024-02 (including for expenditures made during the pendency of this suit), and to the extent they are implicated by KREF Advisory Opinion 2024-02, KRS 121.175 and 32 K.A.R. 1:050, or, in the alternative, prohibiting enforcement of KREF Advisory Opinion 2024-02, KRS 121.175 and 32 K.A.R. 1:050 as applied to the speech of Plaintiffs as set forth in greater detail herein;

E. That Plaintiffs be awarded their costs in this action, including reasonable attorney fees under 42 U.S.C. § 1988; and

F. Such other relief as this Court shall deem just and proper.

Respectfully submitted,

/s/ Christopher Wiest_____
Christopher Wiest (KBA 90725)
Theodore Roberts (KBA 100610)
Chris Wiest, Atty at Law, PLLC
50 E. Rivercenter Blvd., Ste. 1280
Covington, KY 41011
513/257-1895 (c)
859/495-0803 (f)
chris@cwiestlaw.com
*Counsel for Plaintiffs*

/s/Thomas B. Bruns
Thomas Bruns (KBA 84985)
Bruns, Connell, Vollmar & Armstrong, LLC
4555 Lake Forest Drive, Suite 330
Cincinnati, OH 45242
513-312-9890
tbruns@bcvalaw.com

## VERIFICATION

Pursuant to 28 U.S.C. 1746, I, Chet Hand, on behalf of the Boone County Republican Party Executive Committee, declare under penalty of perjury that I have read the foregoing Verified Complaint, and state that the factual statements therein are true and accurate to the best of my knowledge.

Executed on July 18, 2024.

## VERIFICATION

Pursuant to 28 U.S.C. 1746, I, Bobbie Coleman, on behalf of the Hardin County Republican Party Executive Committee, declare under penalty of perjury that I have read the foregoing Verified Complaint, and state that the factual statements therein are true and accurate to the best of my knowledge.

Executed on July 18, 2024.

*Bobbie Coleman*

## VERIFICATION

Pursuant to 28 U.S.C. 1746, I, Kim Garrison, on behalf of the Jessamine County Republican Party Executive Committee, declare under penalty of perjury that I have read the foregoing Verified Complaint, and state that the factual statements therein are true and accurate to the best of my knowledge.

Executed on July 18, 2024.

_Chair of the Republican Party of Jessamine Co._

# The Boone County Republican Party Urges you to support the Following Candidates and Causes

## Republican Candidates



**President and Vice President: Donald J. Trump and J.D. Vance**



**U.S. Congress: Thomas Massie**



**State Senate: Steve Rawlings**



**State Rep District 66: T.J. Roberts**



**State Rep District 60: Marianne Proctor**



**State Rep District 69: Steve Doan**



**State Rep District 61: Savannah Maddox**



**State Rep District 78: Mark Hart**

## VOTE YES ON:

### ✓ote Amendment 1

Amendment 1 will ban non-citizens from voting in Kentucky elections. This is a crucial step to securing the Republican Party's mission of election integrity!

### School Choice NOW  Amendment 2

Amendment 2 will allow empower parents to be in charge of their children's education, securing the Republican Party's mission of universal school choice

*Paid for by the Boone County Republican Party*



## KENTUCKY REGISTRY OF ELECTION FINANCE

**Thomas P. O'Brien, III, Chairman**
Adrian M. Mendiondo, Vice-Chair
Richard Clayton Larkin, Member
H. David Wallace, Member
J. Bissell Roberts, Member
Laura Marie Bennett, Member
Jessica Burke, Member

140 Walnut Street
Frankfort, Kentucky 40601-3240
Phone: (502) 573-2226
Fax: (502) 573-5622
www.kref.ky.gov

**John R. Steffen**
Executive Director

**Leslie M. Saunders**
General Counsel

### ADVISORY OPINION 2024-02

**Any Advisory Opinion rendered by the Registry under subsection (1) or (2) of this section may be relied upon only by the person or committee involved in the specific transaction or activity with respect to which the Advisory Opinion is required. See KRS 121.135(4).**

July 8, 2024

**VIA FIRST CLASS U.S. MAIL**
Hardin County Republican Party
c/o Bobbie Coleman, Chair
327 Riesling Ct.
Vine Grove, KY 40175

And

Jessamine County Republican Party
c/o Kim Garrison, Chair
1108 Ashgrove Road
Nicholasville, KY 40356

**In re: Request for Advisory Opinion: Use of Funds for Supporting Constitutional Amendments**

Dear Chairpersons Coleman and Garrison:

This Advisory Opinion is sent in response to the requests your respective executive committees (Hardin County Republican Party and Jessamine County Republican Party) made by letters both dated June 7, 2024, and received by the Kentucky Registry of Election Finance ("the



Page 2
Hardin County Republican Party and Jessamine County Republican Party
July 8, 2024

**Use of Funds for Supporting Constitutional Amendments** (AO 2024-02)

Registry") on June 10, 2024.  Both indicated that your executive committees would like to promote and support the passage of Amendment 2 that will be on the ballot for the general election in November.  That amendment addresses whether voters are "in favor of enabling the General Assembly to provide financial support for the education costs of students in kindergarten through 12th grade who are outside the system of common (public) schools." (See 2024 HB 2.) Each request asked two nearly identical questions (identified below as Questions 2 and 3). Chairperson Coleman added one additional question, identified below as Question 1:

> 1)     Would [the Registry] consider the purchasing of signs and advertising to be an activity subject to [its] regulation?[1]
>
> 2)     May county executive committees make expenditures in support of or against constitutional amendment ballot issues?
>
> 3)     If an executive committee may make expenditures in support of or against constitutional amendment ballot issues, what expenditures are allowed and what are prohibited?

Your request was posted on the Registry's web site for ten days for public comment, but the Registry received no comments.

To address Chairperson Coleman's question first, yes, the Registry regulates, by statute, purchasing of signs and advertising in support or opposition to constitutional amendments, as is evidenced by the definition of "political issues committee" in KRS 121.015(3)(c), "which means three (3) or more persons joining together to advocate or oppose a constitutional amendment or public question which appears on the ballot if that committee receives or expends money in excess of one thousand dollars ($1,000)[.]" While this statute does not regulate every such purchase (for instance, it would not regulate the purchase of signs by an individual), it has bearing on the next question.

Executive committees, as opposed to political issue committees, have no statutory definition, but are defined in 32 KAR 1:050 as:

> [A]n organizational unit or affiliate recognized within the document governing a political party, that **raises and spends funds to promote political party nominees**, and performs other activities commensurate with the day-to-day operation of a political party, including voter registration drives, assisting candidate fundraising efforts, holding state conventions or local meetings, and nominating candidates for local, state, and federal office. [Emphasis added.]

While the applicable language about raising and spending funds in that definition applies only to the phrase "promote political party nominees," chairpersons Coleman and Garrison have

---

[1] Although the request does not specify what the signs or advertising oppose or support, the answer in this Advisory Opinion is limited to support or opposition to constitutional amendments, as that is the only fact situation otherwise addressed by the requestors.

Page 3
Hardin County Republican Party and Jessamine County Republican Party
July 8, 2024

**Use of Funds for Supporting Constitutional Amendments** (AO 2024-02)

not pointed to, nor can I find, anything in the Rules of the Republican Party of Kentucky, that would suggest that supporting a constitutional amendment is one of the "other activities commensurate with the day-today operations of a political party." Thus the answer to the second question is that a county executive committee may not use the funds that it raises for party nominees to support a constitutional amendment. To the extent that members of the executive committee would like to begin raising funds to support or oppose a constitutional amendment, those members interested must form a political issues committee to do so.[2] This answer, of course, make the third question moot.

Please keep in mind that this Advisory Opinion is based on the specific facts set forth in your written request and only may be applied to cover the conduct in the transaction you described. If you have any questions concerning this Advisory Opinion, please do not hesitate to contact the Registry. Thank you.

Very truly yours,

LESLIE M. SAUNDERS
General Counsel

Cc:     Registry Members
        John R. Steffen, Executive Director

---

[2] This statement assumes that the contributions or expenditures will exceed $1,000. To the extent they do not, those members are not required to register a committee.

**chris@cwiestlaw.com**

| | |
|---|---|
| **From:** | Saunders, Leslie M  (KREF) <LeslieM.saunders@ky.gov> |
| **Sent:** | Thursday, July 18, 2024 10:07 AM |
| **To:** | chris@cwiestlaw.com |
| **Cc:** | Steffen, John R (KREF) |
| **Subject:** | RE: KREF 2024-02 |

Good morning, Mr. Wiest,

The Registry would agree that county parties have long had a history of engaging in voter education efforts.  It's a fair point to make that voting straight ticket does not vote for or against the amendment (once again, because how one votes on an amendment is not inherently a "party" issue). That the county parties were concerned about this sort of confusion and wanted to print some sort of information to alleviate it would have all been facts worth including in Hardin's and Jessamine's initial requests for an Advisory Opinion.  There might have been ways of accomplishing what they want to do without dancing so close to a violation of the law.

In response to your question below, obviously I am not able to say that the Registry would ignore a properly filed complaint nor guarantee how the Board would vote to handle the matter if it was presented to them.

If you have any other questions, please let me know.

Sincerely,


**Leslie M. Saunders**
General Counsel
Kentucky Registry of Election Finance
140 Walnut Street
Frankfort, Kentucky 40601
(502) 782-9342 (Office)
www.kref.ky.gov

**NOTICE:  This message does not represent the formal legal opinion of the Registry.  For an advisory opinion, you may submit your question in writing in the form of an advisory opinion request as provided by KRS 121.135 and 32 KAR 2:060.  Visit our website at https://kref.ky.gov/legal/Pages/Advisory-Opinions.aspx for more information about the advisory opinion process.**

**The information in this message is the sender's business.  As such it is confidential and may be legally privileged.  If you are not the intended recipient, any disclosure, copying, distribution or action taken or not taken in reliance on it is prohibited and may be unlawful.  If you have received this electronic mail transmission in error, inform the sender that you received it and then delete it.  Thank you.**


**From:** chris@cwiestlaw.com <chris@cwiestlaw.com>
**Sent:** Wednesday, July 17, 2024 11:56 AM
**To:** Saunders, Leslie M (KREF) <LeslieM.saunders@ky.gov>; Steffen, John R (KREF) <John.Steffen@ky.gov>
**Cc:** 'tj' <tj@cwiestlaw.com>
**Subject:** RE: KREF 2024-02

Ms. Saunders:

A separate issues committee does not solve the problem.  The intention is to run electioneering communications that jointly advocate for both the Republican ticket (up and down the ballot) as well as the constitutional amendment, including voter education that a straight ticket vote does not vote the amendment.  Said another way, the intention is to run mail and door-to-door pieces that advocate for both the Republican ticket and the constitutional amendment, on the same mail and door-to-door pieces.

The issues committee is not permitted, as we understand it, to run electioneering communications (mail and door-to-door pieces) in favor of the Republican ticket.

Are you saying that if the Republican parties spend money advocating in favor of the constitutional amendment, that KREF will not take any enforcement action against them, if a complaint is filed?  Please let me know the answer to that question today.

Because if that is the case, I will feel comfortable sharing that position with them (and the media), so they can freely spend in favor of the amendment.  If that is not the case, and there is the possibility of enforcement, then that will also weigh into ourcalculus (especially given the rancor of the debate and the interests on both sides of the amendment debate make it a practical certainty that a complaint would be filed if they spent in favor of the amendment).


Christopher Wiest
Chris Wiest, Attorney at Law, PLLC
50 E. Rivercenter Blvd, Ste. 1280
Covington, KY 41011
513-257-1895
chris@cwiestlaw.com


---

**From:** Saunders, Leslie M (KREF) <LeslieM.saunders@ky.gov>
**Sent:** Wednesday, July 17, 2024 9:15 AM
**To:** chris@cwiestlaw.com; Steffen, John R (KREF) <John.Steffen@ky.gov>
**Cc:** 'tj' <tj@cwiestlaw.com>
**Subject:** RE: KREF 2024-02

Good morning, Mr. Wiest:

John and I have reviewed the below and I want to make sure that you understand what an Advisory Opinion does and not do.  The only effect a Registry Advisory Opinion has is to protect the *requester* from campaign finance sanctions if the requester takes the action set out in the facts he or she provided in the request.  (See KRS 121.135(4)(b).  At this point the Registry has taken no action against any executive committee, nor is it contemplating action at this time.  Further, no complaint has yet been filed that would result in the requesters coming before the Registry Board.  In either event, the requester would still have the ability to make any arguments they felt were applicable.  Therefore, I'm not sure what action your suit for injunctive relief would address.

Further, an Advisory Opinion has no precedential value and may not be relied upon by anyone besides the requester.  (See KRS 121.135(4)(b))  I don't see how anyone you have mentioned below besides the Hardin County Republican  Executive Committee would have standing for a lawsuit such as you have mentioned.  The only other interested party is Jessamine County.

I once again reviewed the Rules  you mentioned below and I see no references to anything other than committee logistics and supporting candidates.  I noted that in the newspaper article Monday the state party agrees it only spends on candidates.  In fact, I've reviewed some 12,000 line items of expenditures, back to 2022, and have found only seven that reflect party spending on issues.  Five of these were from the same county party.  This either not something that does not occur regularly or something the county parties aren't reporting fully.

Once again, nothing stops members from Hardin County Republicans from forming a political issues committee and not commingling the funds meant for candidates with the funds for the political issue funds.  Nothing stops them from calling it "Hardin County Republicans Political Issue Committee" or "Hardin County Republicans – Vote "Yes" for School Choice" or any of the myriad of other options.  Because the reporting schedules for executive committees and political issues committees differ greatly, I am sure you can see where the transparency interest lies.  What strikes me as odd is why the county parties wouldn't prefer to put their political issues money into a fund that can accept unlimited contributions (including from corporations) as opposed to one that  where the contributions are limited by amount and origin.

We would be glad to speak to you further about this issue, but do not expect to take any other action at this time.

Sincerely,


**Leslie M. Saunders**
General Counsel
Kentucky Registry of Election Finance
140 Walnut Street
Frankfort, Kentucky 40601
(502) 782-9342 (Office)
www.kref.ky.gov

**NOTICE:  This message does <u>not</u> represent the formal legal opinion of the Registry.  For an advisory opinion, you may submit your question in writing in the form of an advisory opinion request as provided by KRS 121.135 and 32 KAR 2:060.  Visit our website at https://kref.ky.gov/legal/Pages/Advisory-Opinions.aspx for more information about the advisory opinion process.**

**The information in this message is the sender's business.  As such it is confidential and may be legally privileged.  If you are not the intended recipient, any disclosure, copying, distribution or action taken or not taken in reliance on it is prohibited and may be unlawful.  If you have received this electronic mail transmission in error, inform the sender that you received it and then delete it.  Thank you.**



**From:** chris@cwiestlaw.com <chris@cwiestlaw.com>
**Sent:** Tuesday, July 16, 2024 12:00 PM
**To:** Saunders, Leslie M (KREF) <LeslieM.saunders@ky.gov>; Steffen, John R (KREF) <John.Steffen@ky.gov>
**Cc:** 'tj' <tj@cwiestlaw.com>
**Subject:** KREF 2024-02

Dear John and Leslie:

We have been retained to represent the Boone and Hardin County Republican Parties (and are in the process of being engaged by 3 other Republican parties – 2 county parties and a Congressional District Party).

I want to start with applicable Kentucky law.  KRS 121.175 provides that:

No candidate, committee, or contributing organization shall permit funds in a campaign account to be expended for any purpose other than for allowable campaign expenditures. "Allowable campaign expenditures" means expenditures including reimbursement for actual expenses, made directly and primarily in support of or opposition to a candidate, constitutional amendment, or public question which will appear on the ballot and includes, but is not limited to, expenditures for staff salaries, gifts and meals for volunteer campaign workers, food and beverages provided at a campaign rally, advertising, office space, necessary travel if reported, campaign paraphernalia, purchases of advertisements in athletic and scholastic publications, communications with constituents or prospective voters, polling and consulting, printing, graphic arts, or advertising services, postage, office supplies, stationery, newsletters, and equipment which is used primarily for the administration of the campaign, or for fees incurred from legal services while defending a matter before the Kentucky Legislative Ethics Commission in which the final adjudication is rendered in favor of the candidate.

Plainly then, nothing in the text of KRS 121.175 would restrict an executive committee from making an allowable expenditure, which includes funds used "directly and primarily in support of or opposition to a … constitutional amendment."

The Rules of the Republican Party of Kentucky equally provide wide latitude for local and district parties.  Including advancing potential issues and opportunities by district parties.  Rule 3.0.  And managing and directing the party.  Rule 4.

School choice is a critical component of the Republican national platform.  ([https://prod-static.gop.com/media/RNC2024-Platform.pdf?_gl=1*1ih8dte*_gcl_au*MTU5NTA3NzQzLjE3MjExNDQ2NzA.&_ga=2.68937554.2143623856.1721144670-854709142.1721144670](https://prod-static.gop.com/media/RNC2024-Platform.pdf?_gl=1*1ih8dte*_gcl_au*MTU5NTA3NzQzLjE3MjExNDQ2NzA.&_ga=2.68937554.2143623856.1721144670-854709142.1721144670) at page 17)

That then takes me to KREF 2024-02.  That opinion is based on the proposition that somehow the Republican party rules do not (allegedly) permit spending in favor of a constitutional amendment that is part and parcel with a key provision of the national platform (which is incorrect), but ignores the explicit statutory authorization in KRS 121.175 to make those funds.  Even worse, KREF 2024-02 is a spending restriction (as opposed to a contribution restriction), which triggers strict scrutiny.  *Kruse v. City of Cincinnati*, 142 F.3d 907, 912-13 (6th Cir. 1998).  To be upheld, therefore, the campaign-expenditure restrictions must be both narrowly tailored, *Fed. Election Comm'n v. Nat'l Conserv. Political Action Comm.*, 470 U.S. 480, 496, 84 L. Ed. 2d 455, 105 S. Ct. 1459 (1985) ("NC-PAC"), and necessary to serve a compelling state interest, *Fed. Election Comm'n v. Mass. Citizens for Life*, 479 U.S. 238, 251-252 (1986). *See also Austin v. Mich. Chamber of Commerce*, 494 U.S. 652, 657, 108 L. Ed. 2d 652, 110 S. Ct. 1391 (1990).  That is all the more the case because the restriction at issue would need to look at the content of the communication to determine if it ran afoul of KREF 2024-02.  *Reed v. Town of Gilbert*, 576 U.S. 155 (2015)

I struggle to find any compelling interest that would be served by restricting a political party from spending money on electioneering-related communications to advance a constitutional amendment, that is central to its national platform.  Much less narrow tailoring.  That is all the more the case because contributions to executive committees are publicly reported as required by law, as are expenditures, promoting transparency.

We have been authorized to bring suit in U.S. District Court against the Registry Members in an official capacity and its executive director, and to immediately seek emergency injunctive relief, as our clients had in process campaign communications and mailings that need to be finalized before the election in just a few months.  The last time I had to bring a First Amendment suit against the Registry, it ended up being a six figure attorney fee bill that the Registry incurred.

I would ask that you immediately reconsider KREF 2024-02 and withdraw it, and provide the answer that KRS 121.175 provides for: that executive committees can make the expenditures in favor (or against) constitutional amendments.

4

Otherwise, I intend to file suit early next week and seek preliminary injunctive relief (and possibly restraining order relief).


Christopher Wiest
Chris Wiest, Attorney at Law, PLLC
50 E. Rivercenter Blvd, Ste. 1280
Covington, KY 41011
513-257-1895
chris@cwiestlaw.com

# IN THE UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF KENTUCKY – at COVINGTON

| | | |
|---|---|---|
| **Boone County Republican Party Executive Committee, et. al.** | : | Case No. 3:24-cv-00049-GFVT |
| | : | |
| **PLAINTIFFS** | | |
| | : | |
| v. | | |
| | : | |
| **H. David Wallace, et. al.** | | |
| | : | |
| **DEFENDANTS** | | |

## PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER, PRELIMINARY INJUNCTION, PERMANENT INJUNCTION, AND SUMMARY JUDGMENT

Plaintiffs, the Boone County Republican Party Executive Committee ("BCRP"), the Hardin County Republican Party Executive Committee ("HCRP"), and the Jessamine County Republican Party Executive Committee ("JCRP"), through Counsel, and pursuant to FRCP 65, move this Court for an order granting them a temporary restraining order, preliminary injunction and permanent injunction. Plaintiffs seek consolidation on the merits pursuant to FRCP 65(a)(2) and summary judgment pursuant to FRCP 56 as this case involves no factual disputes. In support is the verified complaint, and the memorandum attached hereto. Proposed orders are also attached. As noted, relief is necessary not later than August 21, 2024.

Respectfully submitted,

/s/ Christopher Wiest_____
Christopher Wiest (KBA 90725)
Theodore Roberts (KBA 100610)
Chris Wiest, Atty at Law, PLLC
50 E. Rivercenter Blvd., Ste. 1280
Covington, KY 41011
513/257-1895 (c)
chris@cwiestlaw.com
*Counsel for Plaintiffs*

/s/Thomas Bruns
Thomas B. Bruns (KBA 84985)
Bruns, Connell, Vollmar & Armstrong, LLC
4555 Lake Forest Drive, Suite 330
Cincinnati, OH 45242
513-312-9890
tbruns@bcvalaw.com

1

**CERTIFICATION UNDER FRCP 65**

Pursuant to FRCP 65(b)(1)(A), the Temporary Restraining Order, precluding Defendants from enforcing their interpretation of Kentucky law, related to campaign speech and the ability of political parties to spend money to advocate in favor of constitutional amendments, infringing upon the rights of the Plaintiffs, should be granted without notice because the rights involved are irreparable, as explained in the attached Memorandum in Support and Verified Complaint, and importantly, there are critical deadlines approaching.  Defendants, through Counsel, will be given notice of this filing immediately after the filing of the motion, and through a telephone call to their Counsel, and their counsel will be served with this Motion by e-mail.  Given time constraints and the significant consequences to this Plaintiff at stake, additional notice was not feasible.  As noted, and reflected in the Verified Complaint's Exhibit C, Defendants were engaged prior to the filing of this suit to try to avoid the filing in its entirety.

/s/ Christopher Wiest_____
Christopher Wiest (KBA 90725)

**MEMORANDUM IN SUPPORT**

I.      **INTRODUCTION**

School choice has become a central issue in American society and politics.  (Pl.'s Ver. Compl., Doc. 1, at PageID#1-15 at ¶1).  In Kentucky in particular, that is especially the case. *Id.* Certain public schools, including in our most populated areas, have faced increasing criticism and challenges over issues that include basic transportation problems in getting children to school,[1] testing results from larger school districts that reveal significant deficiencies in the areas of basic reading and math,[2] and deficiencies in career readiness. *Id.*  In recent years, the

---

[1] https://www.wdrb.com/news/education/a-year-in-review-of-jcps-transportation-system-busing-issues-in-louisville/article_cf5ab9ee-ea39-11ee-809d-cb20aaa08530.html (last accessed 7/17/2024).

[2] https://nces.ed.gov/nationsreportcard/subject/publications/dst2022/pdf/2023010xj8.pdf (last accessed 7/17/2024); https://www.wdrb.com/in-depth/most-jcps-students-struggle-with-reading-and-math-at-grade-level-diagnostic-testing-shows/article_8eb03f74-d87d-11ec-8b89-430271ed9494.html (last accessed 7/17/2024); https://www.usnews.com/education/k12/kentucky/districts/fayette-county-107072#:~:text=In%20Fayette%20County%20Public%20Schools%2C%2041%25%20of%20elementary%20students%20tested,above%20that%20level%20for%20math (last accessed 7/17/2024).

2

Kentucky General Assembly, through its Republican super-majority, has addressed these deficiencies by providing record funding to local schools.[3]  *Id.*  Yet that has not alleviated the problems and issues.  *Id.*  Frustrated with the lack of progress by public schools in ensuring adequate education, despite billions of dollars in public school funding, the Kentucky General Assembly took measures in 2021 to enact an educational opportunity account law that provided tax credits to permit parents, rather than the state, to make choices on where and how students are educated.[4]  *Id.*  The Kentucky Supreme Court ruled the provision unconstitutional in December, 2022.  *Commonwealth ex rel. Cameron v. Johnson*, 658 S.W.3d 25 (Ky. 2022).  *Id.*

In 2024, the Kentucky General Assembly, with a vote that fell largely upon political lines, placed a constitutional amendment on the ballot for the November, 2024 election, to permit what *Johnson* forbade, namely to permit the General Assembly to enact school choice legislation.[5]  *Id.* at ¶2.  If passed, it will amend the Kentucky Constitution to provide for the following:

> ***The General Assembly may provide financial support for the education of students outside the system of common schools. The General Assembly may exercise this authority by law, Sections 59, 60, 171, 183, 184, 186, and 189 of this Constitution notwithstanding.***  *Id.*

---

[3] https://www.prichardcommittee.org/posts/historic-increase-in-education-funding-helps-drive-a-big-bold-future-for-kentucky#:~:text=%E2%80%8D-,Historic%20increase%20in%20education%20funding%20helps%20drive,Big%20Bold%20Future%27%20for%20Kentucky&text=LEXINGTON%2C%20Ky%20%E2%80%94%20As%20the%202024,million%20annually%20in%20education%20funding (last accessed 7/17/2024); https://www.kentuckyteacher.org/leadership/guest-columns/2022/05/2022-kentucky-general-assembly-includes-key-increases-for-education-funding-in-biennial-budget/ (last accessed 7/17/2024).

[4] 21 RS HB 563, https://apps.legislature.ky.gov/record/21rs/hb563.html (last accessed 7/17/2024);

[5] 24 RS HB 2, available at https://apps.legislature.ky.gov/record/24rs/HB2.html (last accessed 7/17/2024).

This will be the second amendment passed by the legislature for consideration by Kentucky's voters on the ballot in the fall of 2024, and is colloquially known as "amendment 2," but we refer in this suit to the foregoing legislation and amendment as the "School Choice Amendment." *Id.*

All of the foregoing efforts by Kentucky's General Assembly are consistent with the Republican Party Platform, including the 2024 Platform, that contained an entire chapter on cultivating great K-12 schools, that specifically provides for providing universal school choice in every state.[6] *Id.* at ¶3.

## II.   FACTS

### The Parties

Plaintiffs, the Boone County Republican Party Executive Committee ("BCRP"), the Hardin County Republican Party Executive Committee ("HCRP"), and the Jessamine County Republican Party Executive Committee ("JCRP"), are the duly chartered county party executive committees for the Republican Party; all are also "executive committees" pursuant to Kentucky campaign finance law, including KRS 121.015. *Id.* at ¶4.

Defendants are H. David Wallace, Laura Marie Bennett, Jessica Burke, Richard Larkin, Adrian Mendiondo, Thomas O'Brien, and J. Bissell Roberts. All are members of the Kentucky Registry of Election Finance ("KREF"), and Defendant, John Steffen is the Executive Director of KREF; all Defendants are sued in their official capacity. *Id.* at ¶¶ 5-6.

KREF is charged with enforcement of (KRS 121.140), and actively enforces[7] Kentucky's campaign finance laws, arising under KRS Chapter 121. *Id.* at ¶7.

---

[6] 2024 Republican Party Platform, at Chapter 7, pages 17-18, at ¶2. Available at: https://prod-static.gop.com/media/RNC2024-Platform.pdf?_gl=1*184yiv3*_gcl_au*MTU5NTA3NzQzLjE3MjExNDQ2NzA.&_ga=2.64768809.702348249.1721235523-854709142.1721144670 (last accessed 7/17/2024).
[7] https://kref.ky.gov/legal/Pages/Cases.aspx (last accessed 7/17/2024).

KREF is empowered, pursuant to KRS 121.135, to issue advisory opinions, which are made available to the public and posted online. *Id.* at ¶8. While, pursuant to the terms of KRS 121.135, the issuance of an advisory opinion provides certain legal protection for the requester who complies with advice given (if the facts provided are also adequately described), it also reflects KREF's view of the law and the scope of Kentucky election finance law, and is made available to the public so others can determine the scope and requirements of law. *Id.*

An advisory opinion serves another purpose as well: to delineate KREF's view of the law so that those who transgress it know that they will be held accountable. *Id.* at ¶9. Said another way, it serves as a credible threat of enforcement for those who act contrary to any opinion. *Id.*

KREF is also charged, under KRS 121.140, with processing and handling complaints. *Id.* at ¶10. Upon receipt of a sworn complaint, including by the public or on its own initiative, KREF is required to determine if there is probable cause for a violation. *Id.* KRS 121.140(2). Once probable cause is established, KREF can then resolve the violation by way of agreement, or hearing. *Id.* Penalties include up to $5,000 per violation, or, if the violation is made knowingly, the law permits referral to prosecuting attorneys for criminal prosecution. KRS 121.140(2), (4), and (5). *Id.*

<p align="center">Facts Common to the Claims</p>

On or about June 10, 2024, the HCRP and JCRP wrote to KREF, seeking an advisory opinion on whether they could use funds they raised to advocate in favor of the School Choice Amendment for the November, 2024 general election?[8] *Id.* at ¶14. In both letters, HCRP and

---

[8] https://kref.ky.gov/KREF%20Advisory%20Opinions/2024-002%20Requests.pdf (last accessed 7/17/2024).

JCPR advised KREF that they wished to and intended to use funds they raised to advocate in favor of the School Choice Amendment for the November, 2024 general election. *Id.* at ¶15.

In fact, HCRP, JCRP, and BCRP all have expressly raised funds and solicited donors for donations for the express purpose of purchasing signs and campaign materials (to include mailers and door-to-door door hangers) that advocate in favor of the Republican party candidates and nominees (both local and national), as well as the School Choice Amendment (the "Joint Expenditures"). *Id.* at ¶16. BCRP, HCRP, and JCRP have each determined that school choice and the School Choice Amendment is a central issue for voters, particularly voters who align with their values, especially in light of the 2024 Republican National Platform and its entire plank on education, including school choice. *Id.* at ¶17. They have also determined that advocacy in favor of the School Choice Amendment also is likely to substantially assist in electing their nominated candidates, including because driving voter turnout in support for the School Choice Amendment will result in additional voter turnout for nominated Republican candidates. *Id.*

The BCRP equally intends to spend in favor of amendment 1, a provision that prohibits non-citizens from voting in Kentucky's elections. *Id.* at ¶18. It has equally determined that this amendment is consistent with the party's platform, and will advance Republican nominees for political office and turnout for those candidates in the November, 2024 election. *Id.*

Indeed, well established circuit precedent teaches that a party platform, and the candidates it endorses, are part and parcel with each other. *Carey v. Wolnitzek*, 614 F.3d 189, 201-202 (6th Cir. 2010) ("A party platform after all is nothing more than an aggregation of political and legal positions, a shorthand way of announcing one's views on many topics of the day"). *Id.* at ¶19.

BCRP has raised approximately $20,000 for the purpose of running Joint Expenditures, while HCRP and JCRP have raised approximately $10,000 for the purpose of running Joint Expenditures, with each continuing the process to raise additional funds.  *Id.* at ¶¶ 20-23.

For the avoidance of all doubt, BCRP, HCRP, and JCRP each intend to raise, and spend money, in support of election-related communications for both their nominated candidates, and the School Choice Amendment, usually in the same mailer or in door-to-door hangers.  *Id.* at ¶24

To that end, BCRP previously had been working with graphic designers on its mail piece that it intends to have printed, reproduced, and mailed to Republican and Independent voters in Boone County in October, 2024.  *Id.* at ¶25.  A draft of that mail piece, as of July 19, 2024, is attached as **Exhibit A** to the Verified Complaint.  *Id.*  While the details of that mailer may change, the general content and intent concerning that mailer, including the mailer's purpose as a Joint Expenditure that advocates for both the ticket and the constitutional amendment, will not.  *Id.*  The mail piece must be finalized and submitted to the printer not later than the first week of October, 2024, to be in a position to be delivered approximately a week prior to the November 5, 2024 general election date, in accordance with BCRP's election-related plans.  *Id.*

On July 8, 2024, KREF issued Advisory Opinion 2024-02, attached as **Exhibit B** to the verified Complaint,[9] in which it opined that executive committees, to include the BCRP, HCRP, and JCRP, could not expend any funds that advocated in favor of the School Choice Amendment (and, by implication, any other constitutional amendment).  *Id.* at ¶26.  The opinion was made publicly available on KREF's website for public consumption.  *Id.*  Specifically, KREF Advisory

---

[9] Also available at https://kref.ky.gov/KREF%20Advisory%20Opinions/2024-002%20Opinion.pdf (last accessed 7/17/2024).

Opinion 2024-02 makes clear that "a county executive committee may not use the funds that it raises … to support a constitutional amendment." *Id.*

KREF justified its position in KREF Advisory Opinion 2024-02 because KREF promulgated an administrative regulation, 32 K.A.R. 1:050 that defines "executive committee" as (1) "Executive committee" means an organizational unit or affiliate recognized within the document governing a political party, that raises and spends funds to promote political party nominees, and performs other activities commensurate with the day-to-day operation of a political party, including voter registration drives, assisting candidate fundraising efforts, holding state conventions or local meetings, and nominating candidates for local, state, and federal office," and, according to KREF, spending money to advocate in favor of the School Choice Amendment (and advance the party's platform) was not promoting the party's nominees, and was not part of other day-to-day operations of the party. *Id.* at ¶27.

On July 16, 2024 and July 17, 2024, undersigned Counsel for Plaintiffs wrote KREF, asking them to withdraw KREF Advisory Opinion 2024-02, observing that KRS 121.175 permits all committees to expend funds in favor of (or in opposition to) constitutional amendments, pointing out that advancing causes that are critical platform issues is a function of a political party, and providing case law on why KREF Advisory Opinion 2024-02 is unconstitutional. *Id.* at ¶28. A true and accurate copy of those exchanges are attached as **Exhibit C** to the Verified Complaint. *Id.*

Of note, Counsel for Plaintiffs asked KREF if they were disavowing any intentions to enforce KREF Advisory Opinion 2024-02, but KREF declined to disavow such intentions to enforce KREF Advisory Opinion 2024-02. *See* **Exhibit C**. *Id.* at ¶29. To the contrary, and in response to an inquiry about whether KREF would take enforcement action if Plaintiffs sent

election related mail or door-to-door pieces that advocated in favor of the constitutional amendments, Defendants' General Counsel specifically noted that "I am not able to say that the Registry would ignore a properly filed complaint…" *Id.*

Among other things, given the tenor and rancor of the public debate on the School Choice Amendment, it is certain that if BCRP, HCRP, or JCRP expend funds in favor of the School Choice Amendment, Plaintiffs will draw an appropriate verified complaint, triggering a review for probable cause by KREF under KRS 121.140(1) and (2). *Id.* at ¶30.

Thus at present, (i) Plaintiffs BCRP, HCRP, and JCRP each have a present intention to expend funds they have raised and intend to continue to raise funds and spend such funds to advocate in favor of the School Choice Amendment including by way of mailers and door-to-door campaign printings; (ii) BCRP has undertaken graphic design efforts to complete these tasks; (iii) KREF has issued correspondence and an advisory opinion, specifically directed to HCRP and JCRP that engaging in these expenditures is not permitted by Kentucky campaign finance law as KREF interprets and enforces it; (iii) KREF accepts complaints from the public; (iv) there will be a complaint filed if BCRP, HCRP, and JCRP spend funds in favor of the School Choice Amendment; and (v) Defendants have not disavowed enforcement, and in fact have explicitly indicated that they are "not able to say that the Registry would ignore a properly filed complaint." *Id.* at ¶31.

Plaintiffs' intended First Amendment protected election-related speech is thus presently chilled, as they are required to either forgo making expenditures in favor of the School Choice Amendment, or face enforcement by KREF (and potentially criminal prosecutors on a referral from KREF) under KRS 121.140. *Id.* at ¶32.

9

Plaintiffs have thus alleged an intention to engage in a course of conduct arguably affected with a constitutional interest (to spend money on election-related communications in favor of one or both of the pending constitutional amendments) that Defendants contend the challenged statutes and actions proscribe, and, if Plaintiffs so engage, there certainly will be an impending threat of prosecution/enforcement. *Id.* at ¶33.

The actions set forth herein have and continue to deprive Plaintiffs of their First Amendment rights and are presently irreparably chilling their speech. *Id.* at ¶34.

To be clear, and for the avoidance of all doubt, Plaintiffs intend to begin door-to-door efforts in favor of their candidates by August 31, 2024; that requires orders to be placed for door hangers making it necessary to spend Joint Expenditures not later than August 24, 2024 (with the design for such door-to-door pieces needing to be done a few days prior to that), though they will do so earlier if they can. Plaintiffs equally intend to place orders for mail in early October, 2024. *Id.* at ¶35. None of these activities can occur because of Defendants' actions as described above. *Id. Thus, without injunctive relief issued not later than August 21, 2024, Plaintiffs speech will certainly be chilled and their election-related speech and plans will be interrupted,*. *Id.*

### III.   LAW AND ARGUMENT

#### A.  Injunction Standards and Summary Judgment Standard

When deciding whether to issue a preliminary injunction or temporary restraining order, the court must consider the following four factors: (1) a strong likelihood of success on the merits; (2) the movant's irreparable harm; (3) substantial harm to others; and (4) the public interest would be served by issuance. *Suster v. Marshall*, 149 F.3d 523, 528 (6th Cir. 1998); *Northeast Ohio Coalition for the Homeless v. Blackwell*, 467 F.3d 999, 1009 (6th Cir. 2006). These "are factors to be balanced, not prerequisites that must be met." *In re DeLorean*

*Motor Co.*, 755 F.2d 1223, 1229 (6th Cir. 1985).  The standards for a permanent injunction are the same, except that a Plaintiff must show actual success on the merits rather than a likelihood of success.  *Winter v. NRDC*, Inc., 555 U.S. 7, 33 (2008).  "A party is entitled to a permanent injunction if it can establish that it suffered a constitutional violation and will suffer continuing irreparable injury for which there is no adequate remedy at law."  *Lee v. City of Columbus*, 636 F.3d 245, 249 (6th Cir. 2011).

In considering a motion for summary judgment, the court must view the factual evidence in favor of the non-moving party and draw all reasonable inferences in the non-moving party's favor.  *Williams v. Mehra*, 186 F.3d 685, 689 (6th Cir. 1999) (en banc).  Verified complaints carry "the same weight" as affidavits for the purposes of summary judgment (and for injunctive relief).  *El Bey v. Roop*, 530 F.3d 407, 414 (6th Cir. 2008).

### B.  Plaintiffs have standing

We anticipate Defendants to argue that Plaintiffs do not standing because, prior to suit, communications with Defendants seemed to argue as much.  *See* Ver. Compl, Exhibit C.  To establish a likelihood of success in a lawsuit, a plaintiff must, of course, have standing to bring it. *See Vitolo v. Guzman*, 999 F.3d 353, 359 (6th Cir. 2021).  Plaintiffs can show that they have standing to raise this pre-enforcement First Amendment challenge by establishing that: (1) they intend to engage in expression that the Free Speech Clause (or Association Clause) arguably protects, (2) their expression is arguably proscribed by the challenged actions of Defendants, and (3) they face a credible threat of enforcement from those Rules.  *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159-162 (2014) (*quoting Babbitt v. Farm Workers*, 442 U.S. 289, 298 (1979)).  *See, also, Fischer v. Thomas*, 52 F.4th 303, 307 (6th Cir. 2022).

11

Here, it is without question that Plaintiffs intend to engage in expression that the Free Speech Clause (or Association Clause) arguably protects.  The Verified Complaint makes this intention clear in a number of paragraphs, as well as the concrete actions that these Plaintiffs have undertaken to engage in such speech, to include raising funds to print and mail the communications in question, and the BCRP having engaged graphic designers to design the mail in question.  (Ver. Compl., Doc. 1 at ¶¶ 14-18, 20-25, 30-31, 33, 35, Exhibit A, PageID#5-7, 9-10, 19).  It is beyond doubt that Defendants have proscribed those very speech activities.  (Ver. Compl., Doc. 1, at ¶¶ 26-29, 31-32, Exhibit B, PageID#7-9, 20-22).  That leaves the issue of whether there is a credible threat of enforcement here.

"To identify a credible threat of enforcement, the first and most important factor is whether the challenged action chills speech."  *Fischer*, 52 F.4th 303, 307, *citing McKay v. Federspiel*, 823 F.3d 862, 869 (6th Cir. 2016).  And, KREF's "actions do just that."  *Id.*  The JCRP is self-censoring because the communication from Defendants prohibits the speech at issue.  (Ver. Compl., Doc. 1, at ¶36, PageID#10).

"Beyond chill, a variety of facts can demonstrate a credible threat of enforcement."  *Fischer*, 52 F.4th 303, 307.  "Our cases have highlighted four commonly recurring factors to consider: (1) Does the relevant prosecuting entity have a prior history of enforcing the challenged provision against the plaintiffs or others? (2) Has that entity sent warning letters to the plaintiffs regarding their conduct? (3) Does the challenged regulatory regime make enforcement easier or more likely? and (4) Did the prosecuting entity refuse to disavow enforcement of the challenged provision against the plaintiffs?"  *Id., citing Online Merchants Guild v. Cameron*, 995 F.3d 540, 550 (6th Cir. 2021) (recounting factors articulated in McKay,

12

823 F.3d at 869). "This isn't a laundry list; the [Plaintiffs] don't have to satisfy all the  factors." *Id.* at 307-308.

As to the first factor, "KREF is charged with enforcement of (KRS 121.140), and actively enforces[10] Kentucky's campaign finance laws, arising under KRS Chapter 121." (Ver. Compl., Doc. 1 at ¶7, PageID#4).  Past enforcement actions against others suffice to establish this factor. *Fischer*, 52 F.4th 303 at 308.  As in *Fischer*, that factor is met here.

As to the second factor, KREF sent a warning letter, in the form of an advisory opinion, to two of these Plaintiffs, and it posted that warning letter online to serve as a warning for others. (Ver. Compl., Doc. 1 at ¶¶ 8-9, 26-27, Exhibit B, PageID#4, 7-8, 20-22).  A letter directed at a party that informs him or her that engaging in speech is prohibited, such as the advisory opinion here, is sufficient to meet this prong.  *Kiser v. Reitz*, 765 F.3d 601, 605, 609 (6th Cir. 2014). Indeed, what matters for this second factor is whether plaintiffs have pointed to "enforcement warning letters" addressing "their specific conduct."  *Fischer*, 52 F.4th 303 at 308, *quoting McKay*, 823 F.3d at 869.  This factor equally is met.

As to the third factor, the question is whether the law "contains a feature making enforcement 'easier or more likely'—namely, a provision authorizing any member of the public to file complaints."  *Fischer*, 52 F.4th 303 at 308, *quoting McKay*, 823 F.3d at 869.  This factor is met here.  That is because "KREF is also charged, under KRS 121.140, with processing and handling complaints."  (Ver. Compl., Doc. 1, at ¶10, PageID#4-5).  "Upon receipt of a sworn complaint, including by the public or on its own initiative, KREF is required to determine if there is probable cause for a violation."  *Id., citing* KRS 121.140(2).  "Once probable cause is established, KREF can then resolve the violation by way of agreement, or hearing."  *Id.*

---

[10] https://kref.ky.gov/legal/Pages/Cases.aspx (last accessed 7/17/2024).

"Penalties include up to $5,000 per violation, or, if the violation is made knowingly, the law permits referral to prosecuting attorneys for criminal prosecution." *Id., citing* KRS 121.140(2), (4), and (5).  "[T]hat includes 'political opponents' with incentives to file "frivolous complaints" on the eve of an election." *Fischer*, 52 F.4th 303 at 308, *quoting Driehaus*, 573 U.S. at 164. Moreover, "given the tenor and rancor of the public debate on the School Choice Amendment, it is certain that if BCRP, HCRP, or JCRP expend funds in favor of the School Choice Amendment, Plaintiffs will have a verified complaint filed against them, triggering a review for probable cause by KREF under KRS 121.140(1) and (2)."  (Ver. Compl., Doc. 1, at ¶30, PageID#9).  Clearly, the third factor is met.  *Fischer*, 52 F.4th 303 at 308.

And as to the fourth factor, and prior to filing suit, we asked Defendants in light of equivocation whether they were disclaiming enforcement.  The response was "I am not able to say that the Registry would ignore a properly filed complaint…"  (Ver. Compl., Doc. 1, at ¶29, Exhibit C, PageID#8-9, 23).  Thus, "our caselaw makes it clear that such refusals, in combination with the other factors, weigh in favor of finding a credible threat of prosecution."  *Fischer*, 52 F.4th 303 at 308, *citing McKay*, 823 F.3d at 869.

Again, these factors are not "a laundry list; the [Plaintiffs] don't have to satisfy all the factors."  *Fischer*, 52 F.4th 303 at 307-308.  Yet here, Plaintiffs have done so, and they have standing.

### C.  Plaintiffs have demonstrated success on the merits

"'When a party seeks a preliminary injunction on the basis of a potential violation of the First Amendment, the likelihood of success on the merits often will be the determinative factor.'" *Jones v. Caruso*, 569 F.3d 258, 265-66 (6th Cir. 2009) (*quoting Connection Distrib. Co. v. Reno*, 154 F.3d 281, 288 (6th Cir.1998)).  In other words, when a constitutional violation is alleged,

14

especially a First Amendment violation, the factors concerning harm and the public interest can be addressed only after resolving the crucial determination of "whether the [regulation] at issue is likely to be found constitutional.'" *Id.* (*quoting Connection Distrib. Co.*, 154 F.3d at 288); *see also Congregation Lubavitch v. City of Cincinnati*, 923 F.2d 458, 460 (6th Cir. 1991).

Defendants' actions here, as reflected in KREF Opinion 2024-02, violate both the Speech and Association protections of the First Amendment. As the Supreme Court has found, "[t]he First Amendment 'has its fullest and most urgent application to speech uttered during a campaign for political office.'" *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 339-340 (2010) (*quoting Eu v. S.F. Cnty. Democratic Cent. Comm.*, 489 U.S. 214, 223 (1989)); *see also Buckley v. Valeo*, 424 U.S. 1, 48 (1976) ("Advocacy of the election or defeat of candidates for federal office is no less entitled to protection under the First Amendment than the discussion of political policy generally or advocacy of the passage or defeat of legislation."). Thus, political speech— including the endorsement of public issues or constitutional amendments—is at the core of speech protected by the First Amendment.

Precedent is clear that the government may not impose restrictions on disfavored speakers or condition restrictions on speech based on the type of speaker. *Citizens United*, 558 U.S. 310 (2010). "In the realm of protected speech, the legislature is constitutionally disqualified from dictating the subjects about which persons may speak and the speakers who may address a public issue." *Id.* at 347, *quoting First Nat'l Bank v. Bellotti*, 435 U.S. 765, 784-785 (1978). "Discussion of public issues and debate on the qualifications of candidates are integral to the operation of the system of government established by our Constitution." *Buckley*, supra, 424 U.S. 1, 14.

Defendants do not prohibit individuals from making expenditures in favor of the constitutional amendments (or opposing those Defendants) but do prohibit executive committees/political parties from doing so.  That runs afoul of clearly established case law on the Freedom of Association.  "Even though individual members of the state central committees and county central committees are free to issue endorsements, imposing limitations 'on individuals wishing to band together to advance their views on a ballot measure, while placing none on individuals acting alone, is clearly a restraint on the right of association.'"  *Eu*, 489 U.S. 214, 224-225, *quoting Citizens Against Rent Control/Coalition for Fair Housing v. Berkeley*, 454 U.S. 290, 296 (1981).

Moreover, KREF Opinion 2024-02 is a spending restriction based on the content of speech (as opposed to a contribution restriction), which triggers strict scrutiny.  *Kruse v. City of Cincinnati*, 142 F.3d 907, 912-13 (6th Cir. 1998).  To be upheld, therefore, the campaign-expenditure restrictions must be both narrowly tailored, *Fed. Election Comm'n v. Nat'l Conserv. Political Action Comm.*, 470 U.S. 480, 496, 84 L. Ed. 2d 455, 105 S. Ct. 1459 (1985) ("NC-PAC"), and necessary to serve a compelling state interest, *Fed. Election Comm'n v. Mass. Citizens for Life*, 479 U.S. 238, 251-252 (1986).  *See also Austin v. Mich. Chamber of Commerce*, 494 U.S. 652, 657, 108 L. Ed. 2d 652, 110 S. Ct. 1391 (1990).  That is all the more the case here because the restriction at issue would need to look at the content of the communication to determine if it ran afoul of KREF Opinion 2024-02.  *Reed v. Town of Gilbert*, 576 U.S. 155 (2015).

Indeed, courts around the country have been steadfast in striking down actions similar to those taken by Defendants here.  *Sanders County Republican Cent. Comm. v. Bullock*, 698 F.3d

16

741 (9th Cir. 2012) (unconstitutional to prohibit political party from spending money to endorse non-partisan judicial candidates); *Berkeley*, 454 U.S. 290, 296.

Nor does Defendants proposed "solution" to the problem, namely requiring the registration of an issues-related Political Action Committee separate from the executive committee, solve the problem. First, because such issues PACs are "burdensome alternatives," because they "are expensive to administer and subject to extensive regulations," and thus do "not alleviate the First Amendment problems" with Defendants' prohibition on executive committee expenditures in favor (or opposed to) constitutional amendments. *Citizens United*, 558 U.S. 310 at 337. But yet another problem exists with respect to an issues PAC: those PACS cannot run Joint Expenditures either – they can only advocate in favor of the constitutional amendment(s), and not the parties' nominees, and equally cannot run political communications that would associate the two.

There are two governmental interests that can justify certain restrictions on campaign speech – neither of which are implicated here. First, "disclosure" requirements are upheld because they "minimize the potential for abuse of the campaign finance system," are in part "justified based on a governmental interest in providing the electorate with information about the sources of election-related spending," and may also "deter actual corruption and avoid the appearance of corruption by exposing large contributions and expenditures to the light of publicity." *McCutcheon v. FEC*, 572 U.S. 185, 223 (2014). But Plaintiffs do not challenge Kentucky's requirements for disclosure and reporting of contributors and expenditures. (Ver. Compl, Doc. 1, at ¶46, PageID#12). And, second, campaign finance restrictions are often justified on the basis of preventing *quid-pro-quo* corruption or its appearance. *McCutcheon*, 572 U.S. 185, 211. But that interest is not at issue here, because "the risk of *quid pro quo* corruption

17

is generally applicable only to 'the narrow category of money gifts that are directed, in some manner, to a candidate or officeholder.'" *Id.* Yet we do not have money here going to candidates for office or public officeholders. Instead, the money here flows in from donors, is pooled, and is then spent in advancing a slate of candidates and constitutional amendments all part and parcel with the platform of the Republican party.

Defendants thus have <u>no</u> compelling (or even serious) governmental interest in preventing political party executive committees from spending money to advocate in favor (or against) constitutional amendments.

And even if they do articulate such an interest, preventing expenditures towards engaging in advocacy in favor or against a constitutional amendment, is not going to be narrowly tailored to meet such an interest.

Plaintiffs have demonstrated that they succeed on the merits.

### D.  Plaintiffs have demonstrated irreparable harm

In this case, as in many First Amendment cases, the key inquiry is the first one: Who is likely to prevail on the constitutional claim? *Roberts v. Neace*, 958 F.3d 409, 416 (6th Cir. 2020) (per curiam); *Sisters For Life, Inc. v. Louisville-Jefferson Cnty.*, 56 F.4th 400, 403 (6th Cir. 2022). That is because the "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Connection Distrib. Co. v. Reno*, 154 F.3d 281, 288 (6th Cir. 1998), *quoting Elrod v. Burns*, 427 U.S. 347, 373 (1976) (irreparable harm from violation of rights).

Here, the Defendants have undertaken efforts, in the run up to a general election, to chill the speech of groups of people – political parties no less – to advocate in favor of a constitutional amendment that is consistent with those parties' national platform. Chilling such speech is

18

irreparable harm – there is no way to put the genie back in the bottle because such harm cannot be undone.

### E. Plaintiffs have demonstrated the balance of harms and public interest weigh in their favor

Case law is clear that where, as here, there is a First Amendment violation, the balance of harms and public interest likewise weigh in favor of an injunction.  *Foster v. Dilger*, 2010 U.S. Dist. LEXIS 95195 (EDKY 2010) (no substantial harm to others, even where registry incurred printing costs, where constitutional rights at stake); *Martin-Marietta Corp. v. Bendix Corp.*, 690 F.2d 558, 568 (6th Cir. 1982); *see also G & V Lounge v. Mich. Liquor Control Comm'n*, 23 F.3d 1071, 1079 (6th Cir. 1999) ("[I]t is always in the public interest to prevent the violation of a party's constitutional rights.").  See, also, *Sisters For Life, Inc.,* 56 F.4th 400, 409 ("we cannot re-weigh the equities so as to undercut the First Amendment").

## IV.  CONCLUSION

Plaintiffs have demonstrated an entitlement to a temporary restraining order, preliminary injunction, a permanent injunction, and summary judgment in their favor.

Respectfully submitted,

/s/ Christopher Wiest_____
Christopher Wiest (KBA 90725)
Theodore Roberts (KBA 100610)
Chris Wiest, Atty at Law, PLLC
50 E. Rivercenter Blvd., Ste. 1280
Covington, KY 41011
513/257-1895 (c)
chris@cwiestlaw.com
*Counsel for Plaintiffs*

/s/Thomas Bruns
Thomas B. Bruns (KBA 84985)
Bruns, Connell, Vollmar & Armstrong, LLC
4555 Lake Forest Drive, Suite 330
Cincinnati, OH 45242
513-312-9890
tbruns@bcvalaw.com

## CERTIFICATE OF SERVICE

I certify that I have served a copy of the foregoing upon all Counsel or parties of record by: (1) filing same via CM/ECF; (2) by serving this motion and proposed order with the summons and complaint in this matter; (3) by emailing this to the Defendants' General Counsel;

19

and (4) by mailing the foregoing, by ordinary and U.S. mail, to Defendants, all done this 22 day of July, 2024.

/s/Christopher Wiest

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
FRANKFORT

|  |  |  |
|---|---|---|
| BOONE COUNTY REPUBLICAN PARTY EXECUTIVE COMMITTEE, *et al.*, | ) ) ) ) ) | |
| Plaintiffs, | ) ) | Case No. 3:24-cv-00049-GFVT |
| V. | ) ) ) | **MEMORANDUM OPINION & ORDER** |
| H. DAVID WALLACE, *et al.*, | ) ) | |
| Defendants. | ) ) | |

**\*\*\*   \*\*\*   \*\*\*   \*\*\***

This matter is before the Court on Plaintiffs' Motion for Temporary Restraining Order, Preliminary Injunction, Permanent Injunction, and Summary Judgment. [R. 6.]  Because Plaintiffs have failed to satisfy the requirements of Federal Rule of Civil Procedure 65, their request for a Temporary Restraining Order is **DENIED.**  However, the Court will continue analysis of Plaintiffs' Motion for Preliminary Injunction, Permanent Injunction, and Summary Judgment after a scheduling conference has been held and additional briefing has been filed.

**I**

In March 2021, the Kentucky General Assembly enacted House Bill (HB) 563.  Under HB 563, Kentucky taxpayers who donate to account-granting organizations (AGO) receive essentially a dollar-for-dollar tax credit against their income taxes.  These AGOs allocate taxpayer contributions to education opportunity accounts (EOA), which can be used for education-related expenses.  The primary goal behind this tax structure was to assist in reducing the cost of nonpublic school tuition.  The law became effective on June 29, 2021, but was short-lived.  On December 15, 2022, the Kentucky Supreme Court found the law was unconstitutional

under Section 184 of the Kentucky Constitution. *Commonwealth ex rel. Cameron v. Johnson*, 658 S.W.3d 25 (Ky. 2022). Section 184 provides that "no sum shall be raised or collected for education other than in common schools until the question of taxation is submitted to the legal votes." Ky. Const. § 184.

In response to the Supreme Court's opinion, the Kentucky General Assembly placed a constitutional amendment on the ballot for November 2024. The Kentucky Registry of Election Finance (KREF) is tasked with, *inter alia*, "administering Kentucky's campaign finance law." About, *Kentucky Registry of Election Finance*, https://kref.ky.gov/about/Pages/default.aspx (last accessed July 24, 2024). As a part of the enforcement scheme, KREF can issue advisory opinions pursuant to KRS § 121.135. In June 2024, the Jessamine County Republican Party Executive Committee (JCRP) and the Hardin County Republican Party Executive Committee (HCRP) wrote to KREF seeking an advisory opinion on whether they could use funds to campaign in favor of the School Choice Amendment on the November 2024 election ballot. The Boone County Republican Party Executive Committee (BCRP), as well as JCRP and HCRP, have all raised money with the explicit purpose of campaigning in favor of the School Choice Amendment. Specifically, the Plaintiffs seek to invest in "election-related communications for both their nominated candidates, and the School Choice Amendment, usually in the same mailer or door-to-door hangers." *Id.* at 7. The mail piece must be finalized by October 2024 in order to be delivered before the November 5th election date.

On July 8, 2024, KREF issued Advisory Opinion 2024-02, in which they found that the Plaintiffs could not expend funds that advocated in favor of the School Choice Amendment. As support KREF found that within the definition of "executive committee" in 32 KAR 1:050, the Plaintiffs are only entitled to "raise[] and spend[] funds to promote political party nominees," not

advocating for a constitutional amendment.  Further, KREF found that advocating for a constitutional amendment was not part of "other activities commensurate with the day-to-day operations of a political party."  *Advisory Opinion 2024-02*, Kentucky Registry of Election Finance (July 8, 2024), https://kref.ky.gov/KREF%20Advisory%20Opinions/2024-002%20Opinion.pdf.  The Plaintiffs asked KREF if they advocated in favor of the constitutional amendment whether KREF would take enforcement action against them, to which KREF replied they "are not able to say that the Registry would ignore a properly filed complaint."  [R. 6 at 9.]  Thus, the Plaintiffs feel certain that if they were to expend money in favor of the School Choice Amendment, they would face an enforcement action, effectively chilling their election-related speech.  As such, the Plaintiffs filed the present action arguing the Defendants violated the First Amendment.  As relief, the Plaintiffs seek "emergency relief, including a preliminary injunction or temporary restraining order" prohibiting the Defendants from continuing to chill the Plaintiffs' speech.

## II

Rule 65 allows the Court to issue a TRO without notice to the other party only if "(A) specific facts in an affidavit or a verified complaint clearly show that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition; and (B) the movant's attorney certifies in writing any efforts made to give notice and the reasons why it should not be required."  Fed. R. Civ. P. 65(b)(1).  In determining whether to issue a TRO, the Court examines: (1) whether the movant has shown a strong likelihood of success on the merits; (2) whether the movant will suffer irreparable harm if the injunction is not issued; (3) whether the issuance of the injunction would cause substantial harm to others; and 4) whether the public interest would be served by issuing the injunction.  *Overstreet v. Lexington–*

3

*Fayette Urban County Government*, 305 F.3d 566, 573 (citations omitted).

"[A] temporary restraining order is an extraordinary remedy designed for the limited purpose of preserving the status quo pending further proceedings on the merits[.]" *Stein v. Thomas*, 672 Fed. App'x 565, 572 (6th Cir. 2016). This is because "our entire jurisprudence runs counter to the notion of court action taken before reasonable notice and an opportunity to be heard has been granted both sides of a dispute." *Reed v. Cleveland Bd. of Educ.*, 581 F.2d 570, 573 (6th Cir. 1978) (quoting *Granny Goose Foods, Inc. v. Teamsters*, 415 U.S. 423, 439 (1974)).

The Plaintiffs have asked the Court to enjoin Defendants from enforcing their Advisory Opinion. Per Rule 65, a temporary restraining order may not exceed fourteen (14) days. Fed. R. Civ. P. 65(b)(2). The Plaintiffs have not alleged—and the Court finds it unlikely— that KREF will review the Plaintiffs' practices concerning their use of campaign funding within the next fourteen days. Further, even if enforcement were suspended for fourteen days, it does not automatically follow that KREF will not seek enforcement of their Advisory Opinion following the expiration of the TRO. The Court acknowledges the principle that a violation of one's constitutional rights is an irreparable harm. *See, e.g., Deja Vu of Nashville, Inc. v. Metro. Gov't of Nashville & Davison County*, 274 F.3d 377 (6th Cir. 2001); *Jones v. Perry*, 215 F. Supp. 3d 563 (E.D. Ky. 2016). But the irreparable harm the Plaintiffs allege is not immediately preventable by means of a temporary restraining order.

### III

Accordingly, and the Court being sufficiently advised otherwise, it is hereby

**ORDERED** as follows:

1. Plaintiffs' Motion for Temporary Restraining Order [R. 6] is **DENIED**; and

4

2.  A scheduling conference regarding Plaintiffs' Motion for Preliminary
    Injunction, Permanent Injunction, and Summary Judgment [R. 6] shall be held
    telephonically on **Thursday, July 25, 2024** at **1:30 p.m**.

3.  To join the teleconference, the parties are **DIRECTED** to call Microsoft
    Teams Teleconferencing at 1-606-371-5577 and enter Phone Conference ID
    648 877 261#.

This the 24th day of July, 2024.

Gregory F. Van Tatenhove
United States District Judge

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF KENTUCKY**
**NORTHERN DIVISION (Covington)**

*ELECTRONICALLY FILED*

BOONE CNTY. REPUBLICAN PARTY EXECUTIVE COMM., ET AL.      PLAINTIFFS


v.                                                  CIVIL ACTION NO. 3:34-cv-49-GFVT


H. DAVID WALLACE, ET AL.                                   DEFENDANTS

**DEFENDANTS' MEMORANDUM OF LAW**
**IN SUPPORT OF RESPONSE TO**
**PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION,**
**PERMANENT INJUNCTION, AND MOTION FOR SUMMARY JUDGMENT**

---

## I.      INTRODUCTION

Defendants H. David Wallace, Laura Marie Bennett, Jessica Burke, Richard Larkin, Adrian Mendiondo, Thomas O'Brien, and J. Bissell Roberts, board members of the Kentucky Registry of Election Finance ("Registry"), and John Steffen, Registry executive director, all named in their official capacities, respectfully move this Honorable Court to deny the Motion for a Preliminary Injunction, Permanent Injunction, and Summary Judgment ("Motion") [DN 6][1] filed with the Complaint [DN 1] in this matter by Plaintiffs Boone County Republican Executive

---

[1] In the same pleading, the Plaintiffs also requested a temporary restraining order, which this Court denied on July 24, 2024 [DN 10]. A permanent injunction, the standards for which would be the same as for a preliminary injunction, with the notable exception that in the preliminary injunction, the plaintiffs must show a *likelihood* of success on the merits of the case, whereas the question of whether a permanent injunction is appropriate follows *actual* success on the merits. *Am. C.L. Union of Kentucky v. McCreary Cnty., Ky.*, 607 F.3d 439, 445 (6th Cir. 2010). To the extent that the preliminary injunction would be inappropriate, permanent injunctive relief would be as well.

Committee ("BCREC"), Hardin County Republican Executive Committee ("HCREC"), and Jessamine County Republican Executive Committee ("JCREC").

Without question the First Amendment right to free speech protects the rights of candidates and contributors to disseminate their political message free from excessive government intrusion. The United States Supreme Court, however, has recognized that not all campaign finance laws raise the same level of constitutional concern. Plaintiffs attempt to cast this case in terms of "spending restriction," akin to the outright prohibition on corporations making "electioneering communications" that was overturned in *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310 (2010). The Registry argues below that this is the wrong analysis altogether and that the law it is trying to enforce is not a restriction on the content of speech or the identity of speaker but instead is one which promotes disclosure of election information in a manner calculated to be useful to the electorate. As such it represents a narrowly tailored law that furthers a compelling government interest and meets the "exacting scrutiny" which the *Citizens United* Court required.

## II. STATEMENT OF FACTS

Since 1992, the Kentucky legislature has defined a "political issues committee" as "three (3) or more persons joining together to advocate or oppose a constitutional amendment or public question which appears on the ballot if that committee receives or expends money in excess of one thousand dollars ($1,000)[.]" Ky. Rev. Stat. Ann. ("KRS") §121.015(3)(d). A political issues committee, because it spends in conjunction with a regular (commonly referred to as "general") election, reports in the same way a candidate reports. The committee indicates whether it intends to raise or spend $5,000 or more in the election within five days of receiving contributions or making expenditures. KRS §121.180(1)(a)1. If it intends to receive or spend

less than that amount, it reports only on a 30-day post-election statement of contributions and expenditures.  KRS §121.180(4).  If it does not claim the reporting exemption and raises and spends less than $5,000, it makes reports 60 days, 30 days, and 15 days prior to the election, along with the 30-day post-election statement.

Political issues are not subject to the sort of *quid pro quo* corruption one might fear with candidates. *McIntyre v. Ohio Elections Comm'n,* 514 U.S. 334, 352 n. 15, (1995).  Thus, political issues committees cannot be subject to the same sorts of restrictions as committees formed to support candidates.  They do not have the same limits on contributions and can accept corporate contributions.[2]  This will be addressed further below, but to the extent that three or more of their individual members of the Plaintiffs' executive committees have already pooled money to support an issue on the ballot, those individuals are already, under Kentucky law, acting as a political issues committee.[3]

Executive committees, on the other hand, are not defined in the statute, but by each party's bylaws.  They act as the functional unit of the party at county (in this matter) level. For Kentucky campaign finance law purposes, they report on a schedule that has little to do with the election schedule.  It is presumed that they spend for party nominees and, starting this year, many smaller executive committees file only once a year.  KRS §121.180(2)(c) (Executive committees shall report on a "semiannual basis if the committee has more than ten thousand dollars ($10,000) in its campaign fund account. . . .If the committee has less than ten thousand dollars ($10,000) in the campaign fund account, the report. . . .shall be made on an annual

---

[2] KRS 121.150(18) excepts political issues committees from the list of entities not allowed to receive contributions from a corporation.

[3] As the Plaintiffs acknowledge in the Complaint, p. 16, executive committees are made up of individuals.  Further, executive committees are not corporations.  If they were, they could not contribute to campaigns under KRS §§ 121.025, 121.035, 121.150 and Ky. Const. §150.

basis[.]")   When executive committees make contributions, either monetary or in-kind, to a candidate, the candidate reports the contributions on the same schedule outlined for political issues committees above. KRS §121.180(3). To the extent that executive committees make independent expenditures for candidates, the timeline to report those in Kentucky is even shorter. They must be reported as soon as the expenditures exceed $500 in one election (KRS §121.150(1)) and then no later than 48 hours from "the date the communication is publicly distributed" (KRS §121.120(6)(j).)  It is under this system of reporting[4] that the Registry opined that executive committees are not able to make expenditures to support or oppose ballot issues.

Plaintiffs are three county-level Republican Party executive committees, those in Boone, Hardin, and Jessamine counties.  Of those three, two availed themselves on June 7, 2024, of the Registry's advisory opinion process set out in KRS § 121.135(1), which states:

> Any person may file a written request with the registry for an advisory opinion concerning the application of the provisions of this chapter or any administrative regulation promulgated by the registry with respect to a specific transaction or activity by the person. The registry shall render a written advisory opinion relating to the specific transaction or activity to the person making the request not later than thirty (30) days after the registry receives the request.

As recounted in Advisory Opinion 2024-02 ("AO 2024-02") and attached to the Plaintiff's Complaint as Exhibit B, both HCREC and JCREC asked two questions through letters signed by their chairs (Bobbie Coleman for HCREC and Kim Garrison for JCREC) in nearly identical verbiage:

1) May county executive committees make expenditures in support of or against constitutional ballot issues; and

---

[4] Plaintiffs do not challenge the requirements that executive committees must report contributions and expenditures.  Complaint, p. 12, para. 46.

2) If an executive committee may make such expenditures in support or against constitutional ballot issues, what expenditures are allowed and what are prohibited?

HCREC asked a third question, whether the purchasing of signs and advertising would be an activity that the Registry believed was subject to its regulation, a question and answer which the Plaintiffs do not address further in their Complaint.

The Registry's General Counsel, the undersigned, answered all three questions on July 8, 2024, stating that "executive committee" was not a type of committee defined in KRS §121.015, the general definitional section of Kentucky's campaign finance statutes, but they were defined in 32 Ky. Admin. Reg. ("KAR") 1:050, the administrative regulation that describes how political organizations required to make campaign finance-related filings under Kentucky law must do so. That definition states that an executive committee is:

> . . . an organizational unit or affiliate recognized within the document governing a political party, that raises and spends funds to promote political party nominees, and performs other activities commensurate with the day-to-day operation of a political party, including voter registration drives, assisting candidate fundraising efforts, holding state conventions or local meetings, and nominating candidates for local, state, and federal office.

Nothing in that definition referenced, nor did the rules of the Republican Party of Kentucky discuss, an executive committee spending to advocate for or against ballot issues, thus, the Advisory Opinion stated that, under Kentucky law, executive committees could not use funds they would otherwise use to raise and spend to support the party's nominees.  It noted, however, that individual members could join together and form political issues committees, as described above, under KRS §121.015(d).

While the Plaintiffs categorize the AO 2024-02 as the state's "threat of enforcement," in its Complaint, advisory opinions do not reflect the Registry's intent to begin enforcement action. The Registry, under KRS §121.135, issues advisory opinions only when requested and makes

5

them public.  However, the statutory and regulatory scheme make clear that advisory opinions are of limited value, which accrues only to the requester.  First, the opinion must describe a "specific transaction or activity by" the requester.  KRS §121.135(1).  Once an opinion is rendered, it relates only to the person making the request.  *Id.*  Under the corresponding administrative regulation, 32 KAR 2:060, the request must:

- Disclose the identity of the requester (Subsection 1(1));

- Describe a transaction the requester intends to undertake or is presently taking (Subsection 1(2)(a));[5]

- Not present a general question of interpretation, pose a hypothetical situation, or regard actions of a third party (Subsection 1(2)(b)); and

- Contain a complete description of all relevant facts (Subsection 1(3)).

If the requester meets all of these criteria, KRS §121.135(4)(b) states that:

> [A]ny person or committee to whom a written advisory opinion has been rendered who relies upon any provision or finding of the advisory opinion and who acts in good faith in accordance with the provisions and findings of the advisory opinion shall not, as a result of any act with respect to a transaction or activity addressed by the advisory opinion, be subject to any sanction provided by this chapter or any administrative regulation promulgated by the registry.

The statute also makes clear that:

> It shall be no defense in any civil or criminal proceeding regarding a violation of any provision of this chapter or any administrative regulation promulgated by the registry for a person or committee to claim that he relied upon and acted in good faith based upon any provision or finding of an advisory opinion if the person or

---

[5] Plaintiffs have asked for this case to move in an expedited manner, because they anticipate beginning door-to-door campaigning on August 24, 2024.  Thus, they ask for relief by August 21, 2024, to have time to print material similar to that provided in the Complaint.  It is worth noting here that the time crunch has been created by HCREC and JCREC waiting until June to request an advisory opinion that they could have requested at any time after the bill was delivered to the Secretary of State on March 21, 2024, when it became clear there would be a ballot issue to support.

committee was not the person or committee involved in the specific transaction or activity with respect to which the advisory opinion was rendered.

In this instance, HCREC and JCREC requested opinions based on the same, quite limited, fact pattern. The committees stated nothing more than, in JCREC's case:

We want to promote and support the passing of Amendment 2 on School Choice that will be on the ballot this November. We anticipate spending money on texts, signs, and other advertising/promotional materials. There are many other groups, such as teachers' unions, promoting their thoughts on the issue.

HCREC's request stated that the committee "wants to spend money on signs and other advertisements in favor of the school choice amendment that will be on the Kentucky ballot November 5, 2024."[6] BCREC did not make a request, nor was it even mentioned in the other requests. Neither were "joint expenditures" as described in the Plaintiffs' Complaint or the layout of a potential mailer itself, as attached to the Complaint as Exhibit A. At the time the requests were made, they were posted, as required by statute, for ten days, for public comment. The Registry received no comments, not even from BCREC.

As evidenced in the Complaint's Exhibit C, what happened immediately after the release of the AO 2024-02, on July 16, 2024, is that Counsel for the Plaintiffs contacted the Registry to threaten action in federal court if the Registry did not withdraw it. However, at that time, counsel said he represented HCREC and BCREC. Counsel for the Registry attempted to explain that the AO 2024-02 took no action of itself, but acted only as a defense to an action. Further, BCREC would not be able to avail itself of that defense, no matter what the opinion had said, as it had not been a requester. The Registry noted that any individuals who wish to support the amendment could form a political issues committee, call it anything they like, up to and

---

[6] See Exhibit A to this Response for copies of the Requests, which are also available at on the Registry's website at https://kref.ky.gov/KREF%20Advisory%20Opinions/2024-002%20Requests.pdf.

including "Hardin County Republicans – Vote 'Yes' for School Choice" and stay within the law.

Further, the Registry noted that, as discussed above, it did not see the committees as a distinction

without a difference because the reporting schedules are so different.

On July 17, 2024, Mr. Wiest emailed the following:

A separate issues committee does not solve the problem.  The intention is to run electioneering communications that jointly advocate for both the Republican ticket (up and down the ballot) as well as the constitutional amendment, including voter education that a straight ticket vote does not vote the amendment.  Said another way, the intention is to run mail and door-to-door pieces that advocate for both the Republican ticket and the constitutional amendment, on the same mail and door-to-door pieces.

Here, for the first time, the Registry was advised that some executive committees were

interested in spending on advertising that looked something like the advertising provided with

the Complaint, which represented a different question entirely, and was not covered by the AO

2024-02.  This is clear in the Registry's emailed response, which agrees that county parties have

a long history of voter education and that educating voters on how straight ticket voting works

would be part of the executive committees' job in the counties.  The Registry noted, which

would be true in no matter what the outcome of the AO 2024-02 that it cannot refuse to process a

complaint properly filed under KRS 121.140.  Advisory opinions, once again only act as a

defense to enforcement action.  In Response to the Registry's email on Thursday, July 18, 2024,

the Plaintiffs filed this matter on Monday, July 22, 2024.  Plaintiffs simultaneously with their

Complaint, filed motions for a temporary restraining order, preliminary injunction, permanent

injunction, and summary judgment.[7]  However, Plaintiffs' motions for injunctive relief and

---

[7] This Court denied the Motion for Temporary Restraining Order on July 24, 2024, finding that the Plaintiffs had not alleged and the Court found unlikely, that the Registry would review the Plaintiffs' use of campaign funds inside of 14 days, nor would a TRO keep the Registry from seeking enforcement following the end of that period.  The Court acknowledged at that time that "violation of one's constitutional rights is an irreparable harm," but that any potential harm was

summary judgment should be denied as the Plaintiffs can meet none of the four factors used to determine whether injunctive relief is appropriate, nor do the Defendants agree with the facts as the Plaintiffs present them.

## IV.   THE COURT SHOULD DENY INJUNCTIVE RELIEF IN THIS MATTER.

### A.   Standard

The Court considers four factors in determining whether to grant a preliminary injunction motion:

    (1)    the likelihood of plaintiff's success on the merits;

    (2)    whether the injunction will save plaintiff from irreparable injury;

    (3)    whether the injunction would harm others; and

    (4)    whether the public interest would be served.

*International Longshoremen's Association v. Norfolk Southern Corp.,* 927 F.2d 900, 903 (6th Cir. 1991).  The Court must make specific findings concerning each of the four factors, unless fewer are dispositive of the issue.  *Id*., see also *In re DeLorean Motor Co*., 755 F.2d 1223, 1228 (6th Cir. 1985).  The Plaintiffs should prevail on none of these factors.

### B.   The Plaintiff Does Not Have a Likelihood for Success On the Merits.

In the Motion, Plaintiffs quote *Jones v. Caruso*, 569 F.3d 258, 265-66 (6th Cir 2009) for the proposition that "[w]hen a party seeks a preliminary injunction on the basis of a potential violation of the First Amendment, the likelihood of success on the merits often will be the determinative factor" and the Registry agrees.  Plaintiffs, however, cannot establish that they prevail.  The governmental interest in this matter is one of disclosure and providing the electorate with information in a timely matter relative to the election date.  This is not a matter subject to

---

not preventable by the Plaintiffs' choice of remedy.  The Registry, of course, argues below that there has been no harm or threat of harm because the Plaintiffs' rights had not been violated.

strict scrutiny, but one that must meet a standard of exacting scrutiny. Of such matters, the

Supreme Court has said:

> Disclaimer and disclosure requirements may burden the ability to speak, but they 'impose no ceiling on campaign-related activities,' *Buckley,* 424 U.S., at 64, 96 S.Ct. 612, and 'do not prevent anyone from speaking,' *McConnell,* [540 U.S. 93] at 201, 124 S.Ct. 619 (internal quotation marks and brackets omitted). The Court has subjected these requirements to 'exacting scrutiny,' which requires a 'substantial relation' between the disclosure requirement and a 'sufficiently important' governmental interest. *Buckley, supra,* at 64, 66, 96 S.Ct. 612 (internal quotation marks omitted); see *McConnell, supra,* at 231–232, 124 S.Ct. 619.
>
> In *Buckley,* the Court explained that disclosure could be justified based on a governmental interest in 'provid[ing] the electorate with information' about the sources of election-related spending. *Buckley, supra.* at 66, 96 S.Ct. 612.

*Citizens United at* 366–67.

The disclosure interest here is specific. Instead of contributions and expenditures relating

to a ballot issue being reported once (or potentially twice) a year, and in no relation to the

election, the contributions and expenditures are reported on a schedule related to the election, in

the same way candidates are reported. The Registry has no interest in the identity of speakers or

the message here, only the transparency of campaign finance. The only "content restriction" is a

determination of whether an issue is on the ballot (thus, subjecting committees supporting or

opposing it to registration as a "political issues committee" under KRS §121.015(3)(d) and 32

KAR 1:050) or not. Further, the Registry's interpretation of the law in this manner is not a

spending restriction. In reality, registering as a political issues committee alleviates restrictions

to which executive committees are subjected, such as the prohibition on corporate contributions

in KRS §121.035 and the $5,000 per year contributor limit in KRS §121.150(11)(a)&(b).

All of the above makes the Plaintiff's reliance on *Eu v. San Francisco Cnty. Democratic*

*Cent. Comm.,* 489 U.S. 214 (1989) for its Freedom of Association Claim curious. It cites the

case for the proposition "[e]ven though individual members of the state central committees and

county central committees are free to issue endorsements, imposing limitations on 'individuals wishing to band together to advance their views on a ballot measure, while placing none on individuals acting alone, is clearly a restraint on the right of association." *Id*. at 224-225. Here the Registry wants to treat the party's membership *exactly* as it would individuals banding together to advance views on a ballot measure.

This is not the case that the Supreme Court faced in *Fed. Election Comm'n v. Massachusetts Citizens for Life, Inc.,* 479 U.S. 238 (1986), in which a non-profit corporation wished to publish a newsletter urging readers to vote for "pro-life" candidates and the Federal Election Campaign Act and the FEC wanted it to establish a "separate segregated fund" (which the court likened to a political committee). There the court said that the "state interest in disclosure [] can be met in a manner less restrictive than imposing the full panoply of regulations that accompany status as a political committee under the Act." *Fed. Election Comm'n v. Massachusetts Citizens for Life, Inc.,* 479 U.S. 238, 262, 107 S. Ct. 616, 630, 93 L. Ed. 2d 539 (1986). Kentucky requires no independent expenditure reporting for advertising advocating for or against ballot issues. The only meaningful reporting of expenditures for ballot issues comes through the registration as a political issues committee. The government's disclosure interest in providing this information to the public near in time to the election is both "sufficiently important" and "bears a substantial relation" to the requirement in order to survive "exacting scrutiny." *See Citizens United* at 366-367.

C.    **The Plaintiffs Have Suffered No Irreparable Injury**

In this case, the most concrete harm the Plaintiffs have alleged is that HCREC and JCREC do not have access to a defense, by virtue of a favorable KRS 121.135 advisory opinion, against a potential complaint that no third party has made or an enforcement action that the

11

Registry has not threatened.  BCREC, having not been one of the requesters of 2024-002, stands in no different position than it did had the Registry never issued the 2024-002 in the first place. Given that the Registry was not provided with the full facts of the "specific transaction or activity" that the Plaintiffs wished to conduct, the Defendants would argue that, without conceding the issue of whether executive committees can spend on political issues,  AO 2024-02 currently does not apply to the situation in which the Plaintiffs wish to engage.   As evidenced by the Registry's email exchange with Plaintiffs' counsel, had HCREC and JCREC more fully explained the nature of these "Joint Expenditures," which the Plaintiffs still have not fully clarified, the resulting advisory opinion would not have looked the same.

Plaintiffs have attempted to categorize 2024-02 as a "warning letter," such as the letter issued by the Ohio State Dental Board in *Kiser v. Reitz, 765 F. 3d 601 (6th Cir. 2014),* in which the board issued a letter to a regulated dentist stating that it had recently concluded an investigation into a particular patient's treatment, and "concerns [had] arisen" regarding the scope of his practice and his advertising of it.  *Id.* at 605.  In that case, the 6th Circuit noted that the Supreme Court in *Texas v. United States*, 523 U.S. 296 (1998) that a court should not adjudicate a claim "if it rests on contingent future events that may not occur as anticipated, or indeed may not occur at all." (Internal citations omitted.)  The 6th Circuit continued:

> A plaintiff satisfies this requirement when he alleges "an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder." *Babbitt v. United Farm Workers Nat'l Union,* 442 U.S. 289, 298, 99 S.Ct. 2301, 60 L.Ed.2d 895 (1979). When a plaintiff has engaged in a course of conduct and the state has instructed him to stop or face disciplinary action, we may infer a threat of prosecution that is neither 'chimerical,' *Steffel v. Thompson,* 415 U.S. 452, 459, 94 S.Ct. 1209, 39 L.Ed.2d 505 (1974) (internal quotation marks omitted), nor 'imaginary or wholly speculative,' *Babbitt,* 442 U.S. at 302, 99 S.Ct. 2301. Under such circumstances, a plaintiff has adequately alleged a concrete and imminent harm      sufficient      to      meet      the      'injury      in      fact'      requirement.

12

*Kiser* at 608.

Because of this, it found that Kiser had suffered harm that resulted from the Board's particularized threatened enforcement against him, the result of an investigation. Such is not the case in the matter currently before the Court. Here, two of the Plaintiffs requested an opinion, which the Registry gave as required by statute. The Registry has engaged in no enforcement action against those two Plaintiffs (nor indicated it intended one) and has said nothing of the third at all, except that it did not view the advisory opinion as being relevant to it.

Further, the Registry is without the ability to prevent prosecution should another agency charged with upholding criminal election laws decide to pursue action. Plaintiffs claim to suffer irreparable harm because they could face criminal penalties as a result of AO 2024-02. However, Plaintiffs cannot reasonably base their claims of irreparable harm on the fear that the Registry, through the Defendants, will criminally prosecute them. Kentucky's Attorney General is the chief enforcement officer of criminal violations of Kentucky's campaign finance law. The role of the Registry is civil: to assure the integrity of Kentucky's electoral process by making certain there is full public access to campaign financial data and financial disclosure reports, and by administering Kentucky's campaign finance laws. The Registry's regulatory function includes tracking of candidate and committee election finance activities, audit functions, investigations, review of and response to requests for advisory opinions, and adjudication of administrative charges of violations of campaign finance laws. KRS § 121.005, et seq.

The Registry's jurisdiction is limited to Chapter 121 of the Kentucky Revised Statutes. However, KRS Chapter 121 does not provide the only means by which a campaign finance violation may be initially investigated. *Naegele Outdoor Advertising Co. v. Moulton*, 773 F.2d 692, 694-95 (6th Cir. 1985) cert. denied, 475 U.S. 1121 (1986), see also *Democratic*

13

*Party of Kentucky v. Graham*, 976 S.W.2d 423, 429-30 (Ky. 1998). KRS § 121.140 expressly contemplates that the Attorney General or appropriate local prosecutor has responsibility for prosecutions of Kentucky's campaign finance law. *Naegele* at 697.

Nor is the Registry able to keep the Plaintiffs from producing any advertising they wish. The only conceivable harm the Plaintiffs face from the Registry would be civil penalties, and for those to accrue all of the following must happen: [8]

- The Registry receives a complaint from an outside party or from staff;

- The Registry General Counsel conducts an investigation into the matter, files a report and makes recommendations;

- The Registry's Board meets and votes that there is probable cause to believe that a violation has occurred that was not made knowingly;

- The Registry's Board refer the matter to the General Counsel and the Executive Director for conciliation proceedings; ***and***

- The Plaintiffs either accept a conciliation agreement or proceed to a formal administrative hearing.

Should the alleged violation survive all of those steps, the Plaintiffs could face a penalty. Even if that were a certainty, they do not face irreparable harm. The Supreme Court has said:

> 'The key word in this consideration is irreparable. Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay, are not enough. The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm.'

---

[8] KRS §121.140 and 32 KAR 2:030 -2:050.

*Sampson v. Murray*, 415 U.S. 61, 90 (1974), citing with approval  *Virginia Petroleum Jobbers Assn. v. FPC*, 259 F.2d 921 (1958).  The Plaintiffs have shown no irreparable damage here, thus this factor should be found for the Defendants.

> **D.        An Injunction at this Stage Would Harm Others and Fail to Serve the Public Interest.**

The last two factors seem hard to detangle in this matter.  The third parties involved in this matter would, of course, be *the public*.  In *Citizens United*, the Court said, "Even if the ads only pertain to a commercial transaction, the public has an interest in knowing who is speaking about a candidate shortly before an election." *Id.* at 369.  Nothing would compel a different result for ballot issues here.  If the public has any interest at all in knowing about who is spending on a ballot issue, it would surely be before such an election is held, when the transparency can allow it to "give proper weight to different speakers and messages." *Id.* at 371.

For this ballot issue, the applicable election date is November 5, 2024.  Under KRS §121.180, executive committees had a July 31, 2024, reporting deadline and will not report again until January 31, 2025.  The way the Plaintiffs timed their advertising and subsequent request for preliminary injunction ensures that the voting public,[9] will not have a chance to see who contributed to the ballot issue ads for Amendment 2, which the Complaint refers to as the "School Choice Amendment," before the election.  Note even the post-election report is close in time.  That information is lost.

The Motion confuses the issue of what kind of committee the Registry is addressing, calling it an "issues PAC."  The Motion needs to use this term to then argue that the Supreme Court called PACs burdensome in *Citizens United*:

---

[9] Or even the curious public.

15

> PACs are burdensome alternatives; they are expensive to administer and subject to extensive regulations. For example, every PAC must appoint a treasurer, forward donations to the treasurer promptly, keep detailed records of the identities of the persons making donations, preserve receipts for three years, and file an organization statement and report changes to this information within 10 days.

*Id.* at 337–38. For Kentucky purposes, there is no committee known as a "political action committee" or a "PAC" or an "issues PAC." Committees most analogous to federal PACs are known as "permanent committees" in Kentucky and are not at issue here. See KRS 121.015(3)(e). For state purposes, all committees appoint a chairperson and a treasurer, forward contributions to the treasurer, keeps records, preserve them for six years, file organizational statements, and make reports as required.

If the Plaintiffs report as a political issues committee, they will report contributions and expenditures on September 10, October 8, and October 23, 2024, all pre-election. The public will also have the benefit of a December 12, 2024, report. Once again, no additional information is required, nor is any left out across the two reporting schemes. The only question is will the information be of any use to the public when it receives it? These factors weigh against a preliminary injunction for the Plaintiffs.

## V. THE COURT SHOULD DENY SUMMARY JUDGMENT IN THIS MATTER.

In addition to their requests for injunctive relief, the Plaintiffs also move for summary judgment. The arguments against the appropriateness of summary judgment on the grounds that the Plaintiffs are not entitled to judgment as a matter of law have already been made in this Response. It will briefly address additional concerns that the motion for summary judgment raises below.

16

**A.       Standard.**

Summary judgment is appropriate where the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law Fed. R. Civ. P. 56(a).   "The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

**B.       Genuine Issues of Material Fact Remain.**

There are a number of "Facts Common to All Claims" included in the Complaint that the Defendants have no ability to confirm or deny, as would be required in an Answer, nor have the Plaintiffs provided any proof of them, aside from filing a verified complaint..   Among these are that the School Choice Amendment "is a central issue to voters," that "advocacy in favor of the School Choice Amendment is likely to also substantially assist in electing their nominated candidates," or that "driving voter turnout in support for the School Choice Amendment will result in additional voter turnout for nominated Republican candidates" (all in Para. 17). However, the Registry would disagree with at least one "fact" for which it would have knowledge that extends beyond that of the Plaintiffs.

Each Plaintiff has stated that its committee has raised substantial funds for the purpose of "running Joint Expenditures," with BCREC raising approximately $20,000 and the other two counties raising approximately $10,000 each.   As described above, the Registry currently has made no opinion, advisory or otherwise, as to what is allowable for "joint expenditures." It is uncertain what these expenditures are and whether they reflect in-kind contributions to or independent expenditures for candidates, coupled with an expenditure in support of ballot issues.

17

The Plaintiffs have not stated how expenditures are to be divided between the two ballot issues and the candidates or how they intend to report them. AO 2024-02 does not address "joint expenditures," nor were they explained in the request. Thus, the Registry could not, and did not, issue an advisory opinion concerning those "joint expenditures" at all. (See Complaint, Para. 31.) It was unaware that they were planned until it received Plaintiffs' counsel several days later and had not seen an example until the Complaint was filed on July 22, 2024.

## CONCLUSION

Plaintiffs are not entitled to injunctive relief in this case. They have failed to demonstrate a substantial likelihood of prevailing on the merits or that they will suffer irreparable injury. The public's interest is not served by reduced reporting on election spending that occurs only after the election and the voting public is harmed as a result of it. For these reasons, Defendant respectfully requests that the Court deny the Plaintiffs' Motion for Preliminary and Permanent Injunctions. The Defendants also argue that this case is not appropriate for summary judgment and respectfully request the Court to deny the Plaintiffs' motion for it, as well.

Respectfully submitted,

*/s/ Leslie M. Saunders*

Leslie M. Saunders (KBA 89446)
General Counsel
Kentucky Registry of Election Finance
140 Walnut Street
Frankfort, Kentucky 40601
LeslieM.Saunders@ky.gov
(502) 573-2226 (phone)
(502) 573-5622 (fax)
*COUNSEL FOR DEFENDANTS*

18

## CERTIFICATE OF SERVICE

I hereby certify that on August 9, 2024, I electronically filed the foregoing document with the Court by using the CM/EFC system, which will send a notice of electronic filing to the Hon. Christopher Wiest (email address: chris@cwiestlaw.com), the Hon. Theodore Roberts (tjroberts223@gmail.com), and  the Hon. Thomas Bruns (email address: tbruns@bcvalw.com). Further service will be provided to the Kentucky Attorney General, Office of the Attorney General, 700 Capitol Avenue, Suite 118, Frankfort, Kentucky 40601-3449, by copy sent via first class mail, postage pre-paid.

*/s/Leslie M. Saunders*

_____

Leslie M. Saunders
*COUNSEL FOR DEFENDANTS*



The Office of the General Counsel,
Kentucky Registry of Election Finance
140 Walnut Street
Frankfort, KY 40601

June 7, 2024

Dear Ms. Saunders,

I am the Chair of the Jessamine County Republican party. We want to promote and support the passing of Amendment 2 on School Choice that will be on the ballot this November.  We anticipate spending money on texts, signs and other advertising/promotional materials. There are many other groups, such as teachers' unions, promoting their thoughts on the issue. Therefore, we are seeking an advisory opinion on the legality of such expenditures, including the following:

1. May County committees make expenditures in support of or against constitutional amendment ballot issues?
2. If executive or County committees may make expenditures in support of or against constitutional amendment ballot issues, what expenditures are allowed and what are prohibited?

Because this issue is already being debated, we would appreciate any help with a quick decision.

Thank you for your time and attention to this request,

Kim Garrison, Chair RPJC

KY REGISTRY OF
ELECTION FINANCE
JUN 1 0 2024



**Hardin County Republican Party**
c/o Bobbie Coleman, Chair
327 Riesling Ct.
Vine Grove KY 40175
(217) 240-4572
bobbie.coleman71@gmail.com

Office of the General Counsel
Kentucky Registry of Election Finance
140 Walnut Street
Frankfort, KY 40601

June 7, 2024

Re: Request for an Advisory Opinion

Dear General Counsel,

I am an authorized Chair of the Hardin County Republican Party of Kentucky regarding this request.

Our County Committee wants to spend money on signs and other advertisements in favor of the school choice amendment that will be on the Kentucky ballot November 5, 2024.

1. Can executive committees make expenditures in support or opposition of constitutional amendment ballot issues?

2. If executive committees can make expenditures in support or opposition of constitutional amendment ballot issues, what expenditures are allowed, and which are prohibited?

Would KREF consider the purchasing of the signs and advertising to be an activity subject to KREF regulation?

Please feel free to request additional information.

Sincerely,

Bobbie S Coleman

Bobbie S. Coleman, Chair
Hardin County Republican Party of KY

KY REGISTRY OF
ELECTION FINANCE
JUN 1 0 2024

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE EASTERN DISTRICT OF KENTUCKY – at COVINGTON**

| | | |
|---|---|---|
| **Boone County Republican Party Executive Committee, et. al.** | : | Case No. 3:24-cv-00049-GFVT |
| | : | |
| **PLAINTIFFS** | | |
| | : | |
| v. | | |
| | : | |
| **H. David Wallace, et. al.** | | |
| | : | |
| **DEFENDANTS** | | |

**PLAINTIFFS' REPLY IN SUPPORT OF THEIR MOTION FOR A PRELIMINARY INJUNCTION, PERMANENT INJUNCTION, AND SUMMARY JUDGMENT**

Plaintiffs, the Boone County Republican Party Executive Committee ("BCRP"), the Hardin County Republican Party Executive Committee ("HCRP"), and the Jessamine County Republican Party Executive Committee ("JCRP"), through Counsel, provide this Reply.

**INTRODUCTION**

Defendants' Response (Doc. 14) is an unabashed exercise in misrepresentation. Among other misrepresentations, Defendants misrepresent Kentucky's disclosure requirements, and then misrepresent their content-based prohibition on speech by political parties as a mere "disclosure requirement." Likewise, Defendants attempt to distance themselves from the plain and unambiguous language of KREF Advisory Opinion 2024-02 ("Advisory Opinion") and their own General Counsel's recognition that the speech Plaintiffs seek to engage in is at least "close to a violation of the law," by misrepresenting that unconstitutional position as merely "preliminary." Their misrepresentations aside, Defendants (sort of) argue standing, but fail to cite to or address appropriate legal authority that would acknowledge Plaintiffs' pre-enforcement standing.

**A.** **Defendants' misrepresent that expenditures in favor of or against the ballot amendments are not promptly reported**

1

Defendants begin the defense of their Advisory Opinion by misrepresenting that disclosure requirements are different for executive committees and issues committees.  Yet, Defendants concede that any combination of persons who pool money would be subject to disclosure requirements for political issues committees.  (Resp., Doc. 14 at p.,3, PageID#124).  And Defendants also concede that executive committees that expend funds advocating in favor of candidates must report those expenditures within 48 hours.  *Id., see, also*, KRS 121.120(6)(j).  Said another way, Plaintiffs have to report their expenditures in support of most of their door-to-door pieces and mailings within 48 hours, as that restriction is the most onerous.

**B.      Defendants misrepresent the import of their Advisory Opinion**

Essentially, Defendants argue that advisory opinions generally are of very limited significance.  (Resp., Doc. 14 at pp. 4-7, PageID#124-128).  However, their argument ignores that their Advisory Opinion was issued to two of the Plaintiffs herein; covered their intended speech (Plaintiffs' proposed advocating in favor of the constitutional amendments); and threatened that the intended speech was, in the eyes of the body charged with enforcing Kentucky Campaign Finance Law, illegal.  (Doc. 1-3, PageID#21-23).

Defendants then misrepresent the clear language of their Advisory Opinion, by coyly suggesting that the Joint Expenditures Plaintiffs intend to make are not (necessarily) encompassed within and/or prohibited by their Advisory Opinion.  (Resp., Doc. 14 at pp. 5-8, PageID#126-129).  First, the Joint Expenditures are not the extent of what the Plaintiffs intend to do: they also intend to mail and spend generally in favor of the amendments.  (Compl., Doc. 1, at ¶¶ 15, 18, 24, PageID#5-8).  Moreover, Defendants' Advisory Opinion is clear: "Thus the answer to the second question is that a county executive committee **may not use the funds it raises for party nominees to support a constitutional amendment**."  (Doc. 1-3, PageID#23)

2

(emphasis added).  Further, Defendants' argument ignores the their own General Counsel's threat that "mail and door-to-door pieces that advocate for both the Republican ticket and the constitutional amendment on the same mail and door-to-door pieces", is speech that constitutes "dancing so close to a violation of the law."  (Doc. 1-4, PageID#24-25).  And after being told about the Joint Expenditures, Defendants declined to disavow enforcement.  *Id.*  Said another way, the General Counsel's communication is yet another credible threat of enforcement if Plaintiffs proceed with their intended speech.

> **C.** **<u>Defendants misrepresent that their Advisory Opinion is a disclosure requirement. Rather, it is a content-based spending restriction that triggers strict scrutiny. Regardless, Defendants' "disclosure" interest fails generally and, in any event, an outright ban on issue advocacy is not narrowly tailored towards meeting a disclosure interest</u>**

Defendants misrepresent that the governmental interest here is merely one of disclosure. (Doc. 14 at pp. 9-10, PageID#130-131).  Several problems exist with this false statement.  First, executive committees that advocate in favor of candidates must report such expenditures within 48 hours, so plainly this is not about disclosure.  *Id., see, also*, KRS 121.120(6)(j).  Second, even if Plaintiffs ran mailers that <u>only</u> advocated in favor of the ballot measures and not the Republican slate, they would, as Defendants concede, still be acting as a political issues committee and still be required to report such expenditures and contributors under the normal schedule.  (Resp., Doc. 14 at p.,3, PageID#124); KRS 121.180.  It is notable that in their Advisory Opinion, Defendants *<u>did not state</u>* (as they could have) that the parties had to make such reports, but instead Defendants flatly prohibited any expenditures in favor of the ballot amendments.

Defendants misrepresent the applicable legal standard where their concession that one must look "at the content" of the mailer or door-to-door piece to determine what laws are

triggered (Doc. 14 at p.10, PageID#131) unequivocally triggers strict scrutiny.  *Reed v. Town of Gilbert*, 576 U.S. 155 (2015).  Regardless, the plain text of their Advisory Opinion confirms it is, in fact, a content-based spending restriction: "Thus the answer to the second question is that a county executive committee ***may not use the funds*** it raises for party nominees ***to support a constitutional amendment***."  (Doc. 1-3, PageID#23 (emphasis added)).

Threatening someone that it is illegal to use funds to advocate in favor of a ballot measure is a quintessential spending restriction.  As the Supreme Court made clear:

> A restriction on the amount of money a person or group can spend on political communication during a campaign necessarily reduces the quantity of expression by restricting the number of issues discussed, the depth of their exploration, and the size of the audience reached. This is because virtually every means of communicating ideas in today's mass society requires the expenditure of money.

*Buckley v. Valeo*, 424 U.S. 1, 19 (1976); see, also, Kruse v. City of Cincinnati, 142 F.3d 907 (6th Cir. 1998).  And the Supreme Court also has held, "[t]he First Amendment 'has its fullest and most urgent application to speech uttered during a campaign for political office.'" *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 339-340 (2010) (*quoting Eu v. S.F. Cnty. Democratic Cent. Comm.*, 489 U.S. 214, 223 (1989)); *see also Buckley*, 424 U.S. 1, 48. Thus, political speech—including the endorsement of public issues or constitutional amendments—is at the core of speech protected by the First Amendment.

In contrast, "disclosure" requirements are upheld because they "minimize the potential for abuse of the campaign finance system," are in part "justified based on a governmental interest in providing the electorate with information about the sources of election-related spending," and may also "deter actual corruption and avoid the appearance of corruption by exposing large contributions and expenditures to the light of publicity."  *McCutcheon v. FEC*, 572 U.S. 185, 223

(2014).  And here, Plaintiffs do not challenge Kentucky's requirements for disclosure and reporting of contributors and expenditures.  (Ver. Compl, Doc. 1, at ¶46, PageID#12).

Rather, Plaintiffs challenge Defendants' content-based spending restriction, which we know is a spending restriction and not a disclosure requirement, because Defendants are not requiring Plaintiffs to report their contributions or expenditures, but rather are directing that Plaintiffs cannot spend *any* amount advocating in favor of a constitutional amendment ballot measure.  Regardless, and as applied to the Joint Expenditures, because Plaintiffs are also advocating in favor of the Republican slate, disclosure will be made within 48 hours of any expenditure, and in a manner that is much *more timely* than is the case with other issues committees that report in a delayed fashion.  KRS 121.120(6)(j).

Precedent is clear that the government cannot impose restrictions on disfavored speakers or condition restrictions on speech based on the type or identity of the speaker.  *Citizens United*, 558 U.S. 310 (2010).  "In the realm of protected speech, the legislature is constitutionally disqualified from dictating the subjects about which persons may speak and the speakers who may address a public issue."  *Id.* at 347, *quoting First Nat'l Bank v. Bellotti*, 435 U.S. 765, 784-785 (1978).  "Discussion of public issues and debate on the qualifications of candidates are integral to the operation of the system of government established by our Constitution."  *Buckley*, supra, 424 U.S. 1, 14.

Tellingly, Defendants do not prohibit individuals from making expenditures in favor of a constitutional amendment (or opposing an amendment) but do prohibit executive committees/political parties from doing so.  That prohibition runs afoul of clearly established case law on the Freedom of Association.  That is because "imposing limitations 'on individuals wishing to band together to advance their views on a ballot measure, while placing none on

5

individuals acting alone, is clearly a restraint on the right of association.'"  *Eu*, 489 U.S. 214,

224-225, *quoting Citizens Against Rent Control/Coalition for Fair Housing v. Berkeley*, 454 U.S.

290, 296 (1981).

Again, Defendants Advisory Opinion is a clear and unambiguous content-based spending

restriction (as opposed to a contribution restriction), thus triggering strict scrutiny.  *Kruse v. City

of Cincinnati*, 142 F.3d 907, 912-13 (6th Cir. 1998).  Therefore, to be upheld the spending

restriction must be narrowly tailored, *Fed. Election Comm'n v. Nat'l Conserv. Political Action

Comm.*, 470 U.S. 480, 496, 84 L. Ed. 2d 455, 105 S. Ct. 1459 (1985) ("NC-PAC"), and must be

necessary to serve a compelling state interest, *Fed. Election Comm'n v. Mass. Citizens for Life*,

479 U.S. 238, 251-252 (1986).  *See also Austin v. Mich. Chamber of Commerce*, 494 U.S. 652,

657, 108 L. Ed. 2d 652, 110 S. Ct. 1391 (1990).  Defendants Advisory Opinion does neither.

Defendants misrepresent that the state interest here is the interest served by disclosure

restrictions.  (Doc. 14 at pp. 10-11, PageID#131-132).  The problem with their false argument is

that their Advisory Opinion is not a requirement to disclose Plaintiffs' expenditures or

contributors, or to put a disclaimer on any mailers.  Rather, the Advisory Opinion forbids

Plaintiffs from spending *any amount* in favor of a constitutional amendment issue.  Again, one

need merely go back to the Advisory Opinion: "Thus the answer to the second question is that a

county executive committee *may not use the funds* it raises for party nominees to support a

constitutional amendment."  (Doc. 1-3, PageID#23 (emphasis added)).

And, even conceding a generalized governmental interest in disclosure, narrow tailoring

requires that the government only employ the least restrictive means to achieve its interest,

*United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803, 813 (2000), and Defendants cannot meet

that burden here.

6

Here, Defendants could compel timely disclosure of expenditures and contributors, rather than prohibit any spending in favor of constitutional issues.  Courts disfavor wholesale bans on types of expression protected by the First Amendment (as Defendants do to executive committees on constitutional issue advocacy), and such bans are usually invalidated on the ground that they clearly fail a "least restrictive means" analysis.  *See, e.g., Schneider v. Town of Irvington*, 308 U.S. 147, 160-65 (1939) (invalidating a ban on hand-bill distribution because less intrusive means existed); *Martin v. City of Struthers*, 319 U.S. 141, 145-46 (1943) (same); *City of Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 430 (1993) (invalidating an ordinance prohibiting news racks dispensing commercial handbills that amounted to a "sweeping ban that bars from its sidewalks a whole class of constitutionally protected speech"); *Citizens United v. FEC*, 558 U.S. 310, 337 (2010) (invaliding an "outright ban" on specific types of corporate political speech).

If disclosure actually was the state interest at issue here (versus merely being Defendants' *post-hoc* excuse), an outright ban on issue related advocacy is not the narrowly tailored means to meet a disclosure interest when, instead, more timely disclosure could be compelled.  Plaintiffs have thus demonstrated that they succeed on the merits.

### D.       Plaintiffs have demonstrated irreparable injury

Defendants begin their lack of irreparable harm argument by misrepresenting the nature of what they have done in terms of their Advisory Opinion, including falsely arguing that there is no threat of enforcement.  (Doc. 14 at pp. 11-14, PageID#132-135).  Again, Defendants explicitly informed two of the three Plaintiffs in this case that each of them "***may not use the funds*** it raises for party nominees to support a constitutional amendment." (Doc. 1-3, PageID#23 (emphasis added)).  Defendants then made their position on the law public.  And

7

Defendants' General Counsel described "mail and door-to-door pieces that advocate for both the Republican ticket and the constitutional amendment, on the same mail and door-to-door pieces," as something that is at least "dancing so close to a violation of the law," and, after being told about Plaintiffs' intended speech, refused to disclaim enforcement.  (Doc. 1-4, PageID#24-25).

Defendants next misrepresentation is that there is something "uncertain" about what Plaintiffs intend to do and what the legal response will be if Plaintiffs do it, thus implying (though not explicitly arguing) that standing is lacking.  (Doc. 14 at p. 12, PageID#133).

The factual record is clear.  Counsel for Plaintiffs asked KREF if they were disavowing any intention of enforcing their Advisory Opinion and KREF declined to do so.  (Doc. 1-4, PageID#24-25).  To the contrary, KREF doubled down when its General Counsel specifically stated that "I am not able to say that the Registry would ignore a properly filed complaint…"  *Id.* And here, given the tenor and rancor of the public debate on the School Choice Amendment, it is a certainty that if BCRP, HCRP, or JCRP expend funds in favor of the School Choice Amendment, Plaintiffs will draw a "properly filed complaint", triggering a review for probable cause by KREF under KRS 121.140(1) and (2).  (Doc. 1 at ¶30, PageID#1-15).

At present, (i) Plaintiffs BCRP, HCRP, and JCRP each have a present intention to expend funds they have raised, and continue to raise, in order to advocate in favor of the School Choice Amendment, including by way of mailers and door-to-door campaign printings; (ii) BCRP has undertaken graphic design efforts to complete these tasks; (iii) KREF has issued correspondence and an Advisory Opinion specifically directed to HCRP and JCRP that engaging in these expenditures is not permitted by Kentucky campaign finance law as KREF interprets and enforces it; (iii) KREF accepts complaints from the public; (iv) there will be a complaint filed if BCRP, HCRP, and JCRP spend funds in favor of the School Choice Amendment; and (v)

8

Defendants have not disavowed enforcement, and in fact have explicitly indicated that they are "not able to say that the Registry would ignore a properly filed complaint." *Id.* at ¶31.

Thus, it is undisputed that Plaintiffs' intended First Amendment protected election-related speech presently is chilled, as Plaintiffs are required to either forgo making expenditures in favor of the School Choice Amendment, or face enforcement by KREF (and potentially criminal prosecution on a referral from KREF) under KRS 121.140. *Id.* at ¶32.  Plaintiffs have thus alleged and proven an intention to engage in a course of conduct affected with a constitutional interest (to spend money on election-related communications in favor of one or both of the pending constitutional amendments) that Defendants assert is illegal, and, if Plaintiffs so engage, there certainly will be an impending threat of prosecution/enforcement. *Id.* at ¶33. The actions set forth herein have deprived and continue to deprive Plaintiffs of their First Amendment rights and are presently irreparably chilling their speech. *Id.* at ¶34.

And, although not explicitly raised by Defendants, Plaintiffs easily demonstrate standing to raise their pre-enforcement First Amendment challenge.  As demonstrated, Plaintiffs established that: (1) they intend to engage in expression that the Free Speech Clause (or Association Clause) protects, (2) their expression is proscribed by the challenged actions of Defendants, and (3) they face a credible threat of enforcement from those Rules. *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159-162 (2014) (*quoting Babbitt v. Farm Workers*, 442 U.S. 289, 298 (1979)). *See, also, Fischer v. Thomas*, 52 F.4th 303, 307 (6th Cir. 2022).

Here, and as noted, Plaintiffs have proven an intention to engage in expression that the Free Speech Clause (or Association Clause) protects.  The Verified Complaint makes this intention clear in a number of paragraphs, as well as the concrete actions that these Plaintiffs have undertaken to engage in such speech, to include raising funds to print and mail the

9

communications in question, and the BCRP having engaged graphic designers to design some of the mail in question.  (Ver. Compl., Doc. 1 at ¶¶ 14-18, 20-25, 30-31, 33, 35, Exhibit A, PageID#5-7, 9-10, 19).  And, there is no question that Defendants have proscribed those very speech activities.  (Ver. Compl., Doc. 1, at ¶¶ 26-29, 31-32, Exhibit B, PageID#7-9, 20-22).  That only leaves the issue of whether there is a credible threat of enforcement.

"To identify a credible threat of enforcement, the first and most important factor is whether the challenged action chills speech."  *Fischer*, 52 F.4th 303, 307, *citing McKay v. Federspiel*, 823 F.3d 862, 869 (6th Cir. 2016).  And, KREF's "actions do just that."  *Id.*  It is undisputed that the JCRP is self-censoring because Defendants' Advisory Opinion prohibits the speech at issue.  (Ver. Compl., Doc. 1, at ¶36, PageID#10).

"Beyond chill, a variety of facts can demonstrate a credible threat of enforcement." *Fischer*, 52 F.4th 303, 307.  "Our cases have highlighted four commonly recurring factors to consider: (1) Does the relevant prosecuting entity have a prior history of enforcing the challenged provision against the plaintiffs or others? (2) Has that entity sent warning letters to the plaintiffs regarding their conduct? (3) Does the challenged regulatory regime make enforcement easier or more likely? and (4) Did the prosecuting entity refuse to disavow enforcement of the challenged provision against the plaintiffs?"  *Id., citing Online Merchants Guild v. Cameron*, 995 F.3d 540, 550 (6th Cir. 2021) (recounting factors articulated in McKay, 823 F.3d at 869). "This isn't a laundry list; the [Plaintiffs] don't have to satisfy all the factors." *Id.* at 307-308.

As to the first factor, "KREF is charged with enforcement of (KRS 121.140), and actively enforces[1] Kentucky's campaign finance laws, arising under KRS Chapter 121."  (Ver. Compl.,

---

[1] https://kref.ky.gov/legal/Pages/Cases.aspx (last accessed 7/17/2024).

Doc. 1 at ¶7, PageID#4).  And, past enforcement actions against others suffice to establish this factor.  *Fischer*, 52 F.4th 303 at 308.  As in *Fischer*, that factor is met here.

As to the second factor, KREF sent two warning letters, first in the form of the Advisory Opinion, directed at two of these Plaintiffs, and posted it online to serve as a warning to others. (Ver. Compl., Doc. 1 at ¶¶ 8-9, 26-27, Exhibit B, PageID#4, 7-8, 20-22).  And, Defendants' own General Counsel threatened that "mail and door-to-door pieces that advocate door pieces," is at least "dancing so close to a violation of the law," along with informing Plaintiffs that Defendants would not disclaim enforcement if Plaintiffs proceeded with their intended speech.  (Doc. 1-4, PageID#24-25).  A letter directed at a party that informs him or her that engaging in speech is prohibited, such as Defendants' Advisory Opinion and email communication from their General Counsel here, is sufficient to meet this prong.  *Kiser v. Reitz*, 765 F.3d 601, 605, 609 (6th Cir. 2014).  What matters for this second factor is whether plaintiffs have pointed to "enforcement warning letters" addressing "their specific conduct."  *Fischer*, 52 F.4th 303 at 308, *quoting McKay*, 823 F.3d at 869.  This factor equally is met.

As to the third factor, the question is whether the law "contains a feature making enforcement 'easier or more likely'—namely, a provision authorizing any member of the public to file complaints."  *Fischer*, 52 F.4th 303 at 308, *quoting McKay*, 823 F.3d at 869.  This factor is met here.  That is because "KREF is also charged, under KRS 121.140, with processing and handling complaints."  (Ver. Compl., Doc. 1, at ¶10, PageID#4-5).  "Upon receipt of a sworn complaint, including by the public or on its own initiative, KREF is required to determine if there is probable cause for a violation."  *Id., citing* KRS 121.140(2).  "Once probable cause is established, KREF can then resolve the violation by way of agreement, or hearing."  *Id.* "Penalties include up to $5,000 per violation, or, if the violation is made knowingly, the law

11

permits referral to prosecuting attorneys for criminal prosecution." *Id., citing* KRS 121.140(2), (4), and (5).  "[T]hat includes 'political opponents' with incentives to file "frivolous complaints" on the eve of an election." *Fischer*, 52 F.4th 303 at 308, *quoting Driehaus*, 573 U.S. at 164. Moreover, "given the tenor and rancor of the public debate on the School Choice Amendment, it is certain that if BCRP, HCRP, or JCRP expend funds in favor of the School Choice Amendment, Plaintiffs will have a verified complaint filed against them, triggering a review for probable cause by KREF under KRS 121.140(1) and (2)."  (Ver. Compl., Doc. 1, at ¶30, PageID#9).  Clearly, the third factor is met.  *Fischer*, 52 F.4th 303 at 308.

And as to the fourth factor, prior to filing suit, we asked Defendants whether they were disclaiming enforcement and told them what Plaintiffs intended to do.  The response was "I am not able to say that the Registry would ignore a properly filed complaint…"  (Ver. Compl., Doc. 1, at ¶29, Exhibit C, PageID#8-9, 23).  Defendants also described Plaintiffs' speech as something that is at least "dancing so close to a violation of the law."  (Doc. 1-4, PageID#24-25).

Thus, "our caselaw makes it clear that such refusals, in combination with the other factors, weigh in favor of finding a credible threat of prosecution."  *Fischer*, 52 F.4th 303 at 308, *citing McKay*, 823 F.3d at 869.  Again, these factors are not "a laundry list; the [Plaintiffs] don't have to satisfy all the factors."  *Fischer*, 52 F.4th 303 at 307-308.  Yet here, Plaintiffs have satisfied each factor.  Plaintiffs have standing.

Nor is it relevant that others actually prosecute criminal violations of the Campaign Finance Act.  Despite their denials, Defendants are charged with enforcement of (KRS 121.140), and actively enforce[2] Kentucky's campaign finance laws, arising under KRS Chapter 121.  *Id.* at ¶7.  KREF is also charged, under KRS 121.140, with processing and handling complaints.  *Id.* at

---

[2] https://kref.ky.gov/legal/Pages/Cases.aspx (last accessed 7/17/2024).

¶10.  Upon receipt of a sworn complaint, including by the public or on its own initiative, KREF is required to determine if there is probable cause for a violation.  *Id.*  KRS 121.140(2).  Once probable cause is established, KREF can then resolve the violation by way of agreement, or hearing.  *Id.*  Penalties include up to $5,000 per violation, or, if the violation is made knowingly, the law permits referral to prosecuting attorneys for criminal prosecution.  KRS 121.140(2), (4), and (5).  *Id.*  If such prosecutors work in concert with Defendants, they would be bound by any injunction.  FRCP 65(d)(2)(C).

Defendants have sufficient connection with the law at issue to render injunctive relief against them appropriate.  *Russell v. Lundergan-Grimes*, 769 F.3d 919 (6th Cir. 2014).  The fact that other local officials may also be involved in the statutory enforcement does not prohibit standing or the issuance of injunctive relief against Defendants.  *Id.* at 1047-1049.  Not surprisingly, Defendants misrepresent that a future civil penalty issued against Plaintiffs in an enforcement action for protected First Amendment speech is not irreparable harm.  Well, the "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."  *Connection Distrib. Co. v. Reno*, 154 F.3d 281, 288 (6th Cir. 1998), *quoting Elrod v. Burns*, 427 U.S. 347, 373 (1976) (irreparable harm from violation of rights).

In this case, as in many First Amendment cases, the key inquiry is the first one: Who is likely to prevail on the constitutional claim?  *Roberts v. Neace*, 958 F.3d 409, 416 (6th Cir. 2020) (per curiam); *Sisters For Life, Inc. v. Louisville-Jefferson Cnty.*, 56 F.4th 400, 403 (6th Cir. 2022).  Having demonstrated success on the merits, Plaintiffs meet the irreparable harm prong.

> **E.**  **Plaintiffs have demonstrated that an injunction is in the public interest and the balance of harms favor them**

13

Defendants' next misrepresentation is that no one will be able to ascertain, prior to the election, who contributed to the mailers and door-to-door hangers. That is patently false with respect to the Joint Expenditures, which must be reported within 48 hours because they advocate for the Republican Party Slate. KRS 121.120(6)(j). Regardless, that false statement ignores that where, as here, there is a First Amendment violation, the balance of harms and public interest likewise weigh in favor of an injunction. *Foster v. Dilger*, 2010 U.S. Dist. LEXIS 95195 (EDKY 2010) (no substantial harm to others, even where registry incurred printing costs, where constitutional rights at stake); *Martin-Marietta Corp. v. Bendix Corp*., 690 F.2d 558, 568 (6th Cir. 1982); *see also G & V Lounge v. Mich. Liquor Control Comm'n*, 23 F.3d 1071, 1079 (6th Cir. 1999) ("[I]t is always in the public interest to prevent the violation of a party's constitutional rights."). *See, also*, *Sisters For Life, Inc.,* 56 F.4th 400, 409 ("we cannot re-weigh the equities so as to undercut the First Amendment").

### F. <u>There are no issues of fact and summary judgment is appropriate</u>

Defendants failed to file an appropriate FRCP 56(d) declaration demonstrating what they claim the issues of fact are, and why discovery is necessary, which means that the court can proceed to enter summary judgment. *Doe v. City of Memphis*, 928 F.3d 481, 489-491 (6th Cir. 2019). Instead, Defendants merely suggest that they have "questions" about the central nature of the School Choice Amendment, the Plaintiffs' determination that advocacy in favor of the amendments also helps Republican candidates, and voter turnout. (Doc. 14, p.17 at PageID#138). However, those determinations are not actually material facts in this case: no legal issue or conclusion is going to turn on the wisdom of Plaintiffs' issue advocacy.

What is clear is that Defendants plainly have determined "that a county executive committee ***may not use the funds*** it raises for party nominees to support a constitutional

amendment." (Doc. 1-3, PageID#23 (emphasis added)).  And what is equally clear is that

Plaintiffs intend to do just that.

Simply put, there are no genuine issues of material fact.  Defendants forbid political

parties from using party funds to advocate in favor of (or against) constitutional amendments,

Plaintiffs desire to engage in this First Amendment protected speech, and Defendants'

restrictions against that speech are patently unconstitutional.

## CONCLUSION

Plaintiffs are entitled to a preliminary injunction, a permanent injunction, and summary

judgment in their favor.

Respectfully submitted,

/s/ Christopher Wiest_____          /s/Thomas B. Bruns
Christopher Wiest (KBA 90725)            Thomas B. Bruns (KBA 84985)
Theodore Roberts (KBA 100610)           Bruns, Connell, Vollmar & Armstrong, LLC
Chris Wiest, Atty at Law, PLLC          4555 Lake Forest Drive, Suite 330
50 E. Rivercenter Blvd., Ste. 1280      Cincinnati, OH 45242
Covington, KY 41011                     513-312-9890
513/257-1895 (c)                        tbruns@bcvalaw.com
chris@cwiestlaw.com
*Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I certify that I have served a copy of the foregoing upon all Counsel or parties of record
by filing same via CM/ECF this 14 day of August, 2024.

/s/Christopher Wiest

15

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE EASTERN DISTRICT OF KENTUCKY – at COVINGTON**

| | | |
|---|---|---|
| **Boone County Republican Party Executive** | : | Case No. 3:24-cv-00049-GFVT |
| **Committee, et. al.** | | |
| | : | |
| **PLAINTIFFS** | | |
| | : | |
| v. | | |
| | : | |
| **H. David Wallace, et. al.** | | |
| | : | |
| **DEFENDANTS** | | |

**<u>NOTICE OF APPEAL</u>**

All Plaintiffs, the Boone County Republican Party Executive Committee, Hardin County

Republican Party Executive Committee, and Jessamine County Republican Party Executive

Committee, through Counsel, gives notice of their appeal from the opinion and order denying

their motion for a preliminary injunction (Doc. 22), entered on August 22, 2024, to the United

States Court of Appeals for the Sixth Circuit.

<div style="margin-left: 50%;">

Respectfully submitted,

/s/ Christopher Wiest_____
Christopher Wiest (KBA 90725)
Chris Wiest, Atty at Law, PLLC
50 E. Rivercenter Blvd., Ste. 1280
Covington, KY 41011
513/257-1895 (v)
859/495-0803 (f)
chris@cwiestlaw.com

/s/ Thomas B. Bruns_____
Thomas B. Bruns (KBA 84985)
Bruns, Connell, Vollmar, Armstrong
4555 Lake Forrest Dr., Ste. 330
Cincinnati, OH 45242
513-312-9890(v)
*Counsel for Plaintiffs*

</div>

## <u>CERTIFICATE OF SERVICE</u>

I certify that I have served a copy of the foregoing upon Counsel of record, by filing same in the Court's CM/ECF system, this 23 day of August, 2024.

/s/ Christopher Wiest_____

# IN THE UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF KENTUCKY – at COVINGTON

**Boone County Republican Party Executive Committee, et. al.**       :       Case No. 3:24-cv-00049-GFVT

:

    **PLAINTIFFS**

:

v.

:

**H. David Wallace, et. al.**

:

    **DEFENDANTS**

## EMERGENCY MOTION FOR INJUNCTION PENDING APPEAL

All Plaintiffs, the Boone County Republican Party Executive Committee, Hardin County Republican Party Executive Committee, and Jessamine County Republican Party Executive Committee, through Counsel, move the Court for an injunction pending appeal, pursuant to FRAP 8(a)(1)(C).  Plaintiffs reincorporate the arguments set forth in their briefing (Doc. 6, Doc. 17), and further state as follows:

The Court suggested that the burden of certain members of the Plaintiffs separately registering an political issues committee was negligible, and thus suggested that this matter was distinguishable from *FEC v. Massachusetts Citizens for Life*, 479 U.S. 238 (1986), where the Court discussed and rejected the argument by the FEC that the Plaintiff could merely register a separate committee and engage in the speech activities that it desired.  That analysis ignores the Supreme Court's fundamental holding and observation that the fact that the entity desiring to engage in speech was "not free to use its general funds for campaign advocacy purposes," was "not an absolute restriction on speech," but was nevertheless "a substantial one."  *Id.* at 252.  It was not the burden of establishing a committee and the steps taken that made the burden "substantial," but instead was the very fact that the entity could not "use its general funds for campaign advocacy purposes."  *Id.*

And the comparators of burdens in *Massachusetts Citizens for Life* is equally indistinguishable. The Court explained the burdens to include (i) identifying all contributors donating over $200; (ii) disclosing the name and address of all recipients of funds exceeding $200; (iii) identifying all persons who make contributions over $200 earmarked for independent expenditures. *Id.* Additionally, the committee had to (iv) appoint a campaign treasurer; (v) ensure that contributions are forwarded to the treasurer within 10 or 30 days of receipt, depending on the amount of contribution; (vi) see that its treasurer keeps an account of every contribution regardless of amount, the name and address of any person who makes a contribution in excess of $ 50, all contributions received from political committees, and the name and address of any person to whom a disbursement is made regardless of amount; and (vii) preserve receipts for all disbursements over $ 200 and all records for three years; (viii) file a statement of organization containing its name, address, the name of its custodian of records, and its banks, safety deposit boxes, or other depositories; (ix) must report any change in the above information within 10 days; and (x) may dissolve only upon filing a written statement that it will no longer receive any contributions nor make disbursements, and that it has no outstanding debts or obligations. Id. at 253-254. Its filing including quarterly reporting during election years, and reports 12 days before and 30 days after an election. *Id.* at 254.

The Supreme Court observed that "[d]etailed record-keeping and disclosure obligations, along with the duty to appoint a treasurer and custodian of the records, impose administrative costs that many small entities may be unable to bear." *Id.* "Furthermore, such duties require a far more complex and formalized organization than many small groups could manage." In a footnote, the Court observed that "the administrative costs of complying with such increased responsibilities may create a disincentive for the organization itself to speak." *Id.* at fn.7.

Under Kentucky law, a separate political issues committee (i) must file official notice of intention at the time of organization, giving names, addresses, and positions of the officers of the organization, identifying an official contact person of the committee, and providing the issue or issues that it is advocating for (KRS 121.170(1)); (ii) must have separate chairpersons and treasurers (KRS 121.170(3)); (iii) designate a treasurer to act as agent (KRS 121.170(2) makes the provisions of KRS 121.160 applicable to the committee, including KRS 121.160(1)); (iv) obtain a separate bank account (which usually requires obtaining a separate EIN from the IRS) (KRS 121.170(2) and KRS 121.160(2)(a)); (v) keep detailed records of contributors (KRS 121.170(2) and KRS 121.160(2)(b)); (vi) obtain separate checks for the purpose of making expenditures over $25, which any expenditure like a mailer would be (KRS 121.170(2) and KRS 121.160(2)(c)); (vii) maintain for six years from the date of the last report filing all receipts and account records (KRS 121.170(2) and KRS 121.160(2)(d)); (viii) report "all money, loans, or other things of value, received from any source, and expenditures authorized, incurred, and made, since the date of the last report," including a "complete statement of all expenditures authorized, incurred, or made" that "shall include the name, address, and occupation of each person to whom an expenditure is made in excess of twenty-five dollars ($25), and the amount, date, and purpose of each expenditure" (KRS 121.180(3)(a)), with reports filed 60 days, 30 days, and 15 days prior to an election (KRS 121.180(3)(b)(2), (3), and (4)), as well as 30 days after (KRS 121.180(4)); (ix) is prohibited from utilizing funds to further candidates from office, including the Republican slate (KRS 121.180(10)); and (x) cannot receive funds from a executive committee (and the representation that the issues committee could receive raised funds from the Plaintiffs herein is contrary to the directives on Defendants' websites).[1]

---

[1] https://kref.ky.gov/committees/Pages/Political-Issues-Committee.aspx https://kref.ky.gov/Pages/Contribution-Limits.aspx (last accessed 8/23/2024).

These are not *de minimis* requirements.

Finally, this Court is (presently) alone in the suggestion that a separate committee can somehow alleviate the constitutional problems with the content-based restriction on speech present here against the Plaintiffs. *Carey v. FEC*, 791 F. Supp. 2d 121, 132-133 (DCD 2011) ("The fact that Plaintiffs may have another outlet to exercise their First Amendment rights to free speech—such as the establishment of a separate committee or PAC, as suggested by the Commission in its opposition—does not answer this constitutional challenge. While the Commission might expound on such alternatives, they do nothing to cure the constitutional maladies of its heavy handed approach. 'The fundamental flaw' to the Commission's approach continues to be that it 'improperly '[brings] to bear what was essentially a political party analysis to a non-connected, independent committee which is not under the control of, or associated with candidates in the fashion of a political party.'" … Stifling citizens' speech rights during a Presidential campaign runs contrary to the entire history of First Amendment jurisprudence in this country."); *Catholic Leadership Coalition of Tex. v. Reisman*, 764 F.3d 409, 430, fn.27 (5th Cir. 2014) (explaining that separate committees are separate legal entities, and cannot be viewed from the perspective that its members can form separate committees, and noting that doing so runs contrary to the holdings in *Citizens United v. FEC*, 558 U.S. 310 at 343 (2010) (and holding that free speech rights have to be viewed from the perspective of an organization which rights even if it is not a natural person) and *FEC v. Nat'l Conservative Political Action Comm.*, 470 U.S. 480, 494 (1985)).

Plaintiffs seek an emergency injunction pending appeal, enjoining enforcement of Advisory Opinion 2024-02, Defendants' restrictions on Plaintiffs' ability to advocate in favor of

the constitutional amendments, and their enforcement of KRS Chapter 121 that prohibits that advocacy.

Respectfully submitted,

/s/ Christopher Wiest_____
Christopher Wiest (KBA 90725)
50 E. Rivercenter Blvd., Ste. 1280
Covington, KY 41011
513/257-1895 (v)
859/495-0803 (f)
chris@cwiestlaw.com

/s/ Thomas B. Bruns_____
Thomas B. Bruns (KBA 84985)
Bruns, Connell, Vollmar, Armstrong
4555 Lake Forrest Dr., Ste. 330
Cincinnati, OH 45242
513-312-9890(v)
*Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I certify that I have served a copy of the foregoing upon Counsel of record, by filing same in the Court's CM/ECF system, this 23 day of August, 2024.

/s/ Christopher Wiest_____

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION - FRANKFORT

BOONE COUNTY REPUBLICAN PARTY
EXECUTIVE COMMITTEE, et al.,

            Plaintiffs,                    Docket No. 3:24-CV-49
                                           At Frankfort, Kentucky
VS.                                        Friday, August 16, 2024
                                           1:38 p.m.
H. DAVID WALLACE, et al.,

            Defendant.

        TRANSCRIPT OF MOTION HEARING PROCEEDINGS BEFORE
         U.S. DISTRICT JUDGE GREGORY F. VAN TATENHOVE

 APPEARANCES:

  For the Plaintiffs:    CHRISTOPHER DAVID WIEST
                         THEODORE JOSEPH ROBERTS
                         50 East Rivercenter Boulevard
                         Suite 1280
                         Covington, Kentucky  41011
                         (513) 257-1895

                         THOMAS B. BRUNS
                         Bruns, Connell, Vollmar
                         & Armstrong, LLC
                         4555 Lake Forest Drive, Suite 330
                         Cincinnati, Ohio  45242
                         (513) 312-9890

  For the Defendants:    LESLIE M. SAUNDERS
                         Kentucky Registry of Election Finance
                         140 Walnut Street
                         Frankfort, Kentucky 40601
                         (502) 782-9342

  Court Reporter:        SANDRA L. WILDER, RMR, CRR
                         Official Court Reporter
                         313 John C. Watts Federal Building
                         330 West Broadway, Suite 327
                         Frankfort, Kentucky  40601
                         (859) 5161-4114

        Proceedings recorded by mechanical stenography,
    transcript produced by certified court reporter.

*(Proceedings commenced in open court at 1:38 p.m.)*

THE COURT:  Good afternoon, ladies and gentlemen.

Madam Clerk, call the pending matter, please.

COURTROOM DEPUTY:  Yes, Your Honor.

Frankfort Civil Action 24-CV-49, Boone County Republic Party Executive Committee, et al., versus H. David Wallace, et al.  This matter being called for motion hearing, Your Honor.

THE COURT:  Thank you.

Counsel, state your appearances, please.

Mr. Wiest.

MR. WIEST:  Good afternoon, Your Honor.  Chris Wiest for the plaintiff.  With me is Tom Bruns.  And then T. J. Roberts who's an associate in my office.

THE COURT:  Thank you.  Always good to have you in federal court.  Welcome.

MR. WIEST:  Thank you, Your Honor.

MS. SAUNDERS:  Leslie Saunders for the defendant, Your Honor.

THE COURT:  Ms. Saunders, good to have you as well.

MS. SAUNDERS:  Thank you.

THE COURT:  This matter is called on my docket because of a pending request for a preliminary injunction in this case.

There's also a motion for summary judgment that's been filed. Those are pending before me and the matters have been briefed.

But as is my practice, I've come into the courtroom this afternoon with some questions, and I'm going to ask those questions.

And, Ms. Saunders, I don't recall whether you've appeared before me before.

MS. SAUNDERS: I haven't, Your Honor.

THE COURT: I don't believe so. Glad to have you. Mr. Wiest has on a number of occasions, so he kind of knows my drill.

And you may have come into court with some points that you want to make, and I just want to assure you, I'll give you a chance to do that if my questions don't cover the topics that you'd like to cover.

So this always begins with a consideration in terms of whether I have the power to decide the case, and that's a standing question.

And we've argued and discussed injury before. The Sixth Circuit's given us some further guidance, Mr. Wiest, on injury this week, and I always appreciate that.

But let me begin with you, Ms. Saunders, and let me ask a few questions to try to help me understand the factual predicate of this case.

If the plaintiffs created a flyer and the flyer said, "Vote for this candidate.  This candidate supports lower taxes.  This candidate supports school choice.  This candidate supports the constitutional amendment that's on the ballot to provide families with more choice in terms of schools," would that be a violation -- and I'm talking about the Executive Committee creating that and advocating in that way, is somehow that a violation of kind of the Registry's regulatory scheme?

MS. SAUNDERS:  We had a discussion about that, Your Honor.  We don't believe it would be if they're supporting a candidate.  To any extent they'd like to support that candidate, that would be fine.  The candidate has their own views on things.  They're free to say that the candidate has those views.

And quite honestly, in some respects -- and I think we'll probably get to that -- they're free to talk about issues, provided that they report it correctly.

But yeah, to the extent that they are talking about a candidate and a candidate's beliefs, that's what executive committees are set out to do, to support the candidates, their nominees.  I don't think that -- we wouldn't have a -- the Registry wouldn't have a problem with that, and we would say that's part of their function.

THE COURT:  All right.  So my second question is,

the Executive Committee prepares a sign and the executive committee prepares a brochure. And the focus of the brochure is, "Support this amendment to the Constitution." And they have some clever sign that says -- that's focused solely on the constitutional amendment, "Vote yes on -- I don't know, is it Amendment 2? I think there's two amendments --

MS. SAUNDERS: Yes, Your Honor.

THE COURT: -- Amendment 2. And the reason they're trying to do that is because they really feel strongly that if you can get those voters out who care about that, they're going to support their candidates as well, right? Can they do that?

MS. SAUNDERS: That is exactly what they have argued. And an executive committee to this point in Kentucky history has raised money to support their nominees. So those funds have been raised under the auspices that they're supporting nominees.

THE COURT: Right.

MS. SAUNDERS: If they would like to do what you're talking about doing, they want to -- some group of either all of the membership or certain part of the membership or, you know, the majority of the membership would like to support an amendment, we -- the Registry has no qualms with that. What this is is a reporting issue.

So we would say that that group would register.  You can have more -- you can be in and have more than one committee.

THE COURT:  Right.

MS. SAUNDERS:  All we ask is that you report who your officers, who your treasurer is, and who your chairperson is; they can overlap.

And just by way of example, the state executive committees have what they call building funds.  We treat them as separate committees.  It's in 1 -- they're authorized in 121.172.

It's kind of a similar idea-- in lots of ways, it's vastly different; in lots of ways it's a similar idea. Building funds are not restricted on who they can take funds from, and they're not limited in how many funds -- or what the amount they can take.  But because they can take money from corporations, they can't mingle that money with the money that they're going to use to support candidates.  They can't --

THE COURT:  Is that true of these political committees as well?  Does it broaden the places that you can get your money?

MS. SAUNDERS:  If I understand your question, it would not be true of permanent committees.  Only executive committees can have building funds.

THE COURT: Okay. So let me -- I think I understand what you're saying.

So let me ask this: Could the plaintiffs now -- they've raised money, right?

MS. SAUNDERS: Uh-huh (affirmatively.)

THE COURT: So they have money sitting there. They want to expend it in support of the amendment. Could they next week file as this political entity, as opposed to the executive committee, file a political committee and take those funds already raised and expend them on the amendment?

MS. SAUNDERS: They could, Your Honor.

To the extent that I understand -- you know, we've talked about, you know, this all kind of started as a result of this Advisory Opinion. And in some ways, I feel like -- and, of course, the Advisory Opinion's under my name as the only counsel for the agency -- in some ways, I feel like I'm shootin' at a shifting target because every time I talk to them, I get a little bit more of the facts.

We found out at some point during the course of the pleadings that they already have this money.

THE COURT: Right.

MS. SAUNDERS: So to the extent that they've raised it with this idea that they were going to use it for the amendment --

THE COURT: Right.

MS. SAUNDERS:  -- in some ways, they're holding it in incorrectly under the Registry's view of how the world and how the statutes work, that they wouldn't -- that that needs to be a political -- in a Political Issues Committee. But frankly, they're acting as a Political Issues Committee under the definition of Political Issues Committee.  They already have the funds.  It's more than $1,000.  There's more than three people involved.  And that's not even in the pleadings, but you know it's the case because they have a $20,000 amount, they have a couple $10,000 amounts.  At least with the $20,000 amount, executive committees are limited to $5,000 per contributor.

THE COURT:  Okay.

MS. SAUNDERS:  So there's a limit there.  So we know there's at least four people; there could be more.  But that, by definition, is a Political Issues Committee.

THE COURT:  So let me try to make sure I'm clear on the differences in the reporting requirements because one of the difference between these two entities is one has to report pretty infrequently.

MS. SAUNDERS:  Yes.

THE COURT:  The other one has to report fairly frequently as it's raising money and expending it in the context of a political campaign, fair?

MS. SAUNDERS:  That's correct, Your Honor.

THE COURT:  So if I'm an executive committee, depending upon how much money I have, I may only have to report a couple of times a year?

MS. SAUNDERS:  Depending upon how much money you have, the most you could report is twice a year.

THE COURT:  Twice a year.

MS. SAUNDERS:  Depending on how much money you have, you may only report annually.  That's a new change; that just changed within the last couple years.  I don't believe it was this legislative session.  I believe it was the last.

But they put in this $10,000 threshold.  If you don't have $10,000 -- and I believe the -- we had to go in and do a reg on this as to when your $10,000 accrues because what if I don't have it yesterday, but, Hey, I have it today, or vice-versa.  So we've put a limit in there.

But depending on when this $10,000 -- you know, when you incur it, you don't -- you only report -- or you would report twice a year.  So that would be in December and -- or, no, in January, I'm sorry, and in July.  So they just had one due.

THE COURT:  Okay.  So there's an additional burden on the plaintiff if they operate under the political committee because the reporting's quite a bit more extensive.  So explain to me.  I want to -- I think I

understand --

MS. SAUNDERS:  Okay.

THE COURT:  -- although I'd like to hear from you what the reporting requirements are as a political committee.

MS. SAUNDERS:  Okay.  As a Political Issues Committee, they only report -- they report in relation to the election.  So as an executive committee, they report forever, as long as they exist.  And in some respects, that causes some problems 'cause you get some little ones who forget they may only have $300 or $400.  They still have to report -- they have no activity, they still have to report.

But a Political Issues Committee reports around the election date.  So they report 60 days pre, 30 days pre, 15 days pre, and then there's a wrap-up.  There is a 30 day post to the extent that they -- there's also a threshold there to the extent they have enough money to do it.  There's $1,000 -- under $1,000 you don't report at all.  But they already did it.

THE COURT:  And what are they reporting?  Are they reporting amounts and contributors or both?

MS. SAUNDERS:  Both, and expenditures.  They're reporting what contributors give them.  And there is required information involved with that.  Statute requires that they give us the names.  They require that they give us

addresses, and there's certain statutory information that's required.  You also report your expenditures.

To the extent that you have funds left over, the statute requires that they continue to report on that, and you can't use that unexpended money for something else. Which is sort of important in the context here because executive committees have unexpended funds that they've receive for candidates in previous years.  Now, they have money.  We would say you can't use that money that you've collected for anything but what you've collected it for.

So for candidates, if you were just looking at candidates, that would be that candidate for the next election.

For executive committees, it's their nominees for an upcoming election.  For Political Issues Committees, it's that exact issue.

So if your issue fails -- well, let's say you win. Let's say your issue wins, you can't transfer that money out and then use it is for some other issue you like next year. You have to -- you've distributed that money.  There are statutory ways that you can get rid of it.  In 121 and 180, you can give it to charity; you can do -- there's several options.  But you can't just carry that money over forever and just -- and use it for anything that comes up that you want to support.

THE COURT: Which is the executive committee funds get carried over by the nature of ongoing in executive committee.

MS. SAUNDERS: Yes, Your Honor, that's correct.

THE COURT: And is the reporting both amounts, contributors --

MS. SAUNDERS: It's the same.

THE COURT: -- expenditures is the exact same for the executive committee. It's not that one has less reporting than the others. It's really about the frequency of the reporting.

MS. SAUNDERS: It's about the frequency --

THE COURT: And a limitation over here on the political issue side of the funds in terms of their use and kind of the fungibility of it ultimately, if there's money left over?

MS. SAUNDERS: True, Your Honor. But it's offset by the fact that it broadens where they can get funds from and how much they can receive. So Political Issues Committee can receive corporate funds. A Political Issues Committee can receive unlimited funds, whereas an executive committee cannot. They're limited to $5,000 per contributor, no corporate funds.

So that's -- it's part of the reason commingling becomes a problem because how do I know -- if I have taken

in money, which they say they have for a political issue, and I, you know, taken all comers; anyone who'd like to contribute, we've allowed. We've taken their money gladly because we'd like to spend it. Then how do I know for next year what -- if I've commingled all that with my candidate funds, now I've got corporate money in my candidate funds potentially. I'm not saying that's what they've done, but potentially.

THE COURT: Okay.

All right. Mr. Wiest, I want to turn to you, and I've got kind of a very specific way I want to unpack this --

MR. WIEST: Okay.

THE COURT: -- based on Ms. Saunders' response.

And the first thing I want to ask you is, is there anything that you could not accomplish in terms of advocating on behalf of Amendment 2 if you are operating in the context of a Political Issues Committee, rather than operating out of the executive committee?

MR. WIEST: Your Honor, there's a couple of problems with that here.

THE COURT: Okay. You know I'm going to give you a chance to make all your arguments --

MR. WIEST: Right.

THE COURT: -- but I want you to focus on my question because I want to know if you can -- if you were

operating out of a Political Issues Committee, whether you could do the yard signs, do the brochures, and most importantly, could you articulate these specific messages that you want to articulate, could you do it in the context of an executive -- the Political Issues Committee?

MR. WIEST: We cannot, and the reason we cannot is the Issues Committee is not allowed to advocate on behalf of candidates.

And so, Your Honor, when we get into the joint expenditure -- this is Doc. 1-1 -- where we're advocating on behalf of a slate, and then we're advocating on behalf of amendments, they cannot do that.

THE COURT: Okay. But you can do that in the executive committee.

MR. WIEST: Well, we can't because they say we can't advocate on behalf of --

THE COURT: I think we -- I think I just heard that the answer is you can do that.

MR. WIEST: No, Your Honor. What she said is you can transfer your money out of the executive committee to the Issues Committee, and then you can only advocate on behalf of the Issues Committee. She did not say -- and this is an important distinction -- that they can go and run this mailer as an Issues Committee because they're advocating on behalf of a slate of the Republican slate. They're saying,

"Vote for these Republican candidates."

THE COURT:  Right, which the executive committee can clearly do, right?  The executive committee funds can clearly say, "Vote for these candidates, these Republican candidates because they support Amendment 2."

MR. WIEST:  Right.  And so the problem here is, the Issues Committee can't advocate on behalf of the Republican slate, and the executive committee, she says, can't advocate on behalf of the amendment.  And so there's no way that either one of them, according to them, can run this joint mailer; that's the problem.

THE COURT:  I don't think that's what I heard, Ms. Saunders.  Do you agree with that?  I mean, you may.  I mean ...

MS. SAUNDERS:  I agree with that up to this point.  Mr. Wiest is correct; there is no way either entity could run that mailer alone.

Now, what they could do is what you had asked earlier, Your Honor, is can they say --

THE COURT:  So let me -- I want to be clear here.  What's wrong with that mailer from the perspective of both entities?

MS. SAUNDERS:  It is -- it's advocating for two different things; it's advocating for candidates and for issues.

Now, you can say that candidates support issues, but if you're just going to support issues, which their mailer does not say.  It doesn't say, "Vote for these candidates because they support these things."  It's almost two halves, "Vote for these candidates; vote for these issues."

Now, what they can do is this.  We have -- and we've had this question before.  I know there are advisory opinions on it.  What the number of them do not spring to mind.  But what they could do, there's nothing that stops you from running joint advertising campaigns.  We have candidates do it frequently.

Where the question will come up is city commissioners and the mayor; that's where we'll see it a lot.  This mayor and this city commissioner, they appreciate each other's stances.  They would like to advertise together because neither one of them have much money.  So they'll say, "Can we run a joint advertisement?"  "Yes, you can run a joint advertisement."

Now, how do you do that?  Well, you've got to make sure that Mayor A is not offsetting Commissioner B.  You know, he can't put in $10,000, and the commissioner put in nothing.

And -- but if -- you have to account for your percentage of it.  So if you were doing half-and-half, if you felt like you were getting 50 percent of the benefit of it, you put up 50 percent of the money, you would report

that on your reports.

There's no reason. You see it with city commissioners a lot too. There might be -- I remember at one time, there were eight of them that essentially wanted to run as a slate. By definition in Kentucky law, it's not a slate. A slate is a particular thing. But they wanted to run together. They each reported, you know, an eighth of that ad. You can do that. You just can't do it the way they've done it.

THE COURT: Well, so, but executive committees could do that. They do that all the time, but they don't do it designed the way that flyer's designed, which has the slate, or the group of candidates that they're advocating for, and then, Oh, by the way, here's an issue we want to --

MS. SAUNDERS: Yeah. To the extent that they do that with candidates, they can, yes.

THE COURT: All right. All right. Mr. Wiest, let me ask you this: What's the importance of putting the group of candidates on this side of the flyer, and then just without connecting them, having just this separate articulation of the support for the amendment on this side of the flyer?

MR. WIEST: There's -- well, there's two things. First of all, Your Honor, you're not going to have two different sides on the same flyer, why you might not want to

do that, but one reason --

THE COURT:  Well, why would you -- so this is about the voice here.  This is about the --

MR. WIEST:  Right.

THE COURT:  -- you know, the speech that you're wanting to protect.  You can -- there are ways within the system for you to be a strong advocate, talking about the executive committee and the Political Issues Committees, those who've contributed to the political cause that you're advocating for, there are ways for that speech to come forward.  You're arguing for a very narrow, I want to say it this way, right?  It's not that I -- I'm being told that I can't say it.  You can say it.  You can say it with this money.  But you're being told I have to say it this way.  And why is it important to say it that way, particularly from a constitutional perspective?

MR. WIEST:  Well, Your Honor, first of all, there is the freedom of speech for these people to design mail, the way that they want to design mail and the message that they want to send.  And the determination has been made by these executive committees that they believe that running a mailer just like the one that we have attached at 1-1 is a way to associate these amendments with these candidates, and they believe that that is going to help elect the candidates, and it's going to help push a platform position

of the Republican Party that is equivalent to these amendments.  And putting them together and combining them they believe is the most effective advocacy.

Now, that may be wise; that may be unwise, I don't know, but they have the right to do it.

THE COURT:  I think that actually happens all the time, and I think I understand, executive committees do that all the time.  What's missing here is you're implying that those candidates support that issue.

I think what Ms. Saunders is saying, you don't have to -- you shouldn't imply it; you ought to say it.  You ought to simply say, "Vote for these candidates because they vote -- they're going to support this constitutional amendment, which is really good."

Why wouldn't you just say that explicitly?  That's what -- that's the implicit message that you're trying to communicate.

And I want to make sure I'm not misstating kind of where the Registry is.  I think you're saying is if that's the kind of brochure that you had, that's okay for the executive committee to do.

MS. SAUNDERS:  Yes, Your Honor.  The problem then becomes -- this becomes when they say, "Vote for this amendment without -- " well, to the, the definition of a Political Issues committee is one that advocates for or

against an amendment.  Without the candidate piece, what you have is a political issue.  And that would require separate reporting, but that's not -- it's a transparency issue. It's not -- we still wouldn't say -- in some respects, if they did what they'd like to do, we would say, "You've incorrectly labeled it."  No one would go back and say that you can't say it.  And quite honestly, nobody ever asked us in the course of this advisory opinion request, could we go in and say, "Candidate, you know, Smith supports Amendment 2."  The answer is yes.

THE COURT:  They're doing that implicitly clearly in that flyer; that makes absolute sense to me, Mr. Wiest. You want to connect those folks to this amendment, so you're going to put it on the same page and the same side and it's going to connect them together.  And the only thing they're not doing is saying that expressly.  They're just -- by implication, anybody that looks at that flyer knows that that's the point they're making.  But that, based on what you're saying is kind of a -- is a technical violation, in essence, of this distinction you make between Political Issues Committee and executive committees.

MS. SAUNDERS:  Yes, Your Honor.  What we were asked to give an opinion on is can executive committees support political issues.  And we said, "No, you have to have a Political Issues Committee."  It's not a limitation

on speakers.  It's a limitation on documentation.

THE COURT:  Well, you understand my -- I'm a little bit weary it's semantical --

MS. SAUNDERS:  It is.

THE COURT:  -- because executive committees can support issues.  They just have to tie it to a candidate.  They do that all the time.  They say, "This is a great candidate because here are the issues this candidate supports."

MS. SAUNDERS:  I understand what you're saying, Your Honor, yes.

THE COURT:  So that's supporting issues and that's -- you know, that's advocating for those issues, because presumably, if you elect that candidate, you're going to support these things, and the assumption is, there are voters who want to support those things.

MR. WIEST:  Your Honor, I think there's no doubt that the Registry has taken the position that the executive committee, which has raised funds, cannot spend those funds on advocating for the amendments specifically.  In other words, "Vote yes," and I think that's clear.  Even if it's joint, they can't -- they cannot do it.

And what I heard today for the first time is, they can take some of that money, register a separate committee for that purpose, and then perhaps they might be able to

ascertain some way to run this where each of these two committees is paying for part of it.

And I will tell you, Your Honor, that issue has been largely addressed by the U.S. Supreme Court in *The Federal Election Commission V. Massachusetts Citizens for Life*, at 479 U.S. 238.  And the Supreme Court said, You don't have to register another committee to engage in the speech that you want to engage in.  There are problems with that from an administrative standpoint.  It squelches speech and it's unconstitutional.  And at bottom, to figure out what the regulation is that we're dealing with, we've got to go and look at the content of this.  So we're back to strict scrutiny.  She says, "Well, geez, it's just a disclosure issue about who's going to report what."  It's not.  It goes well beyond that in terms of -- I mean, there's no doubt that who was contributing to the Boone County Republican Executive Committee is well-known.  I mean, they're taking contributors within limits.  They're reporting it.

If they run this particular mailer, they're required within 48 hours 'cause they're advocating on behalf of candidates to report it.  This isn't a disclosure issue.  This is -- and by the way, she -- I mean, the opinion is you may not spend funds.

Now, could they gerrymander perhaps some way around it with extraordinary difficulty, including registering another

committee and setting it up and all the administrative rigamarole that goes with that?  Perhaps.  But the Supreme Court says that there's a cost to that in *Massachusetts Citizens for Life* that that's unacceptable under the First Amendment.  And so no matter where we're at, we're at 40 years of case law that says they can't do this.

THE COURT:  Ms. Saunders, let's assume that the plaintiffs, that the executive committees in these three counties go forward and just use that particular flyer in their advocacy leading up to the election.  And the Registry says, "Well, that violates the regulatory scheme," what's the consequence?

MS. SAUNDERS:  I can tell you, Your Honor, it's a long way before we get to an actual -- a penalty or an injury or a result.

THE COURT:  So -- and to be clear, my question short-circuited that length of travel and assumes that you're there, what's the consequence?

MS. SAUNDERS:  Assumes that you're there.

What's the consequence?  One of two things.  To the extent that the Registry believes that it was not a knowing violation, and knowing for Registry purposes is aware or should have been aware.

However, you know, you've got to look at the first instance.  Did they -- at the time they raised the funds, at

the time they put it together, were they aware they should have been aware.  I can't see this being recommended as a knowing violation.

In any event, if it was, it would go before the Board. The Board would vote that there was probable cause, or not, to believe that a violation had occurred.

They can at that point, send it to conciliation, which is, you know, we have lots of strange terms for the Registry; it's really like a settlement negotiation.

If you come to conciliation, we'll agree on a fine. Many times that fine's a couple hundred dollars.  That -- sometimes it's nothing.  Sometimes there's a decision that this is so minimal, there isn't -- but I'm not saying that's the case, but that's -- it could be up to the maximum is $5,000; they are correct.  We've seen that in some egregious cases.  I don't know that -- I think I've seen in four years someone paid a maximum fine one time.  And they agreed to it.  They agreed to that in -- absent going forward with the recommendation that it be referred to the AG, because that's the other half.

The other half is if we believed it was a knowing violation, the Board could say, "We want to refer this to the AG's office for possible criminal prosecution because it's a knowing violation."  Those are D felonies for the most part.  There's one that's an A misdemeanor; it's not

one that's involved here.

At that point, we're out of it.  The Registry will -- if they send it back to us, which happens, and they say, "No, we don't believe this was a knowing violation, or we don't believe this is a violation," it goes back essentially for civil action.  And that's where we are.  That would be where we get.

THE COURT:  I think I'm fair to say, it doesn't feel to you like that's where this would end up based on what you know so far, but the stakes are pretty high in theory.

MS. SAUNDERS:  In theory.

THE COURT:  In theory.  For any executive committee that's in this position, or certainly these three plaintiffs here who have kind of this desire to go forward.

MS. SAUNDERS:  That's true, Your Honor.

It's kind of a -- it's almost a double-edged sword at this point because what they have argued is that politics are so rancorous that we're going to get a complaint against us either way.  So the fact that you've said that we don't have this defense, which is really all an advisory opinion is, is a defense, now there's a finding against us, and now we're going to have a -- now there's definitely going to be a complaint because they've seen that you've said we don't have this defense.

If there's no way out of a complaint, I would even more suggest there's no harm because there's nothing the advisory opinion could have done that would have said that would have gotten them out of this complaint.

The Registry is largely complaint-driven. We can take internal action. The way we see that most often is statewide audits. We're required to audit state-wide candidates.

When those audits come through, we then take action based on those audits. Otherwise, what you see are -- is driven by complaints, third-party complaints. And the Registry, once again, can't stop a complaint from coming in. All we can do is process it when it comes. It would frankly be processed the same way whether they'd gotten an advisory opinion or they didn't.

THE COURT: There's been a lot of focus from the plaintiffs on irreparable injury in the context of the preliminary injunction analysis. And I'm focusing on the injury analysis we used at the standing stage.

Mr. Wiest, do you -- would you concede that that's a different analysis, those two are different, particularly because there has to be kind of this imminence analysis as it relates to whatever injury you're facing in terms of a standing analysis?

MR. WIEST: Your Honor, in this context, that's

true.  It's First Amendment pre-enforcement standing that we're looking at.  We're looking at the *McKay* factors under Sixth Circuit precedent that's been articulated further in *Fischer*.  And frankly, all of those are met here.

There's a history of the Registry enforcing its laws, and so we've met the first factor.

There was a letter directed to these plaintiffs that their activities, should they pursue them, are illegal.  And I know the defendants have taken the position, Well, it's just an affirmative defense.  It's just an advisory opinion.

If you look at the Sixth Circuit's discussion, though, in *Kiser V. Reitz*, and that's 765 F.3d 601, the letter that they pen to the defendant in *Kiser* in terms of these warning letters was pretty innocuous.  It was simply, we think what you're doing -- this was the enforcement body, just as KREF is the enforcement body -- we think what you're doing is contrary to law and, therefore, I mean, it was very, very innocuous.  It was giving them advice on what the law was. This was the *Ohio Dentistry Board*, and the Sixth Circuit said, "That counts as a warning letter."

THE COURT:  Pause just a moment.  I'm going to get right back to you.

Do you think your advisory opinion addressed that mailer that was just shown to me?

MS. SAUNDERS:  No, Your Honor.  We didn't hear

about the concept of these joint expenditures until -- and it's in the record.  There was an email exchange after the advisory opinion between myself and Mr. Wiest.  That's when we got to this idea of joint expenditures.  We didn't have the opportunity.

THE COURT:  So you would have been focused on could the executive committee done yard signs and a stand-alone mailer focused solely on Amendment 2?

MS. SAUNDERS:  Yes, Your Honor.

THE COURT:  Okay.  So that's a little bit of a different situation because that's not what your clients want to do.  They actually want to tie it to a particular candidate.

MR. WIEST:  Well, Your Honor, they want to do both.  And one of the County parties indicated they wanted to buy signs that advocate in favor of the amendment.  They still want to do that.  That's also --

THE COURT:  Just the amendment, just the amendment?

MR. WIEST:  Just the amendment.

THE COURT:  So they can do that, but they would have to do it under a Political Issues Committee.

MR. WIEST:  Yeah.  They can't do it.  They would have to form -- their members would have to form some other committee for that purpose is what she says --

THE COURT:  Right.

MR. WIEST:  -- but they cannot do it.

And what the Registry said, and I'm going to quote it; this is what the opinion was, "A county executive committee may not use the funds that it raises for party nominees to support a constitutional amendment."

And what we heard today from them was that they can't do this either.  If it says, "Vote yes on Amendment 1 and Amendment 2," the executive committee can't do it.

Now, maybe they can transfer money and maybe somebody else can join in in this convoluted process, but the opinion that they rendered in terms of what they can do and not do hasn't changed.  The executive committee itself cannot run this mailer, and she has acknowledged that, it would have to be somebody else.

THE COURT:  You'd need to add -- to run that mailer, you'd need to add one sentence, right?  And that sentence needs to be, "These candidates support this amendment?"

MR. WIEST:  Well, no, Your Honor, because they still couldn't do it because there's express advocacy that says, "Vote yes on 1 and vote yes on 2."  They still can't do it.  That's what she said.  They could say these candidates support these amendments, but if the mailer itself engages in express advocacy and says, "Vote yes on 1,

vote yes on 2," now we've got a problem.

THE COURT:  Okay.  And I think that probably you'd agree?

MS. SAUNDERS:  Yes, Your Honor, that's true.

MR. WIEST:  Okay.  So we know that what they said is that you can't do this.  And then we get into my email exchange with Ms. Saunders where I say, "Hey, by the way -- " I tell her we're going to we're going to run these expenditures, and I say, "You know, are you saying you're disavowing enforcement?"  And she says, "No, I can't tell you we're going to ignore a valid complaint."

THE COURT:  Well, of course, she can't do that, right?  I mean, we don't know what it looks like.  You know, the agency here, the Registry here, they don't know what you're going to end up doing.  They can't give you a get-out-of-jail-free card when they don't know what conduct you've decided to engage in.

MR. WIEST:  They do know, though, because they know that -- what they were told was, Hey, we intend to spend some money on advocating for these amendments, and the answer that came back was, "No," so they do know.

THE COURT:  Yeah.  Well, I think that's fair; I mean, they certainly do know that.

MR. WIEST:  And then we get into the other *Fischer* factors, Your Honor.  We talked about the warning letter.

We talked about *Kiser*.

By the way, my email exchange with Ms. Saunders where she says what they want to do is, you know, dancing so close to a violation of law, that she's not able to say that they would ignore a complaint on it.  All of that, I think, gets -- is additional warning language under Sixth Circuit precedent.  And we're back to the third *McKay* factor, which comes right out of *Driehaus*, the U.S. Supreme Court case in *Driehaus*.  Is there a mechanism that makes enforcement more likely or easier?  Do they accept complaints from the public?  Well, plainly they do.  So we checked that box.

And then I've heard today that if they run this mailer -- and I'm talking about this convoluted process of joining with somebody else, but if Boone, Jessamine, Hardin runs a mailer that advocates in favor of these amendments, they're not disavowing enforcement.  So we've got all factors.

Incidentally, Your Honor, it was enough that one of the factors was met in *Kiser*.  The Sixth Circuit said in *Fischer*, You don't need to meet all the factors.  But I would submit to the Court, we've got all four here.  So we're over the standing.  We've got Article III jurisdiction.  We've got redressability.  If you enjoin them from enforcing their restriction on executive committees being able to spend in favor of the amendments, then we've

redressed the injury. So we checked all of the standing boxes under *Rajon*, under *Fischer*, under *Kiser*. I mean, you know, we're there, so ...

THE COURT: So distinguish -- this would be a good time to give you an opportunity to assume standing, assume we kind of got the kind of injury that's needed to invoke the Court's jurisdiction, how does that relate to the irreparable injury in the preliminary injunction context? You know, I think the teaching seems to be that in this First Amendment context, I mean, there's pretty direct teaching on that. So how would you describe that here?

MR. WIEST: Your Honor, we are dealing with election-related speech. The Sixth Circuit precedent's pretty clear on that, too. You know, you could go right back to *Fischer* on that. There's other cases.

If there's likelihood of success on the merits, there is irreparable harm. And obviously here, we've also got -- I should have mentioned this in *Fischer* -- the Jessamine County Party has indicated that they're self-censoring based on this advisory committee opinion, which is -- which goes right to the element of chilling speech; I forgot to mention that before. I did want to wrap that up.

But in the First Amendment context, particularly when you're dealing with an election that's imminent, if there's a likelihood of success on the merits, the other factors

collapse. And there's a number of cases that teach that.

THE COURT: Okay. So let's talk about that, and let me ask you this question, and it goes back to my very first questions.

If -- I think your argument is not that your clients can't say whatever they want to say. It's that it's more difficult than you'd like for it to be for them to say it.

MR. WIEST: I disagree with that, Your Honor.

THE COURT: Okay.

MR. WIEST: My clients are the Boone, Jessamine and Hardin County Republican Parties, and those parties are not allowed to say what they want to say. Those parties cannot say, "Vote yes on 1. Vote yes on 2."

Now, the defendant's response is, Well, yeah, they can't say that, but their members, or some of them, can go and get together and maybe circumvent this some way.

But the reality is, my clients cannot take the funds that they've raised and spend it the way they want to say it, and they've got to go and engage in this circuitous route to get from point A to point B --

THE COURT: But your members can, and they can use the money, and they can do it exactly like you want them to do it, but they do have to register as a different entity in terms of the Registry, and they then subject to different reporting requirements, which are more onerous than the

reporting requirements of the executive committee.

MR. WIEST: Your Honor, and then there's other problems, too, in terms of if they -- figuring out exactly how much money they've got to do to go and generate these mailers and all of that.

THE COURT: Yeah, without question.

It's more cumbersome for them to say what they want to say under that framework than just simply being able to say it as the executive committee of these party organizations in each of the counties. There's no question about that. And the question is, is that constitutionally infirm? Do you -- do you have this kind of Constitutional First Amendment right to say what you want to say as easily as possible, or can you -- because there's certainly no prohibition against speech here in terms of saying what you want to say. I mean, I know you couch it in terms of, Well, as long as we're this entity, we can't say what you -- and you're right. But there is a way of those individuals using that money to say what they want to say.

MR. WIEST: Well, Your Honor, let me give you the hypothetical of what's really going on here. That's like saying, Mr. Wiest, you can't go out on the street corner with a bull horn and say what you want to say, but we're going to allow you to give Mr. Bruns some money to go out and he can go have a bull horn and he can say what he wants

to say, and it's a circumvention of that.

THE COURT: And I don't think -- I like your analogy, but I don't think it's right. I think the analogy here is you get the bull horn. You can't say certain things with the bull horn because you're not registered -- you haven't filed the right paperwork. But if you file different paperwork, you get to say exactly what you want to say, and you get to use the same money that you were going to use initially.

MR. WIEST: Your Honor, we would -- one, I would disagree with that because I do think these entities are combinations of people who have combined for political purposes to do what they want to do. And what they're saying is you have to go and form another process to go and circumvent that with a degree of onerousness in the midst of an election to figure out a way around this that is frankly inappropriate.

THE COURT: And that's a fair argument. The argument can be fair that it makes it harder for me to say what I want to say, and under First Amendment jurisprudence, you can't make it harder.

MR. WIEST: Well, and, Your Honor, there was some discussion of that in *Massachusetts Citizens for Life* because in that case, there was a corporation that was formed that wanted to engage in Pro-Life advocacy. And what

they had to do under the -- under federal law, under the FEC regulations, was they had to go and create a separate PAC -- if it sounds familiar it's because it is -- to go and engage in the speech that they wanted to engage in. And the Supreme Court said that that was unacceptable. That was an unacceptable burden to put on them, because ultimately, all of that hoop-jumping that they were required to do dissuaded speech, slowed speech, dissuaded people from undertaking those obligations, and it was an unacceptable burden under the First Amendment. I would submit to the Court the same is true here.

THE COURT: You want -- your -- the members of the executive committee want to use this money -- have speech the way they want to say it, but they only want to report it twice a year; they don't want to have to report connected to the election.

MR. WIEST: Well, Your Honor, the statutes only require them to support -- to do it twice a year --

THE COURT: Right.

MR. WIEST: If the legislature decided that if they were to engage in this type of speech, they had to do it more often, we would be fine with that.

If KREF said, You know what? We'll let you do it, but we want a report from you 60 days, 30 days, 15 days out, they would do that, too, in terms of the specific

expenditures. That's not what KREF is saying. KREF is saying, "You can't do it."

THE COURT: It's almost like you're saying there's a constitutional right to have the nomenclature assigned to you of executive committee versus Political Issues Committee because that's really the distinction here, I think, as I'm understanding it. They're not -- they're separate organizational structures, but the people are the same, the money's the same.

MR. WIEST: Well, Your Honor, what I am saying is that --

THE COURT: And I may be wrong. I mean, if I'm wrong about that ...

MR. WIEST: What I am saying is that the organization that is formed to advance the Republican Party and its values in Boone, Hardin and Jessamine Counties have a right, having formed an organization to advance political goals, to engage in the speech that they want to engage in, and that it is not necessary to form a separate organization for them to carry out the speech that they want to engage in. It's strict scrutiny. They've got a burden of demonstrating compelling interests that's narrowly tailored, and they don't do it. That's what I'm saying.

THE COURT: Has there ever been a case that has looked at this structural issue? In other words, I

understand the distinction between the Political Action Committee and another kind of political entity. Is that the closest analogy to what we have here?

I think there are -- I don't think that a Political Issues Committee is synonymous with a Political Action Committee in Kentucky.

MS. SAUNDERS: No, Your Honor.

THE COURT: Yeah, that's a different entity.

MS. SAUNDERS: Yeah. For Kentucky purposes, we call those permanent committees, and it's really kind of the way it sounds. But for -- they also support candidates. They report on a completely different schedule; actually they report quarterly.

But no, we wouldn't say that they rep -- they could -- we've actually had this come up in the last round of amendments -- of amendment vote, there was one about abortion or Pro-Life, depending on what side you stand on it. And one of the Pro-Life organizations called us and they said could we or could our permanent committee -- and I think they had a federal PAC as well -- could we support -- we want to support this amendment. And we told them the same thing. We said, "When you start supporting the amendment, you report as a Political Issues Committee."

THE COURT: So the answer's yes, you can, but you just got to report differently.

MS. SAUNDERS: You report differently.

THE COURT: Well, that's what I'm wrestling with, Mr. Wiest, is that you're not being told no, right? You're not being told you cannot -- you're being told you cannot speak kind of under the structure you're on, but nobody's telling you you can't say or do or create the, you know, what you want to create here, I don't think. Unless -- maybe it's correct that the Political Issues Committee can't do this either, right? Is that part of the problem --

MS. SAUNDERS: I think that would be fair.

THE COURT: -- is that the Political Issues Committee has to just do the stand-alone.

MS. SAUNDERS: Yes, Your Honor.

THE COURT: So for them to accomplish what they want to accomplish, they can do the stand-alones, but those counties that want to do that have to kind of register as a Political Issues Committee. They can tie them to the candidates, but they have to do it expressly. They have to say, "Vote for these candidates because support this."

MS. SAUNDERS: Yes, Your Honor. Or they could support a political issue by name. They could call their Political Issue Committee Hardin County Republicans. They could even call it Hardin County Republicans. They wouldn't have to call it -- support Amendment 2. But they could do that, too, if they wanted.

THE COURT:  Yeah.  There is a little bit of an anomaly here doing what they want to do, but it feels a little bit contrived in order to invoke the constitutional issue, to be candid with you.

But this little bit where they want to put them both on the same piece of paper, it seems like they ought to be able to do that at some point, somewhere, somehow, and they're caught; neither one of these entities can do it.

I'm not sure they're actually caught.  The executive committee actually might very well be able to do it in the end.

MS. SAUNDERS:  They could through -- if they had two reporting structures.

Think about it like this:  If you didn't want to call it -- you could say, "We have to report in two different ways."  They could overlap the officers.  They could have overlapping membership.  They just report different reports based on whether the election is imminent, whether they're talking about a political issue that's on the ballot coming up in November.

THE COURT:  So that's more complicated and that's more burdensome, but that would -- they could use that flyer under that scheme of the reporting mode?

MS. SAUNDERS:  They would be reporting both ways.  But yes, it would definitely require more reports, but if

you look at *Citizens United*, and you look at *Buckley*, and you look at *McCutcheon*, they all recognize this interest in getting out information about the election in time for the electorate to use it.

If we said, "All right.  You don't have to do any of this, you just report as an executive committee, well, that information comes out in December."

Now, they're going to argue, and they have argued that, No, no, we report -- we could report independent expenditures.  Those reports come out in 48 hours, but they're only for candidates.  You don't report independent expenditures for issues.  So in some respects, it still doesn't fix the problem.

THE COURT:  I see.

Mr. Wiest.

MR. WIEST:  Two points, Your Honor.  I know you just mentioned "contrive."  I asked them, I said, Why -- you know, what about this running an Issues Committee?  And the response was, "It costs money.  It costs money to mail out to, you know, 30,000, 40,000 people in Boone County a mailer.  There's a cost associated with that.  And so the prospect that somehow they should run, for instance, two separate mailers at double cost for a county executive committee that has somewhat limited resources, is a problem. I mean ...

THE COURT:  And look, I want -- I think you ought to be able to do that, right?  I think you ought to -- I think an executive committee ought to be able to produce that flyer and ought to be able to -- or I think these -- I think that speech ought to be allowed.

The problem here from your perspective, and the only way it's allowed is this double reporting that would have to take place, this rather Byzantine -- you know, you've got on the one hand, you're advocating for the issue, on the other hand, you're advocating for these candidates, and you want to put it on the same piece of paper for the money reasons. I think you ought to be able to do that.  And the only way you can do that is continue to report as an executive committee, but also register as a Political Issues Committee, and kind do this dual reporting that's going to have to take place 'cause you're trying to do both of those things on one piece of paper.

MR. WIEST:  And, Your Honor, there's another problem with that.  I don't know, looking at this, you know, how you would sit there -- because when somebody runs, for instance, a mail shop decides that they're going to go and they're going to go do printing and mailing and they come up with a cost, how do you divide it?  Do you do it 50/50? What if they don't agree with it?  What if they say, "You know what, we don't agree that that's 50/50."  That's an

inappropriate allocation because you've got this joint expenditure. She just talked about, you know, the free rider problem in the city council election. That is a path fraught with peril for people engaged in political speech.

And I think, you know, as somebody who advises organizations sometimes on First Amendment issues, I would say, You know, be real, real careful with that. And we shouldn't be dealing with that in the context of an election and political speech where they've got a strict scrutiny burden.

You know, it is enough, in my view, particularly when we start to look at -- by the way, this is a candidate advocacy piece. It says, "Support the following candidates and causes", and so that it is going to trigger the 48-hour reporting, at least as applied to this particular mailer. And what is the point of that? What interest is furthered by that? I look at that and I'm like, there is disclosure here, particularly on this piece. You know, perhaps if the -- well, they are, Hardin, I think, has indicated they're ordering signs. It's going to say, "Vote yes on 2," I believe. But in all events, I look at this and I'm like, what is the purpose of this -- you are restricting their speech, or you're making them jump through a bunch of administrative hoops, you know, to go and make a disclosure, I suppose, and, you know, we're happy -- I think my clients

would be happy to engage in additional reporting if you wanted to craft injunctive relief, and that's actually the concern.

But if the legislature doesn't allow this, and they don't, then they need to allow it, and if they want to require more disclosure, that's the less restrictive means of getting there, as opposed to saying you've got to jump through all these administrative hoops that creates significant burdens on speech that the Supreme Court has recognized in *Massachusetts Citizens for Life*.

THE COURT:  Well, the legislature in some sense has required kind of more disclosure in some circumstances and less disclosure in the other, and I don't know about the efficacy of that.  I don't know whether that's good policy or not, but it's not my job to kind of decide what the policy is.  It's just simply to, in this case, decide whether or not that policy has a chilling effect or an unconstitutional and impermissible effect in your ability to say what you want to say.

MR. WIEST:  That's right.

THE COURT:  I do feel you get to -- you can say what you want to say, but I'm very aware and very focused on, you know, the fact that there is a fairly complicated way of accomplishing that simply because of the policy that's in place.  And that -- I'm not going to say there

should be a better policy or there should be some, you know, hybrid approach that addresses these; all that would be better.  The question is, is the cumbersomeness of this rising to the level of limiting these political speakers in their desire to speak.  And I think that's a very fair argument.

MR. WIEST:  And, Your Honor, I don't even think it's a tough question.  The Supreme Court's already again, decided it, and said that it's not enough to have a separate organization in *Massachusetts Citizens for Life,* because that was the argument there.  You just -- the corporation just had to form a separate PAC, and the Supreme Court said, "No, you cannot constitutionally apply it.  You cannot count that as the alternative."  That's the same here.  So I think we've got on-point precedent that forecloses the argument that they're making.

THE COURT:  Well, we'll consider that carefully, for sure.

Ms. Saunders, any points that you came in here today wanting to make and haven't had a chance to do that?

MS. SAUNDERS:  Yes, Your Honor, a couple things -- well, and I'd like to address a couple things Mr. Wiest had said.

We've argued that this isn't a strict scrutiny case; it's exacting scrutiny --

THE COURT:  Yes --

MS. SAUNDERS:  -- as you've, you've seen that.

THE COURT:  -- and I'm aware of that.

MS. SAUNDERS:  The allocation issue, I can -- I could provide documents that I can -- that come to mind right now where we have told other committees, "Do the best you can.  We're not going to come, go through your books."  That's not a -- that's not an issue that we regulate, I believe, as closely as they think we do.

THE COURT:  But you could.

MS. SAUNDERS:  No, we -- I guess we could.  You know, I don't know if we could.  We'd have to -- for similar elections, we'd have to do everyone in the state.  I suppose we could, but the likelihood that we would, would be very minuscule.

This idea that it's some onerous schedule, that they have to create some duplicative process, that it's some onerous schedule.  They would be reporting the exact same thing, the exact same -- you would go in, you would log in, you would report the exact same entries.  You would just report them at a different time.  So am I putting them in twice?  No.  Am I having to send in duplicative reports?  No.  The only thing I'm doing is I'm sending them in on a different schedule.  I'm not creating -- that'd be -- the $20,000 that Boone County Republicans is holding would not

be reported under the committee.  It would be reported under the Political Issues Committee -- or under the executive committee; it would be reported under the Political Issues Committee.

THE COURT:  I guess there's the allocation issue, though.

MS. SAUNDERS:  There's the allocation issue.  But to the extent that they've said in their complaint that they've raised these funds, I'm assuming they know what funds they've raised.  You know, they've said, "We've got $20,000 here, we've got 10 here, we've got 10 here," they know what should go in that Political Issues Committee. They know what they've raised for the issue.

One final thing.  This isn't a case where we're telling a corporation that they have to register as a permanent committee; it's not even similar to that.  It's -- so a corporation speaks as a person.  It's a person under Kentucky law, under, you know, federal law, it's its own person.  It doesn't register as a committee.

So if you're telling someone that in the case Mr. Wiest cited, what you're telling this corporation is, Well, you now have to come in and you're subject to all these registration requirements.  And you just want to put out a ad.  It'd no different than, you know, if I, myself went out and put out, you know, a sign in my yard that I

hand-lettered, and I said, you know, "Support Amendment 2."

Now, you're subject to these -- all these registration requirements.  You have to report as a committee.

We're telling a committee they have to report in a different way.  They have to report essentially as a different type of committee, but it's not that they have to create a brand new structure.  They can use the same officers, they can use everything -- it's not the same level of burden, I think, as he's trying to argue.

THE COURT:  Okay.  All right.

Mr. Wiest.

MR. WIEST:  Your Honor, let me -- yeah, if I may.

THE COURT:  Please.

MR. WIEST:  I want to read this because I think it deals with a lot of what we talked about here today.  And again, I'm quoting from *Massachusetts Citizens for Life*, 479 U.S. 238 at 252.

"The FEC maintains the impact of the legislation on *MCFL's* First Amendment rights by emphasizing that the corporation remains free to establish a separate segregated fund composed of contributions earmarked for that purpose by the donors that may be used for a limited campaign spending. However, the corporation is not free to use its general funds for campaign advocacy purposes.  While that is not an absolute restriction on speech, it is a substantial one.

Moreover, even to speak through a segregated fund, MCFL must make very significant efforts", and then they get -- it gets in -- the Supreme Court then discusses the administrative burden.

So there is this suggestion, the Supreme Court has called the burden a significant one and ultimately struck down the restriction there; the same follows here.

THE COURT:  Good.

MR. WIEST:  Thank you, Your Honor.

THE COURT:  We'll take a very good look at that case.

Are the reporting -- I assume the reporting requirements and the timing are not regulatory; they're statutory.  They're part of the statute that --

MS. SAUNDERS:  That's correct, Your Honor.

THE COURT:  Okay.

And then, Mr. Wiest, I want to make sure you've made your points, the good briefing there typically is in these cases, and you've asked the Court to try to adhere to a very tight timeline in this case.  I'm pleased to try to do that. We're going to try to resolve this -- these preliminary issues as promptly as possible, but I want to make sure ...

MR. WIEST:  Yes, Your Honor.

Again, I would point the Court back to *Massachusetts Citizens for Life*.  There's a discussion there about

reporting and the burden of reporting. There's a discussion in there about the burdens being more extensive than if it were not incorporated or were not an individual. That's on point. There's a discussion in there about raising funds. And this concern that I think the defendants have raised about, Well, geez, you've solicited funds for one purpose and maybe you're using it for another. And there's a discussion of 261 in that decision about the fact that when you raise funds generally to a political organization, there's a delegation and there's no real concern as the defendants put out.

So I do think, you know, the Supreme Court has addressed these issues in *Massachusetts Citizens for Life*, and frankly, a lot of the other cases that we briefed. But everything that they've raised pretty much seems to be addressed and frankly rejected by the Supreme Court in 1986 in the *Citizens for Life* case, and I would ask the Court to take a good look at that.

THE COURT: One final question. What's the scope of the preliminary injunction you're seeking? What does it look like? What are you asking to be enjoined?

MR. WIEST: Your Honor, that seems to be a moving target. We would ask an injunction against the defendants in their official capacity from being able to enforce -- and the only spending restriction we found was in 175, although

they say there's another one.

Kentucky law -- the Kentucky Campaign Finance Law, Chapter 121 against executive committees for spending in favor -- or frankly, in opposition, if there were folks on the other side of the aisle to the constitutional amendments. As applied to that, they cannot enforce 121.

THE COURT: Take enforcement action. They can't take enforcement action when an executive committee expends funds for purposes of advocating on issues.

MR. WIEST: On the constitutional amendments, that's correct, yes.

THE COURT: Just the constitutional amendments?

MR. WIEST: Well, I think they would acknowledge that perhaps they could engage in issue advocacy. They may not -- I think the term is they may not use the funds that it raises for party nominees to support a constitutional amendment.

I would guess if you would ask Ms. Saunders, she would say the same thing if somebody were opposing the amendment, but the same would follow. So I think it's issue advocacy specifically related to the constitutional amendments.

THE COURT: Anything final, Ms. Saunders?

MS. SAUNDERS: I don't believe so, Your Honor. I think we've covered it.

THE COURT: All right. Well, thank you for your

time on this Friday afternoon. I hope everybody has a good weekend. And the matter will stand submitted. And, of course, we're going to turn to it promptly. I'm going to try very hard to kind of hold to the timeline that the parties have asked me, particularly the plaintiffs, have asked me to consider the case before me.

We stand adjourned for the day.

*(End of proceedings – 4:03 p.m.)*

* * * * *

**C E R T I F I C A T E**

I, SANDRA L. WILDER, RMR, CRR, certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.


/s/ Sandra L. Wilder RMR, CRR    Date of Certification:
Official Court Reporter         August 25, 2024