Case No. 24-5783

# UNITED STATES COURT OF APPEALS FOR THE SIXTH CIRCUIT

Boone County Republican Party Executive Committee, *et al.*

*Plaintiffs-Appellants*

v.

H. David Wallace, *et al.*

*Defendants-Appellees*

On Appeal from the United States District Court
for the Eastern District of Kentucky
Case No. 3:24-cv-00049-GFVT

## AMICUS BRIEF OF THE COMMONWEALTH OF KENTUCKY IN SUPPORT OF PLAINTIFFS-APPELLANTS' EMERGENCY MOTION FOR AN INJUNCTION PENDING APPEAL

Russell Coleman
*Attorney General*
Matthew F. Kuhn
*Solicitor General*
John H. Heyburn
*Principal Deputy Solicitor General*
Elizabeth Hedges
*Assistant Solicitor General*

Office of the Kentucky
Attorney General
700 Capital Avenue, Suite 118
Frankfort, Kentucky 40601
(502) 696-5300
Elizabeth.Hedges@ky.gov

*Counsel for Amicus Curiae*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........ ii

INTEREST OF AMICUS CURIAE........ 1

I. Kentucky legislators and their parties are central to the debate over Amendment 2........ 2

II. KREF's opinion misinterprets Kentucky law. ........ 3

III. KREF's opinion violates the First Amendment. ........ 5

CONCLUSION ........ 11

CERTIFICATE OF COMPLIANCE ........ 12

CERTIFICATE OF SERVICE ........ 13

# TABLE OF AUTHORITIES

## Cases

*Ams. for Prosperity Found. v. Bonta*,
594 U.S. 595 (2021) ..... 8, 9

*Carey v. Wolnitzek*,
614 F.3d 189 (6th Cir. 2010) ..... 5

*Citizens United v. FEC*,
558 U.S. 310 (2010) ..... 1, 6, 7, 8, 9

*Commonwealth ex rel. Cameron v. Johnson*,
658 S.W.3d 25 (Ky. 2022) ..... 2

*FEC v. Cruz*,
596 U.S. 289 (2022) ..... 6, 8

*FEC v. Mass. Citizens for Life, Inc.*,
479 U.S. 238 (1986) ..... 8

*Reed v. Town of Gilbert*,
576 U.S. 155 (2015) ..... 5, 6

## Constitutional Provisions

Ky. Const. § 256 ..... 2

U.S. Const. amend. I ..... *passim*

## Statutes

Ky. Rev. Stat. § 117.035(2)(d)(3) ..... 4

Ky. Rev. Stat. § 117.045(2) ..... 4

Ky. Rev. Stat. § 118.015(1) ..... 4

Ky. Rev. Stat. § 118.325(6) ..... 4

Ky. Rev. Stat. § 121.015(d) ..... 3

Ky. Rev. Stat. § 121.120(6)(j) ..... 7

Ky. Rev. Stat. § 15.020(3) ..... 1

**Regulations**

32 Ky. Admin. Regs. 1:050 § 1(1) .......... 4, 5

**Rules**

Fed. R. App. P. 29(a)(2) .......... 1

**Other Authorities**

2021 Ky. Acts ch. 167 .......... 2

H.B. 2, 2024 Gen. Assemb., Reg. Sess. (Ky. 2024) .......... 2

Ky. Registry of Election Fin., "Political Issues Committee," https://perma.cc/2LGQ-M828 .......... 5, 10

Ky. Registry of Election Fin., "Executive Committee," https://perma.cc/4ABU-9HRB .......... 5

Ky. Registry of Election Fin., Advisory Opinion 2024-02 .......... 1, 4, 7

## INTEREST OF AMICUS CURIAE[1]

Under Kentucky law, Attorney General Russell Coleman has the authority to represent Kentucky in any case "in which the Commonwealth has an interest." Ky. Rev. Stat. § 15.020(3). The Commonwealth has a profound interest in protecting the free-speech rights of all political parties within its borders, no matter their views. This is especially so when an agency of the Commonwealth exercises its authority to unlawfully burden speech. After all, "[s]peech is an essential mechanism of democracy, for it is the means to hold officials accountable to the people." *Citizens United v. FEC*, 558 U.S. 310, 339 (2010).

The Kentucky Registry of Election Finance (KREF) recently issued an opinion telling two of the plaintiffs, which are local party executive committees, that they "may not use the funds that [they raise] for party nominees to support a constitutional amendment." R.1-3 (AO 2024-02), PageID#23. Violating this content-based prohibition could result in fines and potentially even criminal charges. The district court, however, declined to enter a preliminary injunction because it found no First Amendment violation. That holding should be swiftly corrected, before the "opportunity to persuade" voters in this November's election "has passed." *See Citizens United*, 558 U.S. at 334. The Commonwealth respectfully urges the Court to uphold the First Amendment's protections for all political parties in the Bluegrass State.

---

[1] The Commonwealth may file this brief without party consent or leave of the Court. *See* Fed. R. App. P. 29(a)(2).

## ARGUMENT

### I. Kentucky legislators and their parties are central to the debate over Amendment 2.

The campaign for what is known as Amendment 2—which prompted this litigation—uniquely implicates Kentucky's legislators and thus their political parties.

The story begins in 2021, when Kentucky's legislature passed the Education Opportunity Account Act. *Commonwealth ex rel. Cameron v. Johnson*, 658 S.W.3d 25, 29 (Ky. 2022). That law authorized tax credits for contributions to nonprofit organizations that provide funds for "various education-related expenses"—including nonpublic school tuition—for low-income families. *Id.*; *see* 2021 Ky. Acts ch. 167 §§ 5–19. The Kentucky Supreme Court unanimously invalidated the Act under the state Constitution. In a sweeping opinion, the court held that the legislature is forbidden from raising money for nonpublic education. *Johnson*, 658 S.W.3d at 36. The court was clear about the proper next step: "if the legislature thinks the people of Kentucky want this change, it should place the matter on the ballot." *Id.* at 39 (cleaned up) (citation omitted).

Thus began the push for Amendment 2. In Kentucky, proposed constitutional amendments must pass the legislature before submission to the voters. Ky. Const. § 256. So in response to *Johnson*, the General Assembly passed H.B. 2 as a ballot initiative for the 2024 election. The initiative would essentially amend Kentucky's Constitution to empower the General Assembly to do what *Johnson* forbade. H.B. 2, 2024 Gen. Assemb., Reg. Sess. (Ky. 2024).

As this background demonstrates, Kentucky's legislators are bound up with Amendment 2. On the front end, Kentucky's high court invalidated *the General Assembly's* work. In response, *the legislature* proposed a constitutional fix. And if that amendment is successful, it will empower *the General Assembly* to pass school-choice legislation. So from start to finish, Amendment 2 uniquely implicates Kentucky's legislators and thus the political parties they represent. Separating speech about candidates and proposed amendments, as KREF's opinion envisions, overlooks what Amendment 2 is all about.

## II. KREF's opinion misinterprets Kentucky law.

While KREF's opinion contravenes the First Amendment, it also misinterprets Kentucky's laws and regulations—especially so given the constitutional backdrop.

Political-issues committees are defined by statute as "three (3) or more persons joining together to advocate or oppose a constitutional amendment or public question which appears on the ballot if that committee receives or expends money in excess of one thousand dollars ($1,000)." Ky. Rev. Stat. § 121.015(d). By contrast, executive committees of state- and county-level political parties are defined not by statute but by regulation. That regulation provides that an executive committee is "an organizational unit or affiliate recognized within the document governing a political party," which "raises and spends funds to promote political party nominees, and performs other activities commensurate with the day-to-day operation of a political party, including voter registration drives, assisting candidate fundraising efforts, holding state

conventions or local meetings, and nominating candidates for local, state, and federal office." 32 Ky. Admin. Regs. 1:050 § 1(1). Party leadership has authority to choose and recognize executive committees. *See, e.g.*, Ky. Rev. Stat. §§ 117.035(2)(d)(3), 117.045(2), 118.325(6).

Whether at the state level or locally, political parties obviously support and oppose both candidates and issues. And by design, local executive committees like the plaintiffs here have the closest relationships with local voters. It follows that they know best what local voters care about. One way local parties boost turnout is by publicizing the election in the way that moves the needle locally, as the plaintiffs here want to do. Maybe promoting candidates is the right approach. Or maybe a certain issue resonates. Or maybe a combination of candidates and issues works best. No matter what, candidates and issues are inseparable and mutually reinforcing for parties in reaching voters. Indeed, in defining "political party," Kentucky law recognizes the inherent connection among parties, candidates, and policy issues. *See* Ky. Rev. Stat. § 118.015(1).

That's why KREF's opinion cannot be right under Kentucky law. It rests on a strained interpretation of the regulatory definition of "executive committee." KREF determined that "supporting a constitutional amendment" is not "one of the 'other activities commensurate with the day-[to-day] operations of a political party'" under the applicable regulation. R.1-3 (AO 2024-02), PageID#23. That determination has two overriding flaws. First, the regulation's list of activities executive committees may conduct is non-exhaustive. Second, advocating for constitutional amendments fits

easily within two parts of the regulation. Promoting an amendment popular with a party's voting base promotes "party nominees" who support the amendment. *See* 32 Ky. Admin. Regs. 1:050§ 1(1). And because issues and candidates are inextricably connected, "other activities commensurate with the day-to-day operation of a political party" naturally includes issue advocacy. *See id.* In sum, despite KREF's view, Kentucky law favors more, not less, speech in the lead-up to a ballot initiative.

One more clarification on the differences between political-issues committees and executive committees. It's true that political-issues committees have "a different disclosure schedule than" executive committees. R.22 (Order), PageID#219. But that is not the only major difference. Executive committees also face stricter contribution limits. *Compare* KREF, "Executive Committee," https://perma.cc/4ABU-9HRB, *with* KREF, "Political Issues Committee," https://perma.cc/2LGQ-M828. Thus, engaging in issue advocacy does not transform an executive committee into a de facto political-issues committee. Executive committees' spending power remains much more limited.

## III. KREF's opinion violates the First Amendment.

If KREF enforces its view of Kentucky law, the government will "censor speech based on its content in the most basic of ways." *See Carey v. Wolnitzek*, 614 F.3d 189, 198–99 (6th Cir. 2010). That is because KREF's opinion prevents executive committees "from speaking about some subjects . . . but not others." *Id.* at 199. Under the First Amendment, content-based speech regulations are "presumptively unconstitutional." *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015). A regulation is "content-based" if it

"applies to particular speech because of the topic discussed or the idea or message expressed." *Id.* at 163. Strict scrutiny applies to such regulations. *Id.* at 165. In particular, strict scrutiny applies to regulations "that burden political speech." *Citizens United*, 558 U.S. at 340 (citation omitted). Under that standard, the government must "prove that the restriction 'furthers a compelling interest and is narrowly tailored to achieve that interest.'" *Id.* (citation omitted).

Strict scrutiny is a steep hurdle in political-spending cases. The Supreme Court "has recognized only one permissible ground for restricting political speech: the prevention of '*quid pro quo*' corruption or its appearance." *FEC v. Cruz*, 596 U.S. 289, 305 (2022) (citation omitted). Thus, to justify prohibiting issue advocacy by executive committees, KREF must show that the prohibition is narrowly tailored to prevent corruption or its appearance. On this record, KREF has not done so.

**1.** To start, KREF has identified no risk or appearance of corruption that it seeks to prevent. It has simply invoked a non-specific interest in transparency. R.14 (Response), PageID#131. But transparency is not the compelling interest the Supreme Court recognizes. *See Cruz*, 596 U.S. at 305; *see also FEC v. Nat'l Conservative Pol. Action Comm.*, 470 U.S. 480, 498 (1985). Because KREF offers no compelling interest, its speech restriction fails strict scrutiny.

**2.** Even if transparency were a sufficient interest, KREF's restriction is not narrowly tailored to achieve it. KREF's opinion sweeps much too broadly. It says that "a county executive committee *may not use* the funds that it raises for party nominees to

support a constitutional amendment." R.1-3 (AO 2024-02), PageID#23 (emphasis added). But if transparency is the goal, why not just require executive committees to disclose issue-advocacy spending more often? *See Citizens United*, 558 U.S. at 369 (explaining that "disclosure is a less restrictive alternative to more comprehensive regulations"). Kentucky's legislature is free to do that. Indeed, Kentucky law requires independent expenditures to be disclosed within 48 hours. Ky. Rev. Stat. § 121.120(6)(j). This less-restrictive alternative shows that KREF fails narrow tailoring. *See Citizens United*, 558 U.S. at 337, 362.

**3.** Despite the content-based restriction in KREF's opinion, the district court did not consider whether strict scrutiny applied. Instead, it held that KREF requires only a disclosure obligation. R.22 (Order), PageID#220. It also held that setting up a political-issues committee to engage in the proscribed speech imposes only a "minimal" burden. *Id.* at PageID#217. But Supreme Court precedent forecloses each step of that reasoning.

**a.** To begin with, AO 2024-02 is a textbook content-based restriction on speech. KREF told local executive committees they "may not" use funds to engage in issue advocacy. That content-based prohibition defies *Citizens United*'s rule that the government "is constitutionally disqualified from dictating the subjects about which persons may speak and the speakers who may address a public issue." 558 U.S. at 347 (citation omitted).

KREF counters, and the district court emphasized, that the plaintiffs' members can create a political-issues committee to speak about Amendment 2. But that argument runs headlong into another part of *Citizens United* that holds that the potential of creating a separate entity to engage in proscribed speech does not solve the First Amendment problem. More specifically, the Supreme Court held that an "outright ban" on election-related communications by corporations was in fact "a ban on corporate speech" even though "a PAC created by a corporation can still speak." *Id.* at 337. That was because a "PAC is a separate association from the corporation." *Id.* The Court couldn't have been clearer: a "PAC exemption . . . does not allow corporations to speak." *Id.* As the plaintiffs note (at 19–20), the Supreme Court reached an analogous conclusion in *FEC v. Massachusetts Citizens for Life, Inc.*, 479 U.S. 238, 252 (1986) (*MCFL*).

**b.** The district court found the burdens of speaking in *MCFL* were more severe than those involved in setting up and running a Kentucky political-issues committee. R.22 (Order), PageID#217–19. Respectfully, even if true, that matters not. Characterizing a burden "as minor and insignificant" is not a strict-scrutiny escape hatch. *See Cruz*, 596 U.S. at 305. Though "the extent of the burden may vary," if a "law does burden First Amendment electoral speech," then it "must at least be justified by a permissible interest." *Id.* As noted above, KREF identifies no such interest. On top of that, narrow tailoring is not "required only for laws that impose severe burdens." *Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 611 (2021). Instead, the Supreme Court determines whether a regulation "'broadly stifle[s]' First Amendment freedoms" by

considering "the scope of challenged restrictions—their breadth—rather than the severity of any demonstrated burden." *Id.* at 610. Consistent with that approach, *Citizens United* made clear that creating a separate entity does not allow an organization to speak—period. 558 U.S. at 337. Only then did it discuss the burdens of creating a separate entity and reach its alternative holding: "[e]ven if a PAC could somehow allow a corporation to speak—and it does not—the option to form PACs does not alleviate the First Amendment problems[.]" *Id.* On its face, KREF's opinion categorically limits *what* executive committees can say. It matters not whether the burden imposed is light, heavy, or in between. *See Bonta*, 594 U.S. at 611.

None of this is to minimize the real burdens involved in setting up a political-issues committee so close to an election. With limited days left in the campaign season and the need to start printing mailers *now* and reaching voters *now*, members of an executive committee should not have to scramble to set up another entity. The plaintiffs' motion (at 21–23) details all that requires. And given KREF's view that an executive committee can't spend money on issue advocacy, it would seem to follow that transferring money from an executive committee to a political-issues committee is a no-go. Although KREF quibbled below about whether all or some of the funds raised by an executive committee can be transferred to a political-issues committee, R.25 (Transcript), PageID#239–40, 245, 279, part of its website states that an executive committee is "[p]rohibited" from contributing to a political-issues committee, *see*

KREF, "Political Issues Committee," https://perma.cc/2LGQ-M828. For all these reasons, setting up a second committee is not a real solution.

**c.** Even if the plaintiffs' members quickly jump through the hoops of establishing a separate political-issues committee and perhaps raising new money, they *still* may not speak as they wish. Remarkably, KREF made clear below that neither an executive committee nor a political-issues committee may independently run a flyer such as the one proposed by Boone County's local party, with a list of candidates on one side and amendments on the other. R.25 (Transcript), PageID#247, 271; *see* R.1-2 (Flyer), PageID#20. The only way for a local political party to engage in this speech, it seems, is for its members to register *both* an executive committee and a political-issues committee and report the flyer as a "joint expenditure" split between the two committees. R.25 (Transcript), PageID#248. Otherwise, the plaintiffs' members must run *two* flyers: one advocating for candidates and another for issues. Of course, that would entail double the expense. This tangle of complications ups the burden of going the political-issues-committee route. Not only must members of executive committees establish and run a political-issues committee, they also must judge whether an advertisement is issue-focused enough to require joint expenditures and then figure out how to accomplish those joint expenditures.

One final point. The view of permitted and prohibited speech expressed by KREF at the preliminary-injunction hearing removes all doubt about whether its restriction is content-based. KREF stated that an executive committee may run a flyer

that says, "Vote for these candidates because they support these things." *Id.* at PageID#247–48. But it may *not* run a flyer that says, "Vote for these candidates; vote for these issues." *Id.* That line-drawing can only be understood as a content-based restriction. And it's hard to conceive of any rational reason, much less a compelling one, for the government to slice and dice approved and unapproved political speech in this way. Under the First Amendment, the government, on pain of fines or criminal prosecution, cannot tell political parties how to speak about the issues of the day.

## CONCLUSION

The Court should hold that the plaintiffs established a violation of the First Amendment.

Respectfully submitted,

*s/ Elizabeth Hedges*
RUSSELL COLEMAN
*Attorney General*
MATTHEW F. KUHN
*Solicitor General*
JOHN H. HEYBURN
*Principal Deputy Solicitor General*
ELIZABETH HEDGES
*Assistant Solicitor General*
**OFFICE OF THE KENTUCKY ATTORNEY GENERAL**
700 Capital Avenue, Suite 118
Frankfort, Kentucky 40601
(502) 696-5300
Elizabeth.Hedges@ky.gov
*Counsel for Amicus Curiae*

## CERTIFICATE OF COMPLIANCE

1. This brief complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) and 27(d)(2)(A) because the brief contains 2,594 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2. This brief complies with the typeface requirements of Fed. R. App. R. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because the brief has been prepared in a proportionally spaced typeface using Microsoft Word 14-point Garamond font.

*s/ Elizabeth Hedges*

## CERTIFICATE OF SERVICE

I certify that on August 29, 2024, I electronically filed this brief with the Clerk of the Court for the United States Court of Appeals for the Sixth Circuit using the CM/ECF system. I further certify, pursuant to 6 Cir. R. 25(f), that all counsel of record in the case are registered CM/ECF users and will receive service through the CM/ECF system.

*s/ Elizabeth Hedges*